No. 25-1910

# In the United States Court of Appeals
## For the
## Fourth Circuit

CITY OF MYRTLE BEACH, SOUTH CAROLINA

Petitioner,

*v.*

HORRY COUNTY, SOUTH CAROLINA;
FEDERAL AVIATION ADMINISTRATION

Respondents.

―――――――――――――――――

On Petition for Review of an Order
of the Federal Aviation Administration

―――――――――――――――――

**PAGE-PROOF BRIEF OF PETITIONER**

―――――――――――――――――

R. Walker Humphrey, II
**WILLOUGHBY HUMPHREY
& D'ANTONI, P.A.**
133 River Landing Drive, Suite 200
Charleston, South Carolina 29492
(843) 619-4426

Hunter R. Pope
**WILLOUGHBY HUMPHREY
& D'ANTONI, P.A.**
930 Richland Street
Columbia, South Carolina 29201
(803) 252-3300

Mark W. Atwood
**GAROFOLO GOERLICH
HAINBACH PC**
1200 New Hampshire Ave., Suite 410
Washington, DC 20036
(202) 776-3975

*Counsel for Petitioner*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __25-1910__        Caption: __City of Myrtle Beach, SC v. Horry County, SC; FAA__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__City of Myrtle Beach, South Carolina__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                     ☐YES ☑NO
        If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _s/ R. Walker Humphrey, II_____     Date: ____August 22, 2025____

Counsel for: _City of Myrtle Beach, SC_____

[ Print to PDF for Filing ]

# Table of Contents

Disclosure Statement

Table of Authorities ....................................................................................... iii

Jurisdictional Statement ................................................................................ 1

Statement of the Issues ................................................................................. 2

Statement of the Case ................................................................................... 3

I.     1958: The City agreed to restrict its use of proceeds from former military property only while Crescent Beach Airport maintained commercial operations. ........................................................................... 3

II.     1976: The restriction on using these proceeds ended when commercial operations ceased at Crescent Beach, and the City has since asserted unrestricted use of them. ............................................................................ 6

III.     2004: The County agreed that the City can use the proceeds for any purpose. ............................................................................................................ 8

IV.     2020: The County sued the City in state court over its renewed claim that the proceeds be used for airport purposes. ....................................... 10

V.     2021: The County refiled its case before the FAA after it lost in court— hoping for, and achieving, a different result. ............................................ 11

Summary of the Argument ........................................................................... 15

Standard of Review ....................................................................................... 18

Argument ........................................................................................................ 19

I.     The FAA's order should be vacated because the FAA lacked jurisdiction over the County's claims. ......................................................... 19

    A.     Courts presumptively decide matters resembling traditional legal and equitable claims. ................................................................................. 20

    B.     The County's suit for specific performance is a traditional equitable claim which courts have resolved for hundreds of years. .... 22

    C.     This action concerns property the government has not owned for nearly 80 years and does not implicate public rights that may be withdrawn from judicial review. ......................................................... 24

i

D. The FAA erred in not addressing its jurisdiction to hear this case. ...................................................................................... 27

II. Even if the FAA had jurisdiction over the County's complaint, the final agency decision should be reversed because the FAA erred on the merits .......................................................................................................... 29

 A. The City's obligation to use proceeds from the properties for airport purposes expired in 1976 and was contracted away in 2004 ........................................................................................................ 29

  1. Any funding obligations in the 1953 Resolution and Release and the 1958 Agreements are ordinary contract terms subject to modification by mutual consent at any time. .............................................................................................. 29

  2. The City's limited contractual obligation to use the proceeds for airport purposes expired when the Crescent Beach Airport ceased commercial operations in 1976. ............. 31

  3. The County contracted away any remaining obligation of the City to use the proceeds for airport purposes in the 2004 IGA. .......................................................................... 38

 B. The FAA exceeded its authority by imposing new conditions on the use of the proceeds which are not found in the contracts ........... 42

III. Alternatively, the FAA erred in not dismissing the County's complaint under the doctrines of estoppel, laches, or the statute of limitations ........... 46

 A. The County is estopped from arguing that proceeds must be used for airport purposes because it agreed the City can use these funds for any purpose ............................................................. 46

 B. The County's claim is untimely because the County has known for almost 50 years that the City denies these proceeds must be used for airport purposes. ............................................................... 49

Conclusion ........................................................................................................ 51

Statement on Oral Argument ........................................................................... 52

Certificate of Compliance ............................................................................... 54

## Table of Authorities

**Page(s)**

**Cases**

*Aiken Mortg. Co. v. Jones*,
    15 S.E.2d 119 (S.C. 1941) ................................................................... 23

*Am. Fed. Bank, FSB v. United States*,
    62 Fed. Cl. 185 (Fed. Cl. 2004) ......................................................... 36

*AT&T, Inc. v. FCC*,
    149 F.4th 491 (5th Cir. 2025) ............................................................. 25

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
    430 U.S. 442 (1977) ............................................................................ 28

*In re Aviation Brake Serv., Inc.*,
    No. CP05SO036, DMS No. FAA-2005-22213,
    2006 WL 657010 (F.A.A. Mar. 9, 2006) ........................................... 50

*Axalta Coating Sys. LLC v. FAA*,
    144 F.4th 467 (3d Cir. 2025) .............................................................. 27

*Cameron v. United States*,
    252 U.S. 450 (1920) ............................................................................ 26

*Casa de Md. v. U.S. Dep't of Homeland Security*,
    924 F.3d 684 (4th Cir. 2019) ............................................................. 28

*Cloud v. Ass'n of Owners, Satellite Apartment Bldg., Inc.*,
    857 P.2d 435 (Colo. Ct. App. 1992) .................................................. 30

*Coast Fed. Bank, FSB v. United States*,
    323 F.3d 1035 (Fed. Cir. 2003) ......................................................... 31

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986) ..................................................................... 20, 21

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
    603 U.S. 799 (2024) ............................................................................ 50

iii

*Delebreau v. Bayview Loan Serv., LLC,*
    680 F.3d 412 (4th Cir. 2012) ............................................................. 46

*Ellis v. Taylor,*
    449 S.E.2d 487 (S.C. 1994) .............................................................. 40

*In re Felts Field Aviation,*
    Dkt. No. FAA-2016-9210, 2020 WL 4443410
    (F.A.A. July 31, 2020) ....................................................... 47, 48, 50

*Friends of Richards-Gebaur Airport v. FAA,*
    251 F.3d 1178 (8th Cir. 2001) ......................................................... 33

*Glasscock Co. v. Sumter Cnty.,*
    604 S.E.2d 718 (S.C. Ct. App. 2004) ............................................. 33

*Godwin v. Collins,*
    9 Del. (4 Houst.) 28 (1869) .............................................................. 23

*Guar. Sav. & Loan Ass'n v. Ultimate Sav. Bank, F.S.B.,*
    737 F. Supp. 366 (W.D. Va. 1990) ................................................. 32

*Hamilton Square, LLC v. United States,*
    160 Fed. Cl. 617 (Fed. Cl. 2022) .................................................... 50

*Hunt Const. Grp., Inc. v. United States,*
    281 F.3d 1369 (Fed. Cir. 2002) ....................................................... 31

*Leisner v. Finnerty,*
    250 A.2d 641 (Md. Ct. App. 1969) ................................................. 36

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ......................................................................... 18

*Michigan Land & Lumber Co. v. Rust,*
    168 U.S. 589 (1897) ......................................................................... 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................... 19

*Nat'l Am. Corp. v. Fed. Republic of Nigeria,*
    448 F. Supp. 622 (S.D.N.Y. 1978) ................................................. 36

*NVT Techs., Inc. v. United States,*
370 F.3d 1153 (Fed. Cir. 2004) ......................................................... 31

*Pennsylvania v. West Virginia,*
262 U.S. 553 (1923) ............................................................................50

*Phoenix Power Partners, L.P. v. Colo. Pub. Util. Comm'n,*
952 P.2d 359 (Colo. 1998) ................................................................ 36

*S. Utah Wilderness All. v. Bureau of Land Mgmt.,*
425 F.3d 735 (10th Cir. 2005)...........................................................30

*SEC v. Jarkesy,*
603 U.S. 109 (2024) ...................................................................*passim*

*Sierra Club v. U.S. Dep't of Interior,*
899 F.3d 260 (4th Cir. 2018) ............................................................ 18

*Stern v. Marshall,*
564 U.S. 462 (2011)..................................................................... 23, 26

*Stevens & Wilkinson of S.C., Inc. v. City of Columbia,*
762 S.E.2d 696 (S.C. 2014) .............................................................. 39

*Sun Valley Orchards, LLC v. United States Dep't of Labor,*
148 F.4th 121 (3d Cir. 2025).............................................................. 21

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
574 U.S. 318 (2015) ...........................................................................22

*Union Oil Co. of Cal. v. Udall,*
289 F.2d 790 (D.C. Cir. 1961) ..........................................................26

*United States v. Amdahl Corp.,*
786 F.2d 387 (Fed. Cir. 1986)...........................................................40

*Westlands Water Dist. v. United States,*
109 Fed. Cl. 117 (Fed. Cl. 2013) ...................................................... 31

*White v. J.M. Brown Amusement Co.,*
601 S.E.2d 342 (S.C. 2004) ..............................................................40

*Wilson v. Landstrom*,
    315 S.E.2d 130 (S.C. Ct. App. 1984) .................................................................. 39

*Wood v. Carpenter*,
    101 U.S. 135 (1879) ............................................................................................ 46

*World-Wide Rights, L.P. v. Combe, Inc.*,
    955 F.2d 242 (4th Cir. 1992) ............................................................................ 19

**Statutes**

5 U.S.C. § 706(2) .................................................................................................... 18

28 U.S.C. § 2401(a) ................................................................................................. 50

49 U.S.C. § 46110(a) ................................................................................................. 1

49 U.S.C. § 47151(b) ............................................................................................... 43

49 U.S.C. § 47153(a)(2) ......................................................................................... 43

Surplus Property Act of 1944, ch. 589, sec. 4, 63 Stat. 700 (1949) ........................ 30

**Court Rules**

Fed. R. App. P. 32(f) .............................................................................................. 55

Local Rule 34(a) ...................................................................................................... 53

**Other Authorities**

14 C.F.R. § 16.1(a)(8) ......................................................................................... 1, 11

14 C.F.R. § 16.26 .................................................................................................... 12

14 C.F.R. § 16.33. ..................................................................................................... 1

14 C.F.R. § 16.33(f) ................................................................................................ 28

14 C.F.R. § 16.33(g) ............................................................................. 1

14 C.F.R. § 565.4(e) ............................................................................ 30

19 Fed. Reg. 4,603 (July 27, 1954) ................................................ 30, 32

17A Am. Jur. 2d *Contracts* § 335 ........................................................ 40

17A C.J.S. *Contracts* § 551 ................................................................ 31

*Biography, Children, & Facts*, Brittanica,
https://www.britannica.com/biography/Edward-IV-king-of-
England (last visited Nov. 24, 2025) ................................................. 23

John G. Cameron, Jr., *Restrictive Covenants, Reciprocal Negative
Easements, and Building and Use Restrictions* No. 5 Real Est. Law.
47, 47 (2010) ..................................................................................... 22

T. Leigh Anenson, *Equitable Defenses in the Age of Statutes*, 36 Rev.
Litig. 659, 659 (2018) ....................................................................... 46

## Jurisdictional Statement

After an unsuccessful suit in state court, Horry County brought this action under 14 C.F.R. § 16.1(a)(8) asking the Federal Aviation Administration to force the City of Myrtle Beach to use proceeds from property called the Seascape Properties for airport purposes. FAA Exhibit 1, Item 1. The FAA issued its Director's Determination on July 17, 2023, generally finding for the County. FAA Exhibit 2, Item 1. The City timely appealed to the Associate Administrator for Airports on September 15, 2023, under 14 C.F.R. § 16.33. Order, Aug. 16, 2023; FAA Exhibit 2, Item 2. And shortly after the Supreme Court decided *SEC v. Jarkesy*, 603 U.S. 109 (2024), the City also moved to dismiss the County's complaint for lack of jurisdiction. FAA Exhibit 2, Item 11. The Associate Administrator affirmed the Director's Determination and denied the motion to dismiss on July 18, 2025. Decision, July 18, 2025. That decision is the FAA's final agency action. *See* 14 C.F.R. § 16.33(g).

The City timely petitioned for review on August 8, 2025. *See* 49 U.S.C. § 46110(a). This Court has jurisdiction under 49 U.S.C. § 46110(a), which authorizes judicial review of FAA orders in the court of appeals for the circuit where the petitioner resides or has its principal place of business. The City is located within the Fourth Circuit.

## Statement of the Issues

I.      Agencies lack authority to adjudicate claims traditionally reserved for courts. The County's claims before the FAA were for specific performance, which courts have resolved for hundreds of years. Did the FAA have jurisdiction to resolve the County's administrative complaint?

II.     The government restricted the City's use of proceeds from former military property only until commercial operations ceased at Crescent Beach Airport, which happened in 1976. The County also agreed in 2004 that the City may use the proceeds for any purpose. Did the FAA err in finding that the proceeds remain restricted and imposing new conditions on their use?

III.    FAA Part 16 claims are subject to estoppel, laches, and the statute of limitations defenses. The County previously agreed that the City can use proceeds from the subject properties for any purpose. The County and the FAA have known for decades that the City denies the proceeds remain restricted. Did the FAA err in not dismissing the County's complaint under these defenses?

## Statement of the Case

**I.     1958: The City agreed to restrict its use of proceeds from former military property only while Crescent Beach Airport maintained commercial operations.**

During World War II, the United States operated an Air Force base and associated bombing and gunnery ranges in Myrtle Beach. In 1948, after the war had ended, the United States quitclaimed these properties to the City under the Surplus Property Act on the condition that the City use them "for public airport purposes." FAA Exhibit 1, Item 1, Exhibit 8 at 8 (1948 Deed). Over the next ten years, the United States replaced that broad statutory restriction with a far more limited contractual one. Neither the 1948 Deed nor the agreements which followed mention the County.

The first change came in 1953. While the City used the base as a civilian airport, it did not need the other parcels—approximately 143 acres known as the Seascape Properties plus another 20.19-acre tract—for an airport. The City thus requested a release from the 1948 Deed's use restriction so it could obtain "marketable fee title" to sell or otherwise use these properties. *See* FAA Exhibit 1, Item 1, Exhibit 9 at 1 (1953 Resolution). The United States agreed and released the use restriction for these properties on February 24, 1953.[1] FAA Exhibit 1, Item 1, Exhibit 10 (1953

---

[1] The 20.19-acre parcel was conveyed, without objection, to another party in 1960 for no cash consideration. FAA Exhibit 1, Item 1, Exhibit 20.

Release). The release's recitals acknowledged that the City had also resolved to use proceeds from these properties to offset the City's costs in operating the Myrtle Beach Airport or a substitute airport. *Id.* at 2; *see also* FAA Exhibit 1, Item 1, Exhibit 9 at 1.

The second change came in 1958, when the United States reacquired the Myrtle Beach Airport for an Air Force base and moved all commercial operations to the Crescent Beach Airport, which the South Carolina Aeronautics Commission (State Commission) would operate instead of the City. The parties set out the terms for this new arrangement in two agreements dated April 21 and October 7, 1958.

Under the April 1958 Agreement, the City agreed to transfer all Myrtle Beach Airport property to the United States "without additional consideration" beyond "the benefits that will accrue to the City through the establishment of new civil airport facilities at Crescent Beach Airport." FAA Exhibit 1, Item 1, Exhibit 11 at 1; *id.* at 2, art. I, § e. To foster the Crescent Beach Airport's development, the United States redirected the Seascape Properties' proceeds from the City to the State Commission for the Crescent Beach Airport. FAA Exhibit 1, Item 1, Exhibit 11 at 2, art. I, § f (limiting the proceeds use obligation to "contributing to the [State] Commission all funds from" the Seascape Properties "for the operation, maintenance and development of the Myrtle Beach Airport at Crescent Beach"). In the October 1958

Agreement, the State Commission agreed to operate the Crescent Beach Airport for 20 years. FAA Exhibit 1, Item 1, Exhibit 12 at 3, § III. And because Crescent Beach would only be an "adequate substitute" for the Myrtle Beach Airport if it was "further developed and improved in certain respects," the City reiterated that it would pay the State Commission "all airport funds for which the City is now and may hereafter become accountable" from the Seascape Properties. *Id.* at 2; *id.* at 3, § II(B). The County was not a party to either agreement or named as a successor to the State Commission.

All parties, including the FAA, understood that the April 1958 Agreement "constituted a complete release of the City from its obligations with respect to the Myrtle Beach Airport" under earlier deeds and grants.[2] FAA Exhibit 1, Item 1, Exhibit 12 at 2 (cleaned up). As a result, the City would be discharged from all obligations under these deeds and grants "upon completion of additional airport development at the Crescent Beach Airport." *Id.* at 3, § 1(B). Shortly thereafter, the City began leasing the Seascape Properties. *See* FAA Exhibit 1, Item 1, Exhibit 19 at 2.

---

[2] The City uses "FAA" to refer to the Federal Aviation Administration and the Civil Aeronautics Administration (the FAA's predecessor agency) interchangeably for consistency and ease of reference. Also, the quoted language identified the 1948 Deed but not the 1953 Release. But the government did not need to mention the 1953 Release to supersede it in the 1958 Agreements. *See supra* pp. 35–37.

II.    **1976: The restriction on using these proceeds ended when commercial operations ceased at Crescent Beach, and the City has since asserted unrestricted use of them.**

The State Commission operated the Crescent Beach Airport until the South Carolina General Assembly transferred it to the Horry County Airport Commission in 1974. FAA Exhibit 1, Item 1, Exhibit 13. In 1976, nearly 20 years after the 1958 Agreements, commercial airport operations returned to the Myrtle Beach Airport from Crescent Beach. FAA Exhibit 1, Item 1 at 11. With no further development and operation of the Crescent Beach Airport needed, the City's funding obligation under the 1958 Agreements expired. The Myrtle Beach Airport operated as a joint use facility with the Myrtle Beach Air Force Base until the early 1990s, when the base closed and the property was transferred to the County for the first time. *Id.* And by that time, the FAA listed neither the Myrtle Beach Airport (then the joint-use Myrtle Beach Air Force Base) or Crescent Beach (now known as the Grand Strand Airport) in the list of airports "that are affected by agreements with the Federal Government under ... the Surplus Property Act." FAA Exhibit 1, Item 7, Exhibit 18.

During the 1980s, the City and County repeatedly litigated their rights in the Seascape Properties, including alleged Surplus Property Act obligations and the ability to lease the properties, in court. At all times, the City maintained that it can use

6

proceeds from the Seascape Properties for any purpose.[3] None of these suits prevented the City from leasing the Seascape Properties or required the City to provide lease or sale proceeds to the County. FAA Exhibit 1, Item 1, Exhibit 18; FAA Exhibit 1, Item 1, Exhibit 19; FAA Exhibit 1, Item 7, Exhibit 2; FAA Exhibit 1, Item 7, Exhibit 5; FAA Exhibit 1, Item 9, Exhibit 8 at 4–5. Even so, the City decided purely as a matter of policy that revenue from the Seascape Properties "should continue to be [used] for capital improvements to an airport serving the Myrtle Beach area" and voluntarily established the "Airport Trust Fund" for that purpose.[4] FAA Exhibit 1, Item 1, Exhibit 15.

---

[3] *Compare* FAA Exhibit 1, Item 16, Exhibit 3 at 5, ¶ 10 (the County alleging in 1982 that the City agreed to pay the County "all funds derived from the aforesaid airport property" under the October 1958 Agreement), *with* FAA Exhibit 1, Item 16, Exhibit 4 at 1, ¶ 2 (the City admitting only that it "has been paying to the Horry County Airport Commission funds derived from the leased premises upon approval by City Council" and expressly denying the remainder of the referenced allegation); *see also* FAA Exhibit 1, Item 7, Exhibit 9 at 7 ("Since the U.S. government released restrictions in 1953, again released restrictions in 1958, and disclaimed any interest in the property in 1982, any restriction on the use of the property or its revenues has been self-imposed by the City of Myrtle Beach."); FAA Exhibit 1, Item 7, Exhibit 6 at 2 ("Any obligation expired twenty years after the October 7, 1958 Crescent Beach accord, and the issue of federal interest was dealt with in finality by the U.S. Attorney in 1982 …. What we do, we do so voluntarily and within our legislative discretion pursuant to the 1995 Resolution, and because the airport is within our city limits and bears our name.").

[4] This resolution did not confer on the County any rights as a trust beneficiary, as it only provided for using funds on "a public airport which serves the Myrtle Beach area," and not the Myrtle Beach Airport or another County airport. FAA Exhibit 1, Item 1, Exhibit 15 at 1.

III.    **2004: The County agreed that the City can use the proceeds for any purpose.**

In 2001, the County renewed its effort to obtain an interest in the Seascape Properties' proceeds by fiat, this time by opening a Part 16 investigation before the FAA. FAA Exhibit 1, Item 1 at 15–16; FAA Exhibit 1, Item 7, Exhibit 7. As it had for decades, the City argued that it has no continuing obligation to use the Seascape Properties' proceeds for airport purposes, but it repeated its intent to continue voluntarily supporting the Myrtle Beach Airport by distributing a portion of the properties' lease proceeds to the County. FAA Exhibit 1, Item 7, Exhibits 6, 8, and 9.

Hoping to end these "lingering, disputed positions that have remained outstanding over an extended period of time," the City and the County heeded the FAA's long-standing advice for them to "mutually reach a new agreement" concerning the Seascape Properties' proceeds. FAA Exhibit 1, Item 1, Exhibit 17 at 1; FAA Exhibit 1, Item 1, Exhibit 22 at 1. The result was an intergovernmental agreement—called the 2004 IGA—which "set[] forth the full and complete understanding of the parties" and "supersede[d] any and all agreements and representations made earlier." FAA Exhibit 1, Item 1, Exhibit 22 at 10.

The 2004 IGA distributed $4 million from the "the Seascape Property account, formerly known as the Airport Trust Fund" evenly between the County and the City with no restriction upon its use. FAA Exhibit 1, Item 1, Exhibit 22 at 6. The

remaining fund balance was earmarked for a regional airport feasibility study and associated land acquisition, with any unused funds being returned to the parties "for such purposes as the respective bodies deem[] appropriate." *Id.* at 6–7. The 2004 IGA also "unconditionally" divided future lease proceeds 75%/25% between the County and the City. *Id.* at 7. The County later acknowledged in official bond records that revenue from the Seascape Properties could end at any time. FAA Exhibit 1, Item 7, Exhibit 11 at 2 ("No assurances can be made that the City will not amend or fail to renew either lease or that revenues under the Intergovernmental Agreement will continue at current levels."). It likewise recognized in a bond ordinance that proceeds from the Seascape Properties may be used for non-airport purposes. FAA Exhibit 1, Item 7, Exhibit 12 at 2 (defining proceeds received under the 2004 IGA as "Non-System Amounts"); *id.* at 3, § 401(e) (using Non-System Amounts for airport maintenance and operation expenses); *id.* at 4, § 413(a) (returning surplus Non-Systems Amounts to the County without restriction).

The City's voluntary payments have been a windfall for the County. Since the 1958 Agreements expired, the City voluntarily paid the County over $40 million in lease proceeds from the properties. *See* FAA Exhibit 1, Item 7, Exhibit 6 at 4 (noting distributions of around $6.5 million from 1979 through 2000); FAA Exhibit 1, Item 7, Exhibit 10 at 16 (noting distributions of over $32 million from 2005 through 2020);

FAA Exhibit 1, Item 1, Exhibit 4 at 16–17 (noting distributions of at least $2.7 million per year after 2020, which ended in October 2022). These payments allowed the County's Airport Department to accumulate about $42 million in unrestricted assets through June 30, 2021, which is the most recent data in the record. FAA Exhibit 1, Item 21, Exhibit D at 3.

## IV. 2020: The County sued the City in state court over its renewed claim that the proceeds be used for airport purposes.

On December 8, 2020, the City approved selling the Seascape Properties to their current lessees for $60 million, which was "a negotiated figure mid-way between the City's appraisal of the property & the proposed purchaser[s'] appraisal[s]." FAA Exhibit 1, Item 1, Exhibit 3d at 3–4.

Two days later, the County sued in state court to enjoin the City from selling the Seascape Properties and to claim for itself the proceeds of any sale which it contended could be made only for "fair market value." *See generally* FAA Exhibit 1, Item 11, Exhibit 8. The County asserted claims for (1) preliminary and permanent injunction, (2) declaratory judgment, (3) breach of fiduciary duties, (4) constructive trust, (5) breach of contract, (6) promissory estoppel, and (7) unjust enrichment. FAA Exhibit 1, Item 11, Exhibit 8 at 8–11. Through these state law causes of action, the County alleged that the 1948 Deed, 1953 Resolution and Release, and 1958

Agreements, all purportedly given under the Surplus Property Act, make it the recipient of all sale proceeds. FAA Exhibit 1, Item 11, Exhibit 8 at 4–5.

The state court dismantled the County's claims one by one, and found that the County had not even stated a fair question on whether it holds an interest in the Seascape Properties or their proceeds. FAA Exhibit 1, Item 1, Exhibit 4 at 21–27. The court also found that the 2004 IGA was a perpetual contract which, under South Carolina law, is terminable at will. *Id.* at 10 n.5. The state court's decision became final on March 17, 2021, when the court denied the County's motion for reconsideration. FAA Exhibit 1, Item 7, Exhibit 15.

## V.    2021: The County refiled its case before the FAA after it lost in court— hoping for, and achieving, a different result.

Having lost in state court, the County voluntarily dismissed the court case and filed its Part 16 (14 C.F.R. §§ 16.1–16.305) complaint on April 15, 2021, the day before the County's deadline to appeal the state court's order. FAA Exhibit 1, Item 7, Exhibit 17. The County invoked the FAA's jurisdiction under 14 C.F.R. § 16.1(a)(8), which purports to allow the FAA to decide cases involving "[o]bligations contained in property deeds for property transferred under the Surplus Property Act." FAA Exhibit 1, Item 1 at 7–8.

As it did in state court, the County sought an order compelling the City to (1) pay "all proceeds from the sale of the Seascape Properties to the County for use

exclusively for airport purposes" and (2) sell the Seascape Properties "at or above fair market value." FAA Exhibit 1, Item 1 at 31. Also like it did in state court, the County based its claims on the 1948 Deed, 1953 Resolution and Release, and 1958 Agreements. *Id.* at 20–31. The County also demanded that the City pay the County the difference between the sales price and any higher fair market value. *Id.* The City moved to dismiss and for summary judgment. FAA Exhibit 1, Item 7. As is relevant here, the City argued that the County's claims are untimely, the County should be estopped from seeking the proceeds because it agreed that the City could receive them unconditionally, and that any restriction on the City's use of the proceeds ended in the 1970s. *Id.* at 23–26. When the FAA did not act on the motion during the time stated in 14 C.F.R. § 16.26, the parties filed their responsive pleadings.[5] FAA Exhibit 1, Item 12 (City's Answer); FAA Exhibit 1, Item 14 (County's Reply); FAA Exhibit 1, Item 16 (City's Rebuttal).

The FAA issued its Director's Determination on July 17, 2023. The Director failed to specifically address the City's timeliness and estoppel defenses, disposing

---

[5] Before the Director issued his initial decision, the City exercised its legal right under state law to terminate the 2004 IGA and retain for itself all lease proceeds from the Seascape Properties. FAA Exhibit 1, Item 20, Exhibit 1. In the spirit of co-operation, the City voluntarily placed 75% of those proceeds in a separate ledger account pending final resolution of this action. FAA Exhibit 1, Item 20, Exhibit 2. The County never challenged the City's termination of the 2004 IGA.

of them instead under the catch-all conclusion that "[a]ll motions not expressly granted in this Determination are denied." FAA Exhibit 2, Item 1 at 27. But the Director did find that "the City is obligated to provide the funds from the proceeds of the sale of the Seascape Properties for airport purposes to benefit civil aviation." FAA Exhibit 2, Item 1 at 22. To get there, he determined that the October 1958 Agreement "did not release the City from its obligation under the 1953 Release," so "the 1953 Release is the governing instrument for the Seascape Properties." FAA Exhibit 2, Item 1 at 21–22.

The Director then went beyond the 1953 Release. While he agreed with the City that "the funds are not required to be given to Horry County," the Director required the City to prove that any alternative use will "have an equal or increased benefit to civil aviation" than paying proceeds to the County. *Id.* at 23. The Director made no findings about fair market value other than declaring that the City must follow the *FAA Airport Compliance Manual*, Order 5190.6B, change 2 (Dec. 9, 2022). *Id.* at 25. The Director then ordered the City to submit a corrective action plan that will "identify its proposal for how to use [sale or lease] proceeds to benefit civil aviation" and "specify that the deed restrictions described above will be included in

13

any sales agreement and future deeds."[6] *Id.* at 26–27. Without further explanation, he summarily denied all outstanding motions not expressly granted. *Id.* at 27. At the City's request, the Director suspended the corrective action plan pending appeal of his decision. Order, Aug. 16, 2023.

The City appealed the Director's Determination to the Associate Administrator on September 15, 2023. FAA Exhibit 2, Item 2. While the appeal was pending, the Supreme Court held in *SEC v. Jarkesy*, 603 U.S. 109 (2024), that agencies cannot decide cases which resemble actions at law or equity which courts traditionally resolve. Citing *Jarkesy*, the City promptly moved to dismiss the County's Part 16 complaint because the County's claims are for traditional specific performance of deed and contract restrictions which must proceed in court. FAA Exhibit 2, Item 11. On July 18, 2025, the Associate Administrator affirmed the Director in full. With no analysis, the Associate Administrator denied the City's motion to dismiss under *Jarkesy*. Decision at 17 ("All other Motions not specifically granted herein are DE-NIED.") As to the rest of the appeal, the Associate Administrator concluded that the 1953 Release imposed a continuing obligation on the City to use all proceeds from

---

[6] The City understands these "deed restrictions" are the right-of-flight and the hazards restriction in the 1953 Release. If that term includes the proceeds re-strictions, the Director erred in converting a personal covenant into a real covenant running with the land. *See infra* p. 29. This action, if affirmed, constitutes a taking entitling the City to just compensation.

the Seascape Properties "to benefit civil aviation" and that this obligation was never extinguished. *Id.* at 13–14. His analysis mentions the 1958 Agreements once, and only to observe that the FAA opined in 1977 that the City had a "continuing" obligation to use the proceeds for airport purposes. *Id.* at 14. The Associate Administrator also concluded that the affirmative defenses of estoppel, laches, and the statute of limitations do not apply to alleged non-compliance with "perpetual" Surplus Property Act obligations. *Id.* at 9–12. Finally, the Associate Administrator upheld the Director's new requirements that the City prove any alternative use of proceeds would provide an equal or greater benefit to civil aviation than transferring funds to the County, and that the sale comply with fair market value standards set forth in the *FAA Compliance Manual*. *Id.* at 15–16.

Like the Director, the Associate Administrator directed the City to submit a corrective action plan specifying how sale or lease proceeds will benefit civil aviation and requiring the inclusion of deed restrictions in any future conveyance. Decision at 16–17. The Associate Administrator stayed the corrective action plan pending this petition for review at the City's request. Order, Aug. 22, 2025.

## Summary of the Argument

This case concerns the straightforward interpretation of a deed and related agreements executed over 70 years ago. The material facts are undisputed. In 1948,

the United States quitclaimed the Seascape Properties to the City under the Surplus Property Act on the condition that the properties be used for airport purposes. Five years later, the United States released that condition so the City could use proceeds from the properties to offset its costs in developing and operating an airport elsewhere. Another five years later, the United States—which took the Myrtle Beach Airport from the City for use as an Air Force base—agreed those proceeds instead would fund the redevelopment and commercial operation of the Crescent Beach Airport. Once commercial operations at Crescent Beach ceased in 1976, the City was released from all relevant restrictions on the Seascape Properties.

Under these agreements, the City has received lease revenues from the Seascape Properties free and clear since 1976. The County admitted as much when it agreed in 2004 that the City can use these proceeds for any purpose. Even so, the City has voluntarily paid the County more than $40 million from revenue generated by the properties to support the Myrtle Beach Airport. The County now seeks all future sale and lease proceeds—an additional windfall of at least $60 million. After a South Carolina court rejected the County's claims, the County turned to the FAA, asking the agency to rewrite the agreements to give the County rights it never had.

In finding that the City nevertheless remains obligated to use the proceeds for airport purposes, the FAA erred in three respects.

*First*, the FAA erred in exercising jurisdiction over the County's claims. In *SEC v. Jarkesy*, 603 U.S. 109 (2024), the Supreme Court held that matters traditionally resolved by courts are private rights which agencies cannot resolve. This dispute seeking specific performance of deeds and contracts between non-federal parties is a classic private-rights case. The County admitted as much when it first filed this dispute in court. Its attempt to now recast this case as a federal compliance matter does not change the nature of its claims, and the County's forum-shopping is one of the ills which *Jarkesy* sought to cure. The FAA therefore had no jurisdiction over the County's complaint.

*Second*, the FAA erred in finding that the City remains obligated to use the proceeds for airport purposes. The City's obligations are defined by and cannot extend beyond the face of the unambiguous agreements. Under their plain language, the City's obligation was fulfilled and expired when commercial operations ceased at Cresent Beach in 1976. Compounding its error, the FAA then exceeded its authority and the agreements' plain language by imposing two *new* conditions on the City: the County is the presumptive recipient of the funds, and the City is bound by FAA compliance manuals issued decades after the operative agreements.

*Third*, the FAA erred in finding that estoppel, laches, and the statute of limitations do not apply. These defenses prevent opportunism, hold parties to positions

17

they have taken in the past, and require that parties timely assert their rights. Here, the County has violated each tenant. The County knew the City's position for decades, previously agreed the City could use the proceeds for any purpose, and then sued to obtain all the funds when it saw a bigger payday. Each defense is enough to compel dismissal of the County's action.

This Court therefore should either vacate the FAA's decision under *Jarkesy* and dismiss the case, or reverse the decision on its merits.

## STANDARD OF REVIEW

The Administrative Procedure Act supplies the familiar governing standards. Under the APA, a reviewing court "shall ... hold unlawful and set aside agency action, findings, and conclusions" if they are

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence ... ; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

Questions of law are reviewed de novo. S*ee Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("Under the APA, it thus 'remains the responsibility of the court to decide whether the law means what the agency says.'") (quoting *Perez v.*

*Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)). This Court has repeatedly applied this principle, holding that "we interpret the relevant statutory provisions de novo." *E.g.*, *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 288 (4th Cir. 2018). The interpretation of unambiguous contracts and deeds likewise is a question of law. *World-Wide Rights, L.P. v. Combe, Inc.*, 955 F.2d 242, 245 (4th Cir. 1992).

Finally, whether the FAA acted "arbitrarily and capriciously" or exceeded its statutory authority is a legal question reviewed without deference. Courts must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## Argument

### I. The FAA's order should be vacated because the FAA lacked jurisdiction over the County's claims.

The FAA's assumption of jurisdiction over the County's complaint violated the City's right to have this dispute heard in court. Under *SEC v. Jarkesy*, 603 U.S. 109 (2024), the existence of an administrative remedy in a statutory scheme is insufficient to invoke the "public rights" exception to judicial resolution of common law actions. The determination of the parties' rights and obligations in this case depends entirely on the interpretation of property conveyances, covenants, and contractual

agreements—matters that *Jarkesy* dictates are outside agency powers. The FAA therefore erred in not dismissing this case.

### A. Courts presumptively decide matters resembling traditional legal and equitable claims.

"Article III, § 1, directs that the 'judicial Power of the United States shall be vested in one supreme Court and in such inferior Courts as the Congress may from time to time ordain and establish,' and provides that these federal courts shall be staffed by judges who hold office during good behavior, and whose compensation shall not be diminished during tenure in office." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 847 (1986). Article III, § 1, thus "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Id.* (internal citation omitted)

Consequently, Congress may not remove matters concerning "private rights" from the courts. *Jarkesy*, 603 U.S. at 127. Everything resembling a claim in law, equity, or admiralty presumptively is heard in court. *Id.* at 132 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855)). The need for an independent judiciary to decide such matters "featured prominently in the calls for revolution." *Id.* at 147 (Gorsuch, J., concurring). Article III was, in part, an

effort "to prevent a backslide toward anything like the vice-admiralty courts" which had been corrupted by the "drip, drip, drip of expanding power" from Parliament. *Id.* at 146–47. For similar reasons, the Due Process Clause ensures "the process and proceedings of the common law" are observed before the government deprives someone of life, liberty, or property. *Id.* at 150 (quotation omitted). "That means the regular course of trial proceedings with their usual protections, not the use of ad hoc adjudication procedures before the same agency responsible for prosecuting the law, subject only to hands-off judicial review." *Id.* at 151 (citing *Murray's Lessee*, 18 How. at 280). Confirming why these protections are necessary, the majority and concurring opinions in *Jarkesy* highlighted the dangers of forum-shopping for more favorable outcomes before an agency. *Id.* at 116–20 (majority op.); *id.* at 141–45 (Gorsuch, J., concurring).

The only exceptions to the general rule are cases involving "public rights," which are matters with an "unbroken tradition" of executive resolution. *Jarkesy*, 603 U.S. at 128; *see also Sun Valley Orchards, LLC v. United States Dep't of Labor*, 148 F.4th 121, 127 (3d Cir. 2025) ("History therefore looms large in the public rights analysis[.]"). But "even with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor" of courts resolving the

dispute. *Jarkesy*, 603 U.S. at 132 (quoting *Northern Pipeline Constr. Co.*, 458 U.S. at 69 n.23 (plurality opinion)).

So the Court must first determine whether the County's claims are ones traditionally heard in court. And if they are, the second step asks whether the public rights doctrine nevertheless allows the FAA to resolve them. The City addresses each question in turn.

### B. The County's suit for specific performance is a traditional equitable claim which courts have resolved for hundreds of years.

The County admits "[t]his is a case best understood as seeking specific performance" of a deed and contracts. FAA Exhibit 2, Item 14 at 6. Because that claim has existed for hundreds of years, this case presumptively must be heard in court.

A grantor's ability to restrict a grantee's use of property "is a concept that has been in use for centuries." John G. Cameron, Jr., *Restrictive Covenants, Reciprocal Negative Easements, and Building and Use Restrictions*, 26 No. 5 Prac. Real Est. Law. 47, 47 (2010). "At common law, the right to own and enjoy real estate was considered to include, as an element of ownership, the right to restrict how that property might be used in the future. Therefore, it was not uncommon for a landowner to convey his or her property subject to any one of a number of possible restrictions." *Id.*; *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 344 n.2 (2015) (Thomas, J., dissenting) (noting that "[t]he Anglo–American legal tradition has long distinguished

22

between 'core' private rights - including the traditional property rights represented by deeds - and other types of rights"). Similarly, "[s]pecific performance is an action of ancient equity jurisdiction." *Aiken Mortg. Co. v. Jones*, 15 S.E.2d 119, 120 (S.C. 1941). It has existed at least since the reign of Edward IV, who became King of England in 1461. *Godwin v. Collins*, 9 Del. (4 Houst.) 28, 48 (1869); *Edward IV | Biography, Children, & Facts*, Brittanica, https://www.britannica.com/biography/Edward-IV-king-of-England (last visited Nov. 24, 2025); *see also Stern v. Marshall*, 564 U.S. 462, 485 (2011) (noting that a state law contract claim is a suit at common law which must be heard in court).

Trying to avoid this history, the County argued below that there is no common law requirement that surplus federal property and funds generated by it be used for airport purposes. FAA Exhibit 2, Item 14 at 8. That myopic thinking is the logic which *Jarkesy* rejected. *Jarkesy* teaches that "what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled." 603 U.S. at 135; *see also id.* at 135–36 (holding that the SEC could not decide cases where "the Government has created claims whose causes of action are modeled on common law fraud and that provide a type of remedy available only in law courts"). As a result, claims which are "a common law suit in all but name" must proceed in court. *Id.* at 136. Meanwhile, claims which "bring no common law soil with them" and "involve[] 'a

new cause of action, and remedies therefor, unknown to the common law'" can proceed before an agency.[7] *Id.* at 137 (quoting *Atlas Roofing Co.*, 430 U.S. at 461). Like the SEC in *Jarkesy*, the County cannot avoid the "common law soil" of its claims by pointing to a federal statute (here, the Surplus Property Act) which is one specific implementation of the rights at issue.

Because the County's action is deeply rooted in centuries-old common law rights, this case presents a quintessential private right which courts presumptively must hear. The County would agree, as the issues it raised before the FAA mirror those which it first raised (unsuccessfully) to the South Carolina state court. As explained below, *Jarkesy* prevents the County and the FAA from overcoming that presumption.

### C. This action concerns property the government has not owned for nearly 80 years and does not implicate public rights that may be withdrawn from judicial review.

*Jarkesy* severely limited an administrative agency's jurisdiction by clarifying that "[t]he public rights exception is, after all, an *exception*." 603 U.S. at 131 (emphasis in original). Because the public rights exception "has no textual basis in the

---

[7] It therefore is irrelevant that "Congress conferred *exclusive* authority on the FAA to enforce Surplus Property Act obligations." FAA Exhibit 2, Item 14 at 8. "[T]he public rights exception does not apply automatically whenever Congress assigns a matter to an agency for adjudication." *Jarkesy*, 603 U.S. at 139–40. Congress's assignment of this claim to the FAA is the problem, not the answer.

Constitution," courts must evaluate its assertion "with care" and pay "close attention to the basis for each asserted application of the doctrine." *Id.* "[W]hat matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled." *Id.* at 135. For instance, neither the presence of the United States as a party nor Congress's creation of a federal statutory scheme specifying the right and providing an administrative enforcement mechanism are enough to convert a private right into a public one. *Id.* at 131, 134; *see also AT&T, Inc. v. FCC*, 149 F.4th 491, 502 (5th Cir. 2025) (holding that the FCC's history of regulatory authority over common carriers "does not imply ... that any regulatory action concerning common carriers implicates the public rights exception"). An administrative agency cannot exercise judicial power simply because a statute authorizes the agency to hear actions arising under federal law.

Public rights instead are those which "historically could have been determined exclusively by the executive and legislative branches." *Jarkesy*, 603 U.S. at 128 (cleaned up). They include the collection of revenue, immigration, customs, relations with Indian tribes, the administration of public lands, and granting public benefits. *Id.* at 128–30. The common link between them is that "no involvement by an Article III court in the initial adjudication is necessary." *Id.* at 128. After all, "Article III could neither serve its purpose in the system of checks and balances nor preserve the

25

integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Stern*, 564 U.S. at 484.

The only class of public rights which the County invoked below is "the administration of public lands." FAA Exhibit 2, Item 14 at 7–10. This argument fails readily. An agency's ability to determine rights in public lands ends once "legal title has passed." *Michigan Land & Lumber Co. v. Rust*, 168 U.S. 589, 593 (1897). At that point, "the matter becomes subject to inquiry only in the courts and by judicial proceedings." *Id.*; *see also Cameron v. United States*, 252 U.S. 450, 460 (1920) (allowing the Secretary of the Interior to determine mining rights on public property "so long as the legal title remains in the government"); *Union Oil Co. of Cal. v. Udall*, 289 F.2d 790, 792 (D.C. Cir. 1961) (holding that "it is well established" that the Secretary of the Interior may determine such claims "until legal title has passed"). So there is no history of agency resolution of these claims. In fact, these cases show the opposite: historically, only courts could hear disputes over rights to property after the government disposed of it.

Here, the government passed legal title in the Seascape Properties to the City almost 80 years ago, so any rights which the FAA retained to determine claims to the Seascape Properties—to the extent it ever had any—have long since expired. FAA

Exhibit 1, Item 1, Exhibit 8 (1948 Deed); *see also* FAA Exhibit 1, Item 1, Exhibit 10 (1953 Release). The obligations at issue now are contractual, not proprietary. Once title passed, any dispute about those obligations became a private rights matter.

To be sure, *Jarkesy* does not abrogate FAA administrative actions concerning compliance with technical FAA regulations. *Cf. Axalta Coating Sys. LLC v. FAA*, 144 F.4th 467, 475–77 (3d Cir. 2025) (holding that an FAA action for civil penalties for failing to comply with regulations for sealing liquids in flight is a public right which can proceed under *Jarkesy*). The FAA therefore retains its core administrative oversight. But *Jarkesy* does compel judicial resolution of common law deed and contract disputes like the one—just as the County believed when it brought this case and others against the City regarding the Seascape Properties in court. The Constitution prohibits forum-shopping to secure a better outcome of those claims before an agency, and the FAA erred in allowing the County to do so here.

### D.    The FAA erred in not addressing its jurisdiction to hear this case.

Because the FAA generically denied the City's motion to dismiss without analysis, it is unclear whether the FAA rejected the motion on its merits or for procedural reasons. FAA Exhibit 2, Item 11 at 3–4. As discussed above, the FAA erred on the merits if it found that it has jurisdiction. And as discussed below, the FAA erred if rejected the motion on procedural grounds.

The only procedural matter is that the City did not argue to the Director that the FAA lacked jurisdiction on this basis because the Supreme Court had not yet decided *Jarkesy*.[8] The City petitioned the Associate Administrator to address this issue less than two weeks after *Jarkesy* was issued. FAA Exhibit 2, Item 11 at 3–4. A petition to raise a new issue on appeal must identify the new matter, provide any new evidence or explain why it cannot be obtained, and explain why the issue could not have been discovered earlier. 14 C.F.R. § 16.33(f). Here, the City undisputedly satisfied these requirements. The new matter is whether the FAA has jurisdiction under *Jarkesy*. This is a purely legal question which involves no new evidence. It could not have been raised earlier because, under preexisting law, the FAA could hear this case under the public rights exception. *E.g.*, *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977). *Jarkesy* changed the public rights landscape. This jurisdictional issue could not have been discovered before the record closed. In any event, parties may challenge subject matter jurisdiction at any time. *E.g.*, *Casa de Md. v. U.S. Dep't of Homeland Security,* 924 F.3d 684, 697 (4th Cir. 2019).

The FAA therefore erred if it declined to reach the merits of its jurisdiction.

---

[8] The City did argue the FAA has no jurisdiction because the County sought to enforce obligations which are not stated in the operative agreements and because the County lacked standing. FAA Exhibit 1, Item 7 at 16–21.

II.    **Even if the FAA had jurisdiction over the County's complaint, the final agency decision should be reversed because the FAA erred on the merits.**

Jurisdiction aside, the County's claims also fail on their merits. The unambiguous deed and contracts terminated any restriction on use of proceeds from the Seascape Properties once the Crescent Beach Airport ceased commercial operations in 1976. The County recognized as much in 2004 when it contractually agreed that the City may use proceeds from the Seascape Properties for any purpose. This Court therefore should reverse the FAA's decision and find that the City may keep the proceeds for any use.

### A.    The City's obligation to use proceeds from the properties for airport purposes expired in 1976 and was contracted away in 2004.

To start, the FAA erred in finding that the City has a continuing obligation to use proceeds from the Seascape Properties for airport purposes. Any obligation expired under the 1958 Agreements or was contracted away in 2004. Either way, the City receives the proceeds free and clear.

#### 1.    Any funding obligations in the 1953 Resolution and Release and the 1958 Agreements are ordinary contract terms subject to modification by mutual consent at any time.

Congress gave the FAA discretion to release a party from Surplus Property Act restrictions upon "such terms and conditions as the Administrator of [the FAA] deems necessary to protect or advance the interests of the United States in civil

aviation."[9] Surplus Property Act of 1944, ch. 589, sec. 4, 63 Stat. 700, 700 (1949). The FAA exercised that discretion when granting the 1953 Release. FAA Exhibit 2, Item 1 at 17 n.29. Those conditions—such as City's obligation to use proceeds from selling the Seascape Properties for airport purposes—are "personal covenants or obligations" rather than "conditions to the release or covenants running with the land." Release of Airport Property from Restrictions of Surplus Airport Property Instruments of Disposal, 19 Fed. Reg. 4,603, 4,604 (July 27, 1954) (to be published at 14 C.F.R. § 565.4(e)) (emphasis added); *see also* FAA Exhibit 2, Item 1 at 10 (finding that the policies and procedures governing the 1953 Release are the same as those in this regulation).

As a result, ordinary contract law principles govern personal covenants like the proceeds restriction in the 1953 Release. *E.g., Cloud v. Ass'n of Owners, Satellite Apartment Bldg., Inc.*, 857 P.2d 435, 440 (Colo. Ct. App. 1992); *see also S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 763 (10th Cir. 2005) ("When Congress legislates against a backdrop of common law, without any indication of

---

[9] The only relevant limitation on that discretion was that sale proceeds "shall be devoted exclusively to the development, improvement, operation, or maintenance of a public airport" only if property is "sold to any party within the five years after" Congress amended the Surplus Property Act in 1949. Surplus Property Act of 1944, ch. 589, sec. 4, 63 Stat. 700, 700 (1949). The Director agreed that this statutory restriction expired by its terms in 1954. FAA Exhibit 2, Item 1 at 17 n.29. Any proceeds restrictions after that time are discretionary.

intention to depart from or change common law rules, the statutory terms must be read as embodying their common law meaning."). The FAA therefore was free to contractually modify or eliminate them. *See* 17A C.J.S. *Contracts* § 551.

**2. The City's limited contractual obligation to use the proceeds for airport purposes expired when the Crescent Beach Airport ceased commercial operations in 1976.**

Contracts which the government is a party to also are subject to ordinary contract construction rules. *Westlands Water Dist. v. United States*, 109 Fed. Cl. 117, 191 (Fed. Cl. 2013). Contract interpretation is a question of law. *Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002). Because the operative agreements here are unambiguous, the Court can go no further than their plain language. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040–41 (Fed. Cir. 2003). "The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." *Hunt Const. Grp.*, 281 F.3d at 1372. An interpretation that renders a part of the contract "useless, inexplicable, void, or superfluous" will yield to one that gives meaning to the entire agreement. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). Finally, multiple contracts concerning the same subject matter, in effect at the same time, must be construed together and "in such a fashion as to render the language of each

meaningful." *Guar. Sav. & Loan Ass'n v. Ultimate Sav. Bank, F.S.B.*, 737 F. Supp. 366, 372 (W.D. Va. 1990).

The first modification of the City's obligations came via the 1953 Release. At the time, the City owned and operated the Myrtle Beach Airport. It explained in the 1953 Resolution that it requested a release from all Surplus Property Act obligations in the 1948 Deed

> to enable the [City] of Myrtle Beach to exploit the property for purpose of obtaining funds needed to defray the cost of conducting civil aviation operations on Myrtle Beach Municipal Airport, or in the development and operation of another civil airport if the [City] is deprived of its right to conduct civil aviation operations on the said Myrtle Beach Municipal Airport, because of military operations on said Airport.

FAA Exhibit 1, Item 1, Exhibit 9 at 1. So the government, exercising its discretion under the Surplus Property Act, replaced the 1948 Deed's restriction that the *properties* be used for airport purposes with a mere contractual obligation that the properties' *proceeds* be used for airport purposes. FAA Exhibit 1, Item 1, Exhibit 10 at 2–3; *see also* FAA Exhibit 1, Item 1, Exhibit 9 at 1–2 (the City agreeing in the 1953 Resolution to use revenue from the Seascape Properties to defray the City's cost of operating an airport). The 1953 Resolution and Release thus generated, at most, a simple contractual obligation. The FAA erred to the extent it found otherwise. 19 Fed. Reg. at 4,604 (stating that release conditions are personal, not real, covenants); *see also Glasscock Co. v. Sumter Cnty.*, 604 S.E.2d 718, 721 (S.C. Ct. App. 2004)

32

("Resolutions do not normally have mandatory or binding effect. Rather, the passage of resolutions is generally considered to be merely directory.").

The 1958 Agreements further limited the City's funding obligations. With the City having lost the right to operate an airport so the United States could gain another Air Force base, the United States redirected the Seascape Properties' proceeds to the State Commission to help "develop[] and improve[]" the Crescent Beach Airport to make it an "adequate substitute" for the Myrtle Beach Airport. FAA Exhibit 1, Item 1, Exhibit 11 at 2, art. I, § f; FAA Exhibit 1, Item 1, Exhibit 12 at 2; *id.* at 3, § II(B). Under the 1958 Agreements' plain language, the City's obligation ended upon the State Commission's development and operation of the Crescent Beach Airport for 20 years.[10] *E.g.*, FAA Exhibit 1, Item 1, Exhibit 12 at 2 ("[I]t was the understanding of all parties to said contract dated April 21, 1958, as well as that of the [F]AA, that the approval granted by the [F]AA [in the October 1958 Agreement] would constitute a complete release of the City from its obligations with respect to the Myrtle Beach Airport under the aforesaid deeds and grant agreements," which include the 1948 Deed); *id.* at 3, § I(B) ("Effective upon completion of additional airport development at the Crescent Beach Airport, as provided in the aforesaid contract dated

---

[10] The FAA has a history of limiting proceeds use restrictions to 20 years. *E.g., Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1183–84 (8th Cir. 2001).

April 21, 1958, the Government hereby releases the City from any and all obligations created by and under the aforesaid deeds dated October 22, 1948[.]"). Here again, the FAA validly exercised its jurisdiction in agreeing to this condition. The October 1958 Agreement's statement that the City will pay the State Commission "all airport funds for which the City is now and may hereafter become accountable" from the Seascape Properties merely reiterated the April 1958 Agreement's obligation and did not create a new one. *See id.* at 3, § II(B).

The FAA erred in three respects in reaching the opposite conclusion. First, the agency disregarded the 1958 Agreements' plain language. The City's obligation cannot extend beyond (1) the State Commission, (2) redeveloping the Crescent Beach Airport, and (3) the 20-year term, without re-writing the 1958 Agreements. There is no provision or reason for the State Commission to receive proceeds from the Seascape Properties after it no longer operated an airport in Horry County and the development of Crescent Beach was complete. In fact, the agreements never named a substitute recipient of the funds after that time. *See* FAA Exhibit 2, Item 1 at 23 ("[T]he October 1958 Agreement does not dictate that the funds should continue to the successor of the SC Commission."). So the City, which gave up the Myrtle Beach Airport and its revenue stream to support our national defense,

34

properly retained the Seascape Properties' proceeds after fulfilling its obligations under the 1958 Agreements.

Second, the FAA wrongly disregarded the April 1958 Agreement because it was signed by a U.S. Army Corps of Engineers representative and not by the FAA. *E.g.*, FAA Exhibit 2, Item 1 at 20.[11] But the United States—not the FAA or any other governmental entity—was the party to April 1958 Agreement, the October 1958 Agreement, and the 1953 Release. The FAA therefore did not need to sign the agreement. At any rate, the FAA concurred in the April 1958 Agreement, FAA Exhibit 1, Item 1, Exhibit 11 at 4, incorporated and approved of it in the October 1958 Agreement, *see generally* FAA Exhibit 1, Item 1, Exhibit 12, and cited the April 1958 Agreement as a source of the City's obligation to pay proceeds to the County. FAA Exhibit 1, Item 1, Exhibit 16. The April 1958 Agreement thus binds the government.

Third, the FAA erred in finding "the 1958 Agreements did not release any obligation associated with the 1953 Release." FAA Exhibit 2, Item 1 at 21; Decision at 14 ("[T]he FAA has never altered its position that the City, via the 1953 Release, is obligated to provide all funds from the proceeds of the Seascape Properties for

---

[11] The Associate Administrator did not address this issue in his decision, but he generally "[a]ffirmed the findings in the Director's Determination." Decision at 14. The City therefore understands that the Associate Administrator adopted this finding.

airport purposes."). This is so, according to the FAA, because the 1958 Agreements referenced discharging obligations in the 1948 Deed but not the 1953 Release. FAA Exhibit 2, Item 1 at 21. A later contract, however, need not expressly mention an earlier one to supersede it. As the Court of Federal Claims explained,

> The parties' agreement to enter into a substituted contract that discharges a prior contract requires the same elements of mutual assent and consideration required for contract formation. 'An agreement to rescind or modify need not be express. Mutual assent to abandon a contract, like mutual assent to form one, may be implied from the attendant circumstances and conduct of the parties.

*Am. Fed. Bank, FSB v. United States*, 62 Fed. Cl. 185, 199 (Fed. Cl. 2004) (quoting Richard A. Lord, *Williston on Contracts* § 73:16 (4th ed.)); *see also Phoenix Power Partners, L.P. v. Colo. Pub. Util. Comm'n*, 952 P.2d 359, 365 (Colo. 1998) ("We conclude that if the essential elements or terms of the contract have been transformed, a new contract will be deemed to supersede the old."); *Leisner v. Finnerty*, 250 A.2d 641, 645 (Md. Ct. App. 1969) ("It should be borne in mind that there does not have to be an expressed intention to substitute the new agreement for the previous contract."). The intent to create a substitute contract is a question of law when that intent appears on the face of the documents. *Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622, 643 (S.D.N.Y. 1978).

The parties' intent to discharge the City from all existing restrictions on the property is unmistakable, even if the 1958 Agreements did not expressly mention the

1953 Release by name. The 1958 Agreements transformed an agreement that proceeds are payable to the City for operating and developing the Myrtle Beach Airport or a substitute airport, to one where proceeds go to a third party—the State Commission—for developing and operating the Crescent Beach Airport for 20 years. Further, the 1958 Agreements declared that completing the Crescent Beach Airport's development will discharge the City from any relevant conditions to its receipt of the property in the 1948 Deed. *See* FAA Exhibit 1, Item 1, Exhibit 12 at 2; *id.* at 3, § I(B). The 1953 Release is an outgrowth of the 1948 Deed and cannot be separated from it. If the 1953 Release remains the "governing instrument," then the 1958 Agreements' promise to "completely release" the City from its obligations means nothing. The FAA therefore did not need to mention the 1953 Release to supersede it in the 1958 Agreements.

In sum, the United States rewrote the City's funding obligation when the government retook the Myrtle Beach Airport and pushed commercial operations to Crescent Beach. The new arrangement limited the City's obligation to one payee (the State Commission), one airport (Crescent Beach), and a set period (the State Commission's 20-year term to redevelop Crescent Beach). The City satisfied its commitment almost 50 years ago. The FAA confirmed in 1990 that all obligations had been discharged when it did not list the Myrtle Beach Airport (then operating as

the Myrtle Beach Air Force Base) or Crescent Beach (now the Grand Strand Airport) as airports affected by Surplus Property Act obligations. FAA Exhibit 1, Item 7, Exhibit 18.

The FAA therefore erred in finding that the City has an existing obligation under the operative agreements to use the proceeds for airport purposes.

> ### 3. The County contracted away any remaining obligation of the City to use the proceeds for airport purposes in the 2004 IGA.

Setting all else aside, the 2004 IGA is independently dispositive, because all other issues are moot if the County bargained away any interest in sale proceeds. The City and the County had a decades-long dispute over whether the City had any remaining Surplus Property Act obligations for the Seascape Properties. With the express intent to resolve these disputes and per the FAA's instruction to "mutually reach a new agreement," the City and the County executed the 2004 IGA. FAA Exhibit 1, Item 1, Exhibit 17 at 1; FAA Exhibit 1, Item 1, Exhibit 22 at 1. The parties agreed that the 2004 IGA "supersedes *any and all agreements* and representations made earlier." FAA Exhibit 1, Item 1, Exhibit 22 at 10 (emphasis added).

This 2004 IGA's merger clause expresses the parties' intent that the 2004 IGA be their complete agreement, the terms of which "cannot be varied or contradicted" by other earlier or contemporaneous agreements. *See Wilson v. Landstrom*, 315 S.E.2d 130, 137 (S.C. Ct. App. 1984). The South Carolina Supreme Court explained:

> When a writing, upon its face, imports to be a complete expression of the whole agreement, and contains thereon all that is necessary to constitute a contract, it is presumed that the parties have introduced into it every material item and term, and parol evidence is not admissible to add another term to the agreement, although the writing contains nothing on the particular item to which the parol evidence is directed.

*Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 762 S.E.2d 696, 701 (S.C. 2014) (quoting *Gladden v. Keistler*, 140 S.E. 161, 167 (S.C. 1927)). The County does not dispute that 2004 IGA "imports to be a complete expression of the whole agreement" via its merger clause.

By its plain terms, the 2004 IGA supersedes any agreement from the 1950s that the City would pay the County all proceeds from the Seascape Properties. In it, the City and County agreed that the City can use proceeds from the Seascape Properties for any purpose. FAA Exhibit 1, Item 1, Exhibit 22 at 6–7. Whether in hindsight the County should have included a provision in the 2004 IGA carving out sales proceeds or requiring that funds be used for airport purposes is of no moment.[12] *See Ellis v. Taylor*, 449 S.E.2d 487, 488 (S.C. 1994) ("The court's duty is to enforce the contract made by the parties regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully.").

---

[12] And, if the County's position—or the substance of its claim—is that the City violated the 2004 IGA, such a claim sounds in contract law, a quintessential common-law cause of action. Under *Jarkesy*, that claim must also be adjudicated by a court rather than the FAA.

Concluding that the County contracted away its claims also avoids rendering the 2004 IGA illegal. "The courts are bound to strike down illegal contracts." *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986); *see also White v. J.M. Brown Amusement Co.*, 601 S.E.2d 342, 345 (S.C. 2004) (holding that a contract whose subject matter became prohibited by statute was "illegal" and "invalidated or rendered dead"). When possible, a contract must be construed so that it is valid and legal, and not illegal or in violation of a statute. 17A Am. Jur. 2d *Contracts* § 335. By entering the 2004 IGA, the County correctly understood there is no existing restriction on the use of proceeds from the Seascape Properties. But accepting the County's new argument that all sale and lease proceeds must be used for airport purposes means the 2004 IGA is illegal and the County unlawfully received more than $30 million under it. The County's original position, where the parties can divide the proceeds themselves, eliminates the illegality.

Further, the 2004 IGA is valid even though the FAA was not a party to the agreement. When the FAA instructed the City and the County to "mutually reach a new agreement" regarding the use of proceeds from the property, the FAA did not require that it be a party to the agreement. *See* FAA Exhibit 1, Item 17 at 1. And when the FAA knew the parties were negotiating a settlement of the County's previous Part 16 complaint and allowed the County to withdraw the complaint, it did not

require agency approval. *See* FAA Exhibit 1, Item 14, Exhibit 1 at 2, ¶¶ 7–8. The FAA would not let parties resolve a Surplus Property Act dispute and allow withdrawal of the underlying complaint, while secretly reserving the right to nullify the parties' agreement 20 years later when one side has buyer's remorse. The FAA's position discourages parties from settling Part 16 disputes, knowing the FAA could later void their settlement. This undermines the policy favoring dispute resolution that the FAA itself promoted when it told the parties to "mutually reach a new agreement."

And finally, the FAA cannot avoid the 2004 IGA on its belief that "the City's obligation is to the United States."[13] *See* FAA Exhibit 2, Item 1 at 21. The FAA conceded that its responsibility over the Seascape Properties' proceeds is "really ministerial in nature." FAA Exhibit 1, Item 1, Exhibit 16. The FAA also admitted that "the U.S. Government claims no current interest in the funds contained in the Airport Fund – only an interest in the proper execution of the terms of the underlying agreements to which it was a party." FAA Exhibit 1, Item 1, Exhibit 21. And the FAA allowed the City and the County to "mutually reach a new agreement" regarding the disposition of proceeds. FAA Exhibit 1, Item 1, Exhibit 17 at 1. At bottom, the FAA

---

[13] This is another finding of the Director which the Associate Administrator arguably incorporated into his final decision. *See supra* p. 35 n.12.

may have authority to enforce a Surplus Property Act obligation if the City has one, but the City owes no obligation to the United States as the FAA claimed.

Because the 2004 IGA resolved the County's claims, the Associate Administrator erred in denying the City's appeal on this ground.

**B.     The FAA exceeded its authority by imposing new conditions on the use of the proceeds which are not found in the contracts.**

Even if the City must use proceeds from the Seascape Properties for airport purposes, the FAA still erred in imposing new conditions on the City beyond those in the 1948 Deed, the 1953 Resolution and Release, and the 1958 Agreements. These new conditions require the City to (1) show any other use of the proceeds besides giving them to the County "would have an equal or increased benefit for civil aviation" and (2) comply with the fair market value requirements of the *FAA Airport Compliance Manual*. FAA Exhibit 2, Item 1 at 23, 25.

First, the FAA had no authority to add these terms. The FAA invoked 49 U.S.C. § 47151(b), titled "Authority to transfer an interest in surplus property,"[14] and 49 U.S.C. § 47153(a)(2), titled "Waiving and adding terms,"[15] as authority for

---

[14] "Only the Secretary may ensure compliance with an instrument conveying an interest in surplus property under this subchapter. The Secretary may amend the instrument to correct the instrument or to make the conveyance comply with law."

[15] "The Secretary of Transportation shall waive a term under [§ 47153(a)(1)] on terms the Secretary considers necessary to protect or advance the civil aviation interests of the United States."

its actions. FAA Exhibit 2, Item 1 at 23 nn.42–43; Decision at 15–16 & n.8. These statutes authorize the FAA to add terms when initially conveying property or releasing restrictions, or to correct technical defects in instruments. They do not authorize the FAA to impose entirely new substantive obligations at its will 70 years after disposing of property. It would be nonsensical, contravene well settled principles of contract law, create an untenable framework, and wreak havoc on parties to permit the FAA to unilaterally change contracts decades after execution.

Second, the Associate Administrator erred in finding these are not new conditions, but are "simply [] the requirements for revenues derived from tracts conveyed by the SPA (*e.g.*, Seascape Properties) and [] the longstanding requirement to obtain FMV for the disposal of the non-aeronautical Seascape Properties." Decision at 16. These conditions, however, did not exist for decades after the agreements were signed. They *are* new, and the FAA's gymnastics claiming otherwise fall flat.

The first new requirement is that the City must give all proceeds to the County *unless* the City proves that another use "would have an equal or increased benefit for civil aviation," even though the 1953 Release "does not specify that the proceeds should go to Horry County." FAA Exhibit 2, Item 1 at 22–23; *see also* Decision at 15–16. This new term fundamentally alters the 1953 Release (assuming it remains

43

controlling), which gave the City discretion to spend these funds on the airport purposes it deemed best.

The second new requirement is that the City must follow fair market value obligations from an *FAA Compliance Manual* issued in September 2023—65 years after the last agreement and almost three years after the County filed its complaint. *See* Decision at 16 n.9 (citing *FAA Airport Compliance Manual*, Order 5190.6B, change 3, Chapter 22, § 22-17 (Sept. 9, 2023)). The Surplus Property Act has no fair market value requirements. And the *Compliance Manual*'s first edition was not issued until 1977, 24 years after the 1953 Resolution and Release and 19 years after the 1958 Agreements. Because the cited *Compliance Manual* post-dates the transactions by two generations, it cannot impair the City's marketable fee title in the Seascape Properties. Further, the pages in the *Compliance Manual* which the FAA cited do not even apply here, as they relate only to obtaining a "Release of Federal Obligations in Regard to Real Property Acquired as Federal Surplus Property," which the City did in 1953. Decision at 16 n.9 (citing *FAA Airport Compliance Manual*, § 22-17). The FAA also concedes that the *Compliance Manual* "is not regulatory and is not controlling with regard to airport sponsor conduct." *FAA Airport Compliance Manual*, § 1.1. The *Compliance Manual* therefore cannot bind the City.

In any event, the City is not proposing to sell the Seascape Properties for less than fair market value. The City and the purchasers agreed upon a $60 million sales price in arms' length negotiations after two qualified appraisals. FAA Exhibit 1, Item 1, Exhibit 3d at 3–4. Naturally, the City's appraisal was higher, and the purchasers' appraisal was lower. But such differences are common in large property transactions. The County also provided no evidence that the $60 million midpoint between the two appraisals is less than fair market value. Thus, the FAA erred in not finding that the County failed to meet its burden to prove noncompliance by the City in this respect.

In short, the FAA had no authority to add these conditions through a Part 16 proceeding commenced 63 years after the last operative document was signed. So even if this Court finds that the City has a continuing obligation to use the sale proceeds for airport purposes, this Court should reverse the FAA to the extent it imposes these conditions.[16]

---

[16] Because the new conditions substantively impair the City's rights in the property, they will constitute a regulatory taking if left in place after final resolution of this case. The City reserves its right to seek compensation if that occurs.

III.    **Alternatively, the FAA erred in not dismissing the County's complaint under the doctrines of estoppel, laches, or the statute of limitations.**

"The fusion of equitable defenses into federal statutes is important because they operate as judicial safety valves aimed at preventing opportunism and, in this way, maintain equity's primary cleansing function in preserving the integrity of the law." *See* T. Leigh Anenson, *Equitable Defenses in the Age of Statutes*, 36 Rev. Litig. 659, 659 (2018). Similarly, statutes of limitation "are found and approved in all systems of enlightened jurisprudence." *Wood v. Carpenter*, 101 U.S. 135, 139 (1879). They reflect a legislative determination to encourage the prompt initiation of claims and avoid staleness, inconvenience, and fraud. *Delebreau v. Bayview Loan Serv., LLC*, 680 F.3d 412, 415 (4th Cir. 2012). These principles compel dismissal of the County's claims.

A.    **The County is estoped from arguing that proceeds must be used for airport purposes because it agreed the City can use these funds for any purpose.**

The County's agreement and separate admissions that the City can use these proceeds for any purposes prevent it from now claiming otherwise. Giving the County as pass on its prior agreements and representations, the FAA held that "the City is attempting to use the doctrine of equitable estoppel to prevent the County from informing the FAA of a potential violation by the City of its [Surplus Property Act] obligations." Decision at 10–11. And because the County is directly affected by

the City's actions, the FAA determined "it would be unwarranted to deny the County the opportunity to pursue" its allegations. *Id.* at 11. The FAA erred as a matter of law by insulating the County from its own actions.

To the FAA's first finding, this case arose out of a complaint which the County filed. If estoppel lies against the FAA when conducting its own investigation, *In re Felts Field Aviation*, Dkt. No. FAA-2016-9210, 2020 WL 4443410, at *4–5 (F.A.A. July 31, 2020), it must also lie against a third party who brings a complaint to the FAA. The County does not enjoy *greater* rights than the FAA does.

To the FAA's second finding, the elements of equitable estoppel—which the Associate Administrator never addressed—prove why the doctrine's application is warranted. "The five (5) legal elements of an estoppel defense are 1) a false representation; 2) a purpose to invite action by the party to whom the representation was made; 3) ignorance of the true facts by that party; 4) reliance, and 5) a showing of injustice and lack of undue damage to the public interest." *Felts Field Aviation*, 2020 WL 4443410, at *5 (citations omitted).

In 1977, the FAA told the City and the County they could independently agree how to use any funds from leasing or selling the Seascape Properties. FAA Exhibit 1, Item 1, Exhibit 17 at 1. The parties did that in the 2004 IGA. To induce the City to sign the 2004 IGA, the County agreed that revenues from the Seascape Properties

may be used for any purpose and the 2004 IGA resolved all prior claims involving the Seascape Properties. FAA Exhibit 1, Item 1, Exhibit 22 at 1, 7–8. The County similarly agreed proceeds from the Seascape Properties can be used for non-airport purposes in its official bond statement. FAA Exhibit 1, Item 7, Exhibit 12 at 2 (defining proceeds received under the 2004 IGA as "Non-System Amounts"); *id.* at 3, § 401(e) (using Non-System Amounts for airport maintenance and operation expenses); *id.* at 4, § 413(a) (returning surplus Non-Systems Amounts to the County without restriction). The City could not have known that the County would fail to honor its representations, and therefore justifiably relied on them, when contracting to sell the Seascape Properties in 2020. The County even admits that the 2004 IGA is "not consistent" with its litigation position that the City remains obligated under the Surplus Property Act. FAA Exhibit 1, Item 9 at 6.

It therefore is unjust to deprive the City of its marketable fee title in the Seascape Properties by directing that their proceeds be used for airport purposes. Neither would giving the City the benefit the County's representations harm the public interest, because the County has accumulated over $42 million in unrestricted assets and fully developed an airport system using proceeds received since 1978 which it will keep. *See* FAA Exhibit 1, Item 21, Exhibit D at 3. The FAA erred in not dismissing the County's complaint under this defense.

**B.** **The County's claim is untimely because the County has known for almost 50 years that the City denies these proceeds must be used for airport purposes.**

The FAA held the County's action is timely because the FAA has jurisdiction to enforce the Surplus Property Act's "perpetual" obligations. Decision at 12. Under this view, the statute of limitations and laches will never run in a Surplus Property Act case. Once again, the FAA erred as a matter of law.[17]

To the extent the FAA suggests that the statute of limitations and laches do not apply when the agency enforces statutory obligations, the FAA is wrong. First, the FAA did not bring this claim; the County did. Second, the FAA has applied time bars to its enforcement proceedings. *E.g.*, *Felts Field Aviation*, 2020 WL 4443410, at *14; *In re Aviation Brake Serv., Inc.*, No. CP05SO036, DMS No. FAA-2005-22213, 2006 WL 657010, at *7 (F.A.A. Mar. 9, 2006). If the FAA's own actions can be time-barred, then so can complaints filed by third parties. The FAA therefore cannot avoid the merits of whether the County's action is timely.

Here, the County's complaint is time-barred under both the statute of limitations and the equitable doctrine of laches. While Part 16 does not have its own statute of limitations, the County agreed below that the FAA may apply the six-year statute

---

[17] The FAA found the County's action is timely "in part" for these reasons. Decision at 12. But the FAA never identified any other reason why this matter is timely.

in 28 U.S.C. § 2401(a). FAA Exhibit 2, Item 5 at 29. The statute begins running when a plaintiff had the ability to see relief in court. *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 810–11 (2024); *see also Hamilton Square, LLC v. United States*, 160 Fed. Cl. 617, 623 (Fed. Cl. 2022) "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923). The related defense of laches requires "inexcusable delay" in bringing the claim and resulting undue prejudice to the defendant. *Felts Field Aviation*, 2020 WL 4443410, at *14.

The County knew as far back as the 1980s that the City disputed it had *any* Surplus Property Act obligations. *See supra* pp. 6–7. At the very least, the County understood the City's position in 2002. FAA Exhibit 1, Item 7, Exhibit 7 at 4, ¶ 10 (the County alleging in 2002 that "the City has taken the position that it has no obligations" under the 1948 Deed, the 1953 Release, or the 1958 Agreements). And the County believes that the City's actions will cause the County irreparable harm. *See, e.g.*, FAA Exhibit 1, Item 1, Exhibit 4 at 10–18 (state court denying the County's claim of irreparable harm). Those disputes came to head in 2002 when the County filed its first Part 16 proceeding against the City, which resulted in the 2004 IGA. If the 2004 IGA did not resolve the County's claim to sales proceeds, as the County argued

50

below (*e.g.*, FAA Exhibit 2, Item 5 at 12–13), then the County had to seek relief as to sales proceeds at the time rather than let the dispute stew for 16 more years. If the 2004 IGA resolved any claim to sales proceeds, as the City argues here, then the County's claims fail because the agreement gives the County no right to those proceeds. The County cannot have it both ways by arguing that the 2004 IGA did not concern sales proceeds *and* that its present claim to those proceeds is timely.

Simply stated, there is no excuse for waiting decades to challenge the City's retention of revenues from the Seascape Properties if the agreements did not allow for it. The City is unduly prejudiced by that delay because it has contracted to use the proceeds for any purpose (the 2004 IGA, which the County now says is illegal) and to sell the Seascape Properties. Public policy does not allow the County to sit on its alleged rights for decades—in the face of known opposition from the City—and then seek to upend another public body's interest in its own property. Under no view of the facts, law, or policy can the County's action be considered timely.

## Conclusion

This case should be decided where it started: in court. The Supreme Court has directed that agencies cannot decide cases which resemble traditional court claims, like the County's specific performance action here. Litigants cannot forum-shop for a favorable agency to resolve a dispute, like the County did by dismissing its

state court case after losing and refiling before the FAA. And even if the FAA had jurisdiction, it disregarded the operative documents and limitations on its authority by requiring perpetual use of proceeds for airport purposes, designating Horry County as the presumptive recipient, and mandating compliance with modern fair market value standards. The FAA cannot rewrite documents decades after their execution to confer benefits on a non-party like the County.

This Court should therefore reverse the FAA and hold that the FAA lacked jurisdiction. Alternatively, it should hold that the City is entitled to retain all proceeds from the Seascape Properties and may use them for any purpose, or at a minimum, hold that the FAA exceeded its powers by adding new conditions to the terms of decades-old agreements.

## STATEMENT ON ORAL ARGUMENT

Under Local Rule 34(a), the City respectfully requests that this appeal be scheduled for oral argument. This appeal concerns which public body has the right to $60 million in proceeds from the sale of real property. It also presents questions involving recent Supreme Court precedent, the interpretation and enforcement of agreements from the 1940s and 1950s, and the FAA's refusal to apply common affirmative defenses. Oral argument therefore will substantially aid the decisional process.

Respectfully submitted,

**WILLOUGHBY HUMPHREY
  & D'ANTONI, P.A.**

*s/R. Walker Humphrey, II*
R. Walker Humphrey, II
133 River Landing Drive, Suite 200
Charleston, SC 29492
Telephone: (843) 619-4426
Facsimile: (843) 619-4430
whumphrey@whdlawyers.com

Hunter R. Pope
930 Richland Street (29201)
P.O. Box 8416
Columbia, SC 29202-8416
Telephone: (803) 252-3300
Facsimile: (803) 256-8062
hpope@whdlawyers.com

**GAROFALO GOERLICH HAINBACH PC**
Mark W. Atwood
1200 New Hampshire Ave. NW, Suite 410
Washington, DC 20036
Telephone: (202) 776-3973
Facsimile: (202) 776-3975
matwood@ggh-airlaw.com

*Attorneys for Petitioner City of Myrtle Beach,
South Carolina*

December 2, 2025
Charleston, South Carolina

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   this document contains 12,915 words.

2. This brief complies with the typeface and type style requirements because:

   this brief has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Equity A font.

   *s/R. Walker Humphrey, II*
   R. Walker Humphrey, II

December 2, 2025
Charleston, South Carolina