No. 25-1910

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

CITY OF MYRTLE BEACH, SOUTH CAROLINA,

Petitioner,

v.

HORRY COUNTY, SOUTH CAROLINA,

Respondent,

FEDERAL AVIATION ADMINISTRATION,

Respondent.

———————————

On Petition for Review from the Federal Aviation Administration
———————————

**AMENDED PAGE-PROOF BRIEF FOR FEDERAL RESPONDENT**
———————————

*Of Counsel:*

WILLIAM MCKENNA
*Chief Counsel*

ANDREW WILLIAMSON
JESSIE DI GREGORY
*Attorneys, Office of the Chief Counsel*

*Federal Aviation Administration*

BRETT A. SHUMATE
*Assistant Attorney General*

AUGUST E. FLENTJE
CAROLINE D. LOPEZ
*Attorneys, Appellate Staff*
*Civil Division, Room 7535*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4825*

## TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.................................................................. 1

STATEMENT OF THE ISSUES.................................................................... 1

PERTINENT STATUTES AND REGULATIONS ................................................... 2

STATEMENT OF THE CASE ...................................................................... 2

    A.    Statutory and Regulatory Background ...................................................2

    B.    Factual Background...........................................................................7

        1.    FAA Transfers and Agreements Pursuant to the Surplus Property Act .......................................................................7

        2.    Agreements Between the City and the County........................11

    C.    Administrative Proceedings ...............................................................12

SUMMARY OF ARGUMENT ..................................................................... 14

STANDARD OF REVIEW ......................................................................... 20

ARGUMENT ....................................................................................... 20

I.    The City's *Jarkesy* Challenge Fails ............................................................ 20

    A.    The Article III Framework ...............................................................21

    B.    The City Forfeited Its Challenge to the Proceedings .........................24

    C.    FAA's Order Does Not Implicate Article III Because It Does Not Impair Petitioner's Private Property Rights ................................28

II.    The City Has Ongoing Surplus Property Act Obligations to Use Seascape's Revenues for Civil Aviation Purposes Under the 1953 Deed Release ............................................................................... 31

A.   The Surplus Property Act Framework ...............................................31

B.   The 1948 Deed, 1953 Deed Release, and 1958 Agreement
     Confirm the City Has Ongoing Obligations to Use Seascape's
     Proceeds for Civil Aviation Purposes ................................................34

C.   The City's Arguments to the Contrary Are Unavailing.....................39

     1.   The 1958 Agreement Does Not Waive the City's
          Obligations Under the 1953 Deed Release and the
          Surplus Property Act.........................................................................39

     2.   Agreements Between the City and the County Cannot
          Alter the City's Obligations to FAA Under the 1953
          Deed Release and the Surplus Property Act ............................43

     3.   FAA's Instructions for the Corrective Action Plan Do not
          Exceed Its Authority ................................................................45

CONCLUSION ....................................................................................... 47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Boesche v. Udall*,
   373 U.S. 472 (1963) ...................................................................27, 32

*Carr v. Saul*,
   593 U.S. 83 (2021) ...........................................................................25

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) .........................................................................22

*Crowell v. Benson*,
   285 U.S. 22 (1932) ...................................................17, 22, 23, 27

*Edd Potter Coal Co. v. Director, Off. of Workers' Comp. Programs*,
   39 F.4th 202 (4th Cir. 2022) ...........................................................25

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989) ...............................................................22, 23, 25

*Northrop Grumman Sys. Corp. v. U.S. Dep't of Lab., Admin. Rev. Bd.*,
   927 F.3d 226 (4th Cir. 2019) ...........................................................20

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
   584 U.S. 325 (2018) .........................................................................22

*Parkway 1046, LLC v. U.S. Home Corp.*,
   961 F.3d 301 (4th Cir. 2020) ...........................................................40

*Robertson v. Federal Election Comm'n*,
   45 F.3d 486 (D.C. Cir. 1995) ...........................................................25

*SEC v. Jarkesy*,
   603 U.S. 109 (2024) ..................................... 13, 16, 17, 23, 24, 25, 27

*Southern Utah Wilderness All. v. Bureau of Land Mgmt.*,
   425 F.3d 735 (10th Cir. 2005) ...................................................33, 39

*Stern v. Marshall*,
   564 U.S. 462 (2011) .........................................................................22

*United States v. King County*,
   122 F.4th 740 (9th Cir. 2024) ...................................................6, 26, 31

*USAir, Inc. v. Department of Transp.*,
   969 F.2d 1256 (D.C. Cir. 1992) .......................................................25

*Wilson v. Omaha Indian Tribe*,
   442 U.S. 653 (1979) .......................................................................33

**U.S. Constitution:**

U.S. Const. art. III, § 1 ...................................................................21

**Statutes:**

Surplus Property Act of 1944, ch. 479, 58 Stat. 765 ........................3, 47

Act of July 30, 1947, ch. 404, 61 Stat. 678.....................................3, 15

Act of Oct. 1, 1949, ch. 589, 63 Stat. 700.........................................3, 4


5 U.S.C. § 706(2)(A)........................................................................20

49 U.S.C. § 46110(a) .....................................................................1, 6

49 U.S.C. § 46110(d) .......................................................................24

49 U.S.C. § 47101(a) ...................................................................5, 6, 7

49 U.S.C. § 47107 ........................................................................ 5, 6, 7

49 U.S.C. § 47111(f) ..................................................................6, 26, 31

49 U.S.C. § 47122 ..............................................................................5

49 U.S.C. § 47122(a) ...................................................................5, 6, 7

49 U.S.C. § 47151(a) ......................................................................4, 32

49 U.S.C. § 47151(b) ............................................................5, 18, 31, 46

49 U.S.C. § 47152 ..........................................................................4, 32

49 U.S.C. § 47152(1) ..........................................................................4

49 U.S.C. § 47152(8) ......................................................................4, 6

49 U.S.C. § 47153(a)(2) ....................................................................45

49 U.S.C. § 47153(b) ......................................................................4, 32

49 U.S.C. § 47153(c) .........................................................................5

49 U.S.C. §§ 47151-47153 ..............................................................3, 4

iv

**Regulations:**

14 C.F.R. pt. 13 ..................................................................5

14 C.F.R. pt. 16 ...............................................................5, 6

14 C.F.R. § 16.31 ...............................................................6

14 C.F.R. § 16.33(b) ...........................................................6

14 C.F.R. § 16.33(f) .......................................................13, 24

14 C.F.R. § 16.109(a), (c)-(d) .............................................6, 7

14 C.F.R. § 16.241 ..............................................................6

14 C.F.R. § 16.245 ..............................................................6

14 C.F.R. § 16.247 ..............................................................6

14 C.F.R. § 16.105 ..............................................................6

14 C.F.R. § 155.3 ..............................................................46

14 C.F.R. § 155.7(b) ..........................................................46

49 C.F.R. § 1.83(a)(9) .......................................................4, 5

**Legislative Material:**

S. Rep. No. 80-359 (1947). ...............................................2-3

## STATEMENT OF JURISDICTION

The Federal Aviation Administration's (FAA) final order was issued on July 18, 2025. FAA1410-36. Petitioner, the City of Myrtle Beach (City) filed a timely petition for review on August 8, 2025, naming FAA and Horry County (County) as respondents. This Court has jurisdiction under 49 U.S.C. § 46110(a).

## STATEMENT OF THE ISSUES

In 1948, the United States transferred several tracts of federal property to the City. Pursuant to the Surplus Property Act, the United States did so at no cost to the City but subject to the condition that the tracts be used to develop a public airport. Most of those tracts became Myrtle Beach Municipal Airport (Myrtle Beach Airport), but one became Seascape Properties (Seascape). In a 1953 Deed Release, FAA accepted the City's request to release Seascape from obligations to use the property directly for airport purposes under the 1948 Deed and substituted new obligations that the City use, lease, or sell Seascape to generate revenue to support such airports. In a 1958 Agreement between FAA, the City, and the South Carolina Aeronautics Commission (Commission), the City agreed that FAA could direct the City to transfer such revenues to the Commission. After doing so for decades, the City indicated that it planned to sell Seascape and might retain the proceeds for non-aviation uses.

The issues presented are:

1. Whether the City was entitled to adjudication by an Article III court before FAA could obtain an accounting of how the City's proposed sale or lease of surplus property it had received without cost from the United States would be used for civil aviation purposes.

2. Whether the City remains obligated to use the proceeds from the sale or lease of Seascape for civil aviation purposes under the Surplus Property Act, as required by the 1953 Deed Release.

3. Whether FAA reasonably interpreted the City's ongoing obligations to use the proceeds from a sale of the property for civil aviation purposes as encompassing a demonstration that the City was getting fair market value for the sale and that the proceeds would be used effectively for those purposes.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

The United States made significant investments related to its World War II efforts, including expending "[w]ell over a billion dollars" in the "acquisition of … property for … airports and for the construction of the airport facilities." S. Rep.

No. 80-359, at 3 (1947). "To aid the reconversion from a war to a peace economy through the distribution of Government surplus property," Congress enacted the Surplus Property Act in 1944, as amended in 1947 and 1949. Surplus Property Act of 1944, ch. 479, pmbl., 58 Stat. 765, 765; Act of July 30, 1947, ch. 404, 61 Stat. 678; Act of Oct. 1, 1949, ch. 589, 63 Stat. 700 (together, Surplus Property Act or Act) (currently codified in relevant part at 49 U.S.C. §§ 47151-47153). The Act originally enabled the transfer of surplus property to the public in exchange for payment of "fair value." Surplus Property Act of 1944, ch. 479, §§ 2, 12, 58 Stat. at 766-67, 770. As to surplus airport property, Congress emphasized that such transfers should "foster the development of civilian aviation and preserve for national defense purposes a strong, efficient, and properly maintained Nationwide system of public airports," which could best be accomplished by transferring such properties to States and local governments. Act of July 30, 1947, ch. 404, pmbl., 61 Stat. at 678. The Act therefore permitted State and local governments to obtain such property "without monetary consideration," while imposing various obligations to ensure the property is used to support civil aviation—the violation of which could trigger reversion to the United States or other remedial action. *See id.* § 2, 61 Stat. 678-80. Congress vested the Secretary of Transportation, as delegated to FAA, with authority to determine whether it served aviation purposes to transfer

3

such properties on these terms and to waive or enforce the attendant obligations.
*See id.*; Act of Oct. 1, 1949, ch. 589, 63 Stat. at 700-01; 49 C.F.R. § 1.83(a)(9).

**1.** The Act's provisions relating to the transfer of federal property for airport
purposes is currently codified at 49 U.S.C. §§ 47151-47153. They reflect
Congress's mandate that FAA only transfer such property to State and local
governments if it is "desirable for developing, improving, operating, or
maintaining a public airport"; "reasonably necessary to fulfill the immediate and
foreseeable future requirements for developing, improving, operating, or
maintaining a public airport"; or "needed for developing sources of revenue from
nonaviation businesses at a public airport." 49 U.S.C. § 47151(a). Such transfers
are also subject to obligations that ensure grantees use the property for these
purposes. For example, these default terms and obligations reserve for the United
States the right to prohibit the property from being used, leased, or sold for non-
aviation purposes and the right to reversion of the property if any of the terms or
obligations are not satisfied. *Id.* § 47152(1), (2).

FAA has discretion to "waive a term required by section 47152 of this title
or add another term if [FAA] decides it is necessary to protect or advance the
interests of the United States in civil aviation or for national defense." 49 U.S.C.
§ 47153(b). FAA must first provide public notice and determine that a waiver "will
not significantly impair the aeronautical purpose of an airport"; "will not result in

4

the permanent closure of an airport (unless the Secretary determines that the waiver will directly facilitate the construction of a replacement airport)"; or "is necessary to protect or advance the civil aviation interests of the United States." *Id.* § 47153(c).

**2.** Congress entrusted enforcement of Surplus Property Act interests related to public airports to FAA. *See* 49 U.S.C. § 47151(b); 49 C.F.R. § 1.83(a)(9). Section 47151(b) authorizes FAA to "ensure compliance with an instrument conveying an interest in surplus property" and further provides that FAA "may amend the instrument to correct the instrument or to make the conveyance comply with law." 49 U.S.C. § 47151(b). This specific authority is reinforced by FAA's general authority to "take action the Secretary considers necessary to carry out this subchapter," in which these Surplus Property Act provisions are codified. *See id.* § 47122(a). Pursuant to these authorities,  FAA employs different tools to ensure that grantees are complying with the obligations in Surplus Property Act deeds, releases, and agreements.

The first step is determining whether there has been a violation that merits enforcement through informal communications and formal investigations pursuant to Part 13 and Part 16 of the regulations. *See* 49 U.S.C. §§ 47101(a), 47107, 47122; 14 C.F.R. pt. 13; *id.* pt. 16.

5

Under the Part 16 procedures used here, FAA may initiate a multi-tiered process based on the agency's own initiative or in response to a written complaint. 49 U.S.C. §§ 47101(a), 47107, 47122(a); 14 C.F.R. pt. 16. If the issues are not resolved informally, the FAA's Director of the Office of Airport Compliance issues an initial decision. 14 C.F.R. §§ 16.31, 16.105. The Director's determination may be appealed to the Associate Administrator, who issues the final agency decision, *id.* §§ 16.31(c) 16.33(b), 16.241, 16.245, subject to judicial review in the court of appeals, 49 U.S.C. § 46110(a); 14 C.F.R. § 16.247.

If FAA determines a grantee has violated its Surplus Property Act obligations, FAA has several enforcement options. It may order grantees to comply with their obligations without taking further enforcement action. *Cf.* 14 C.F.R. § 16.109(a), (c)-(d). FAA may choose to seek reversion of the property where such rights have been reserved. 49 U.S.C. § 47152(8). Alternatively, FAA may require specific performance of the grantee's obligations by "apply[ing] to the district court of the United States" to "restrain[] any person from further violation" under 49 U.S.C. § 47111(f). *See United States v. King County*, 122 F.4th 740, 754-55 (9th Cir. 2024) (quoting 49 U.S.C. § 47111(f)). If the grantee has accepted federal grants to develop an airport related to the property, FAA also may take enforcement action based on the violation of any ongoing grant assurances, such as airport revenue diversion, including by revoking existing grants or prohibiting the grantee

6

from obtaining new grants. 49 U.S.C. §§ 47101(a), 47107, 47122(a); 14 C.F.R.
§ 16.109(a), (c)-(d).

**B.    Factual Background**

**1.    FAA Transfers and Agreements Pursuant to the
Surplus Property Act**

**a. 1948 Quitclaim Deed**

In 1948, the United States conveyed several land tracts in a quitclaim deed
to the City without requiring any monetary payment under the Surplus Property
Act. *See* FAA1413, 214-225. The 1948 Deed made the City's title "subject to"
various "restrictions … which shall run with the land" to ensure that the property
would be used for civil aviation purposes. FAA221. These restrictions required that
the property be "used for public airport purposes for the use and benefit of the
public" and provided that "no property transferred by this instrument shall be used,
leased, sold, salvaged, or disposed of … for other than airport purposes without the
written consent of the Civil Aeronautics Administrator." FAA221, 223. The deed
also contained a property reversion clause to the United States if "any of the
aforesaid terms, conditions, reservations or restrictions is not met, observed, or
complied with by" the City. FAA224.

The City developed some of the tracts as part of Myrtle Beach Airport and
accepted two federal grants to help in those endeavors, which imposed ongoing
grant assurances. *See* FAA1181.

### b. 1953 Deed Release of Two of the 1948 Tracts

In 1953, the City passed a resolution to obtain a release from FAA of the City's obligations as to "two tracts of land … comprising a part of the real estate conveyed by" the 1948 Deed that had not been used as part of Myrtle Beach Airport. FAA230. The City explained that release would enable it to use "revenues derived from the use, lease or disposition of two tracts of land for public airport purposes" to support Myrtle Beach Airport or "another public airport serving the Myrtle Beach" area "in consideration" for release. FAA230-231.

In the 1953 Deed Release, FAA "convey[ed], quitclaim[ed] and release[d] all of the [United States'] right, title and interest … in said two tracts of land, in order that a marketable fee title to said tracts may be vested in" the City. FAA234. FAA released the "possibilities of reverter retained [and] … reserved in the [United States] by said quitclaim deed dated October 22, 1948." FAA235-236. The 1953 Deed Release expressly incorporated the City's 1953 Resolution "obligating" the City "to utilize any revenue derived from the use, lease, or disposition of the said two tracts of land in connection with the civil use of the Myrtle Beach … Airport, or for the development, improvement, operation or maintenance of another public airport." FAA235. And the 1953 Deed Release made the two tracts subject to the agreement that the City, "its successors and assigns" would provide for an "easement" over the airspace near Myrtle Beach Airport and would not allow the

8

land to be "used in any manner … which would create a hazard to the landing, taking off, or maneuvering of aircraft." FAA235, 237.

### c. 1958 Agreements

In 1958, FAA entered an agreement with the City and the Commission, to enable the shift of civil aviation operations from Myrtle Beach Airport, which was needed for exclusively military purposes, to alternate facilities that FAA and the Commission would improve at Cresent Beach Airport and that the City could use.

The United States received the City's "right, title, and interest in and to … the Myrtle Beach Airport" for military uses. FAA255-256. The United States paid $326,000 for improvements at Cresent Beach Airport as "substitute facilities for civil aviation" in the area. FAA256. Because the Commission would "assume[] like obligations to the Government with respect to the Cresent Beach Airport," as those the City previously owed with respect to Myrtle Beach Airport, the United States released the City from its obligations with respect to the tracts constituting Myrtle Beach Airport that were still subject to the enumerated deeds from 1948, 1949, and 1950 and grants from 1949 and 1951, but did not release any of the City's obligations with respect to the two tracts that were instead subject to obligations under the 1953 Deed Release. *See* FAA255-256; *see also* FAA257. The City "agree[d] to pay to the Commission, upon the request of the [F]AA, all airport funds for which the City is now and may hereafter become accountable, derived

9

from the airport property transferred by the aforesaid deeds dated October 22, 1948, June 17, 1949, [and] March 22, 1950." FAA257. The Commission agreed to operate Crescent Beach Airport for at least 20 years, subject to the terms and conditions in the 1958 Agreement. FAA257-260.

### d. FAA Letters to the City

In 1976, FAA directed the City to transfer Seascape's revenue to the Commission's successor "in accordance" with the 1958 Agreement. FAA336. In 1977, FAA explained that it remained "the deeds of release and resolutions by the [City] in the year 1953" —not the 1958 Agreement and its release of prior obligations relating to Myrtle Beach Airport—that "established" the City's "obligation … to use the proceeds from the former government surplus land for public airport purposes." FAA338. The 1958 Agreement instead "establishes the mode of payment for such surplus property proceeds," namely that the City would pay those proceeds to the Commission "upon request [by] the [F]AA," which itself would "be a continuing obligation until the parties mutually reach a new agreement." FAA338 (quotation marks omitted).

In 2001, FAA reiterated that Seascape's revenues are "under obligation from the original 1953 release and subsequent agreements, to be used for public airport purposes." FAA350. In 2002, FAA directed the City to transfer revenues to the

County in accordance with "our February 24, 1953 release and the three-party agreement of October 7, 1958." FAA352.

In 2021, after FAA learned that the City might sell Seascape, FAA instructed the City to transfer any sale proceeds to the County "for appropriate airport purposes," in accordance with the City's obligations to FAA in "the Government's 1953 release of Federal obligations on the Seascape property and the terms of the October 7, 1958 agreement." FAA210. FAA also advised that any such conveyance should "reflect the avigation easement granted by the City as a condition of the Federal Government's release of the City's obligations." FAA210.

### 2.     Agreements Between the City and the County

Since the 1970s, the City and the County have disputed the City's obligation to transfer Seascape's revenues, which has involved several trips to State courts. *See* FAA13-16. As described, FAA sent letters instructing the City to transfer funds to the County pursuant to the 1953 Deed Release and 1958 Agreement, but did not find it necessary to take enforcement action or amend its prior deeds or agreements with the City.

In 2004, the City and the County entered into an intergovernmental agreement (2004 IGA) providing that the County would automatically receive 75% of Seascape's lease revenue and the City would receive the remaining 25%,

FAA947, but did not address how to distribute proceeds from any sale of Seascape, FAA946-950. FAA was not a party to this agreement. FAA950.

### C.    Administrative Proceedings

In November 2020, the County learned the City had proposed selling Seascape and sent a letter objecting to the sale and requesting any proceeds. FAA1415. The next month, the County filed suit in South Carolina state court to enjoin the sale. FAA1415. The court granted the County's temporary restraining order but later denied its request for an injunction. FAA1415. The court subsequently granted the County's voluntarily dismissal. FAA1415.

The County then filed a Part 16 complaint with FAA, arguing that the City's proposed plan to sell Seascape violated the City's Surplus Property Act obligations. FAA1-32. While proceedings were pending, the City terminated the 2004 IGA but "voluntarily placed 75% of those proceeds in a separate ledger account pending final resolution" of FAA's proceedings. Pet'r Br. 12 n.5.

The FAA Director's Determination rejected the City's threshold standing objections to the County's complaint. FAA1175-76. The Director concluded the City remained obligated to use any "proceeds from the disposition of the property … to benefit civil aviation in accordance with the [Surplus Property Act]," as a condition of the 1953 Deed Release, and explained that nothing in the 1958 Agreement (or the 2004 IGA) waived that obligation. FAA1179, 1181. The

12

Director ordered the City to submit a corrective action plan identifying how it would comply with these obligations. FAA1187.

On administrative appeal, the City argued for the first time that FAA should dismiss the County's complaint because, in the City's view, the proceedings implicated "contract issues" that did not come within the public rights exception to the requirement that such claims be heard by Article III courts. *See* FAA1339-1349. The City asserted "good cause" for not having raised this issue before the Director as otherwise required by 14 C.F.R. § 16.33(f) because the City believed that the intervening decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024), "narrowed" the public rights exception. *See* FAA1342.

The Associate Administrator affirmed the Director's Determination. The Associate Administrator found that FAA had "jurisdiction to determine if the City is in compliance with its obligations associated with the federally conveyed Seascape Properties, as this controversy arises out of the [Surplus Property Act]," and rejected the City's argument that the County's complaint bringing this violation to FAA's attention should be barred under the principles of estoppel and the doctrine of laches. FAA1418-21. The Associate Administrator denied "[a]ll other Motions not specifically granted herein." FAA1426.

The Associate Administrator affirmed the Director's conclusions that the City had ongoing obligations under the "condition" set by the 1953 Deed Release

13

"that the proceeds from the disposition of the property would be used to benefit civil aviation in accordance with the [Surplus Property Act]." FAA1422. The Associate Administrator also upheld the Director's "exercis[e of] his authority" to "allow alternative proposals for the use of the sale proceeds demonstrating a relative benefit to civil aviation" and to require that the property be disposed of for "Fair Market Value," consistent with "the requirements for revenues derived from tracts conveyed by the [Surplus Property Act]." FAA1425.

The Associate Administrator ordered the City to submit a corrective action plan that "will identify its proposal for how to use the proceeds to benefit civil aviation" if it "inten[ds] to continue with the sale" and instructed that such sale should "follow Federal law and FAA policy," including by obtaining fair market value. FAA1186. If the City decided against sale, the Associate Administrator ordered a similar accounting for the proposed lease. FAA1187. The Associate Administrator did not impose any penalty or take any other enforcement action but did reserve the right to do so. *See* FAA1187.

## SUMMARY OF ARGUMENT

Congress enacted the Surplus Property Act to dispose of federal property acquired during World War II. To "maintain[ a] Nationwide system of public airports" for "civilian aviation and … national defense purposes," the Act permits the transfer of airport property to States and local governments at no cost but

14

subject to the condition that they use the property to support public airports. Act of July 30, 1947, ch. 404, pmbl., § 2, 61 Stat. at 678-80. Such transfers are subject to ongoing obligations to further this purpose, including that the property cannot be used for non-airport purposes without permission from FAA and that the violation of this or any other obligation could trigger reversion of the property to the United States or other remedial measures. Congress authorized FAA to transfer such property subject to these conditions; waive or amend such conditions if FAA determined doing so would serve aviation purposes; and ensure grantees' compliance with their obligations. Nothing requires a local government to take property under the Surplus Property Act, but once it does it takes on a federal obligation to follow the Act's requirements, subject to FAA's administration.

This petition involves a tract of land—known as Seascape—that was originally transferred to the City in a 1948 Deed without monetary consideration as one of several tracts to be used for a public airport. Many of these tracts became part of Myrtle Beach Airport, which the City initially operated. In 1953, at the City's request, FAA released Seascape from certain obligations under the 1948 Deed and substituted new obligations that the City use, lease, or sell Seascape to generate revenue to support civil aviation. That ongoing Surplus Property Act obligation is at issue here.

Although the City transferred Seascape's revenues to the County's airport commissions for nearly 70 years, the City recently indicated that it planned to sell Seascape and potentially retain the proceeds for non-aviation uses. The County filed a complaint about this proposal with FAA. In the order now on review, FAA determined that the City remained bound by its Surplus Property Act obligations under the 1953 Deed Release and instructed the City to submit a plan explaining how it would structure the sale and proceeds to benefit civil aviation to satisfy that obligation.

**1.** The City's threshold challenge under *SEC v. Jarkesy*, 603 U.S. 109 (2024), is unavailing. As an initial matter, the challenge is forfeited because the City failed to timely present it to the agency and has not established a good cause for waiting. Moreover, it raises the sort of issue that benefits from administrative exhaustion because the question of whether adjudication by Article III courts is required in the first instance depends on a number of case-specific factors, including the nature of the agency's order.

The Constitution preserves the right to adjudication by Article III courts as to certain matters. But throughout the Nation's history, it has been established that certain matters outside of the judicial power may be adjudicated by the Executive Branch. In delineating which matters may be determined by the Executive, the Supreme Court has distinguished between public and private rights. While the

16

Court has not definitively delineated the precise contours of public and private rights, it has long recognized that the Executive may adjudicate disputes implicating the administration of public lands. *Crowell v. Benson*, 285 U.S. 22, 51 (1932); *Jarkesy*, 603 U.S. at 130.

The City contends that an Article III court is required because, in the City's view, FAA resolved a "dispute seeking specific performance of deeds and contracts between non-federal parties." Pet'r Br. 17. That is incorrect, as the order on appeal instead involves FAA evaluating the City's ongoing federal obligations under the Surplus Property Act and requiring an accounting of the City's planned use for Seascape. Accordingly, this Court should not reach the Article III question in this case: FAA is not asserting jurisdiction to impair the City's property rights. FAA has instead ordered the City to submit its plan for a potential sale, and there are multiple potential outcomes that may obviate the City's alleged Article III concerns. If the plan indicates the City will use the proceeds for some sort of civil aviation purposes (and will get fair market value), there would be no reason for enforcement action in any forum. And even if FAA determines that the City's plan would violate its Surplus Property Act obligations, FAA would need to take additional enforcement steps, which likely involve applying to a federal district court to restrain any further violation. That action could resolve any Article III

challenge and allow that court to consider the impact of *Jarkesy*. In sum, the City has not shown that there has been any Article III violation.

**2.** The City fares no better on the merits.

As described, the order only requires the City to explain how it plans to structure the sale and proceeds of the disposition of property it obtained under the Surplus Property Act but does not take any further enforcement action. That kind of order falls squarely within FAA's authority to "ensure compliance with an instrument conveying an interest in surplus property" by evaluating what obligations the agency believes apply and ascertaining what a grantee proposes to do with respect to those obligations. *See* 49 U.S.C. § 47151(b). In any event, it was proper to order an accounting because FAA's interpretation of the City's Surplus Property Act obligations under the 1948 Deed, 1953 Deed Release, and 1958 Agreement are correct as a matter of law.

The plain terms of the 1948 Deed, the 1953 Deed Release, and the 1958 Agreement make clear that the City has ongoing obligations to use the revenues from the lease or sale of Seascape for civil aviation purposes. And because they pertain to the disposition of public lands, any ambiguities as to whether the United States reserved or conditioned the transfer of these public lands to the City are to be read in favor of the federal government. Specifically, the 1953 Deed Release, which served as substitute quitclaim deed for two of the tracts of land in the1948

18

Deed, expressly requires the City to use Seascape's revenues to benefit civil aviation. The 1953 Deed Release contains no time limitation on this obligation, and FAA has never altered its position that it remains in force.

The City now insists that the 1958 Agreement between FAA, the City, and the Commission waived this obligation. Not so. That agreement facilitated the transfer of civil aviation activities at Myrtle Beach Airport, which had been operated by the City, to upgraded civil aviation facilities at Crescent Beach Airport, which would be operated by the Commission. Upon completion of the improvements, the 1958 Agreement released the City only from those obligations "created by or under" the deeds from 1948, 1949, and 1950 and the grants dated 1949 and 1951, but did not reference the 1953 Deed Release or contain any broader language sweeping in other deeds or releases. Because, as noted above, the City's then-current obligations as to this tract of land were instead created by and under the 1953 Deed Release, they were not released by the 1958 Agreement. To the contrary, another provision in the 1958 Agreement confirmed that FAA could direct the City to pay any revenues to the Commission, without placing any time limit on FAA's ability to do so. That accords with the purposes of the agreement: The City no longer needed to operate an airport on surplus property it returned to the United States, so it was released from its obligations related to doing so, but

19

that did not alter the City's obligations to use the surplus property that remained in its hands to support civil aviation elsewhere.

Nor can any subsequent interactions between the City and the County—including the 2004 IGA between those two parties—supersede the City's ongoing Surplus Property Act obligations to FAA under the 1953 Deed Release. Indeed, FAA could not have delegated its authority to other entities because the Surplus Property Act mandates that only FAA can issue such a waiver and only when it would promote the Act's interests in supporting public airports. The City's remaining arguments about FAA's instructions about what information the City should include when describing how its proposed plan would benefit civil aviation are insubstantial.

## STANDARD OF REVIEW

The Court reviews agency action to determine if it is "arbitrary, capricious," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court reviews questions of law de novo. *See, e.g.*, *Northrop Grumman Sys. Corp. v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 927 F.3d 226, 232 (4th Cir. 2019).

## ARGUMENT

### I.    The City's *Jarkesy* Challenge Fails

The City contends that FAA's order must be set aside under *Jarkesy* because only an Article III court can resolve a "dispute seeking specific performance of

20

deeds and contracts between non-federal parties." Pet'r Br. 17. As an initial matter, the City forfeited its *Jarkesy* challenge by failing to properly raise it with the agency. In any event, that argument misunderstands the framework of Article III, which permits FAA to direct the City to provide more information about whether a proposed sale of land deeded to the City pursuant to the Surplus Property Act will accord with the City's accordant obligations so that FAA can determine if further enforcement action is necessary and the appropriate forum for such action. If that forum is a federal district court, that court will be fully capable of considering *Jarkesy*. There is no occasion for this Court to prejudge the applicable Article III limits because FAA did not, as the City incorrectly insists, resolve any contract claims between non-federal parties but instead ordered an accounting from the City of how it planned to carry out its Surplus Property Act obligations to FAA.

## A.    The Article III Framework

The Constitution directs that the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," and provides that these judges "shall hold their Offices during good Behaviour, and shall … receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. art. III, § 1. Throughout the Nation's history, it has been established that certain matters outside of the judicial power may be adjudicated by the

Executive Branch. Thus, "since the beginning of the Republic," executive officials have "conduct[ed] adjudications," which may take "'judicial' forms" but are ultimately "exercises of … the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013).

In delineating which matters may be determined by the Executive, the Supreme Court has distinguished between "public rights" and "private rights." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018). Private rights, "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," are generally reserved to Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quotation marks omitted). But for public rights, "the mode of determining matters … is completely within congressional control," such that Congress may decide the matter itself, "delegate that power to executive officers, or may commit it to judicial tribunals." *Crowell v. Benson*, 285 U.S. 22, 50 (1932) (quotation marks omitted).[1]

Where an Act of Congress implicates "public rights," however, they may constitutionally be assigned to and adjudicated by the Executive Branch. *See SEC*

---

[1] FAA does not understand the City to argue that a claim for specific performance of the obligations must be determined by a jury. The City has disclaimed this argument, *see* FAA1381, and it would be unavailing. Such claims sound in equity, as the City acknowledges, and therefore do not implicate the Seventh Amendment. *Compare Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989), *with* Pet'r Br. 22-23.

*v. Jarkesy*, 603 U.S. 109, 129-31 (2024); *Granfinanciera*, 492 U.S. at 51. The Supreme Court has never definitively identified the distinguishing features of public rights. But the Court's "precedents have recognized that the [public-rights] doctrine covers matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" *Oil States*, 584 U.S. at 334 (quoting *Crowell*, 285 U.S. at 50). It is well-established that the Executive can therefore adjudicate matters related to "the congressional power as to interstate and foreign commerce, taxation, immigration, the public lands, public health, the facilities of the post office, pensions, and payments to veterans." *Crowell*, 285 U.S. at 51; *see also Jarkesy*, 603 U.S. at 130. The Supreme Court has not categorically limited public rights to these specifically identified areas, but it has clarified that the doctrine does not extend to "[w]holly private tort, contract, and property cases, as well as a vast range of other cases." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51 (1989) (quotation marks omitted).

In *Jarkesy*, the Supreme Court considered whether the Securities and Exchange Commission could use an administrative proceeding to impose civil monetary penalties when a person had violated the federal securities laws' "antifraud provisions," which "replicate common law fraud." 603 U.S. at 120. The Court explained that although the relevant securities provisions were part of a

"newly fashioned regulatory scheme," the alleged fraud violations were "a common law suit in all but name," and so did not involve public rights. *Id.* at 135-36 (quotation marks omitted). Instead, the enforcement action "target[ed] the same basic conduct as common law fraud," under a statute that "employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles" to the common law. *Id.* at 134. In so holding, *Jarkesy* reiterated that Congress may direct the Executive to adjudicate matters of public rights and to impose penalties for their violation. *Id.* at 128.

### B.     The City Forfeited Its Challenge to the Proceedings

As a threshold matter, the City did not preserve this challenge to FAA's jurisdiction because the City failed to timely raise that objection during the administrative proceedings.

49 U.S.C. § 46110(d) provides that the "court may consider an objection to an order" of the FAA "only if the objection was made in the proceeding" or "if there was a reasonable ground for not making the objection in the proceeding." And FAA's regulations governing the agency's adversarial Part 16 proceedings likewise require that "[a]ny new issues or evidence presented in an appeal" to the Administrator "will not be considered unless accompanied by a petition and good cause found as to why the new issue … was not presented to the Director." 14 C.F.R. § 16.33(f). As part of the "adversarial administrative proceeding[s]," the

City was "expected to develop the issues" and to exhaust all issues to preserve

them for judicial review, *Carr v. Saul*, 593 U.S. 83, 89 (2021) (quotation marks

omitted), and to do so in accordance by providing notice to the agency in the time

and manner set out in the regulations, *see*, *e.g.*, *Robertson v. Federal Election*

*Comm'n*, 45 F.3d 486, 491 (D.C. Cir. 1995) (citing *USAir, Inc. v. Department of*

*Transp.*, 969 F.2d 1256, 1260 (D.C. Cir. 1992)).

By its own admission, however, the City failed to present this issue to the

Director. Nor is that failure excused because the "the Supreme Court had not yet

decided *Jarkesy*" and that case "changed the public rights landscape," as the City

contends. Pet'r Br. 28. To the contrary, *Jarkesy* emphasizes that existing

precedent—particularly its prior decision in *Granfinanciera*—"effectively decides

this case" as to the public-rights analysis. *Jarkesy*, 603 U.S at 134. The City

therefore already had what it needed to have timely raised this challenge.

Nor, given the context here, is this the type of question that nevertheless

must be addressed now simply because it may be jurisdictional in certain

circumstances. *See USAir, Inc.*, 969 F.2d at 1259-60 (only those jurisdictional

challenges to the very composition or "constitution" of any agency are not subject

to forfeiture (quotation marks omitted)). *But see Edd Potter Coal Co. v. Director,*

*Off. of Workers' Comp. Programs*, 39 F.4th 202, 207 (4th Cir. 2022) (indicating

that forfeiture applies differently for jurisdictional claims). Rather, this is the sort

of question that benefits from administrative exhaustion, especially because the question of whether adjudication by Article III courts is required in the first instance will depend on a number of case-specific factors.

The City argues that an Article III court is necessary because, on the City's account, FAA is "seeking specific performance of deeds and contracts between non-federal parties" in the first instance. Pet'r Br. 17. But there is a threshold question of whether FAA is asserting jurisdiction to impair a grantee's property rights at all. As explained, FAA merely ordered the submission of the City's proposed plan and set forth its expectation that the City would abide by the 1953 Deed Release pursuant to the Surplus Property Act. There are multiple potential outcomes that may obviate the City's alleged Article III concerns. If the City's proposed plan indicates that it will use the proceeds for civil aviation purposes (including if it identifies an appropriate aviation use that does not go to the County) and shows that the sale will be for fair market value, there is no reason to think that FAA would seek to prohibit the sale in any forum. And even if FAA concludes that the proposal would violate its Surplus Property Act obligations, FAA could apply to a federal district court to restrain any further violation. *See* 49 U.S.C. § 47111(f); *see also United States v. King County*, 122 F.4th 740, 754-55 (9th Cir. 2024). As a result, any future Article III concerns may well evaporate.

More broadly, even if an FAA order were to impair a grantee's ability to use such property without any restriction, there are other fact-specific inquiries that may inform the availability of the public rights exception. For example, the particular deeds and agreements may reserve property rights to the United States—such as the right to control marketable title to the property if the grantee wishes to sell or lease the property for non-aviation uses or the right to reversion if the deed conditions related to the promotion of civil aviation purposes are violated—which may implicate the United States' sovereign authority over public lands administration. *Cf. Crowell*, 285 U.S. at 51, *Jarkesy*, 603 U.S. at 130; *Boesche v. Udall*, 373 U.S. 472, 476-78 (1963) (explaining that Secretary of the Interior retained "general powers of management over the public lands" to cancel a mineral lease where the United States has retained an interest in the land in the lease and "subjected the lease to exacting restrictions and continuing supervision"). And other questions may arise in particular proceedings about how the potential violations intersect with other FAA statutory authorities that do not turn on title to the property, such as where the grantee also has grant assurance obligations relating to federal grants it may have received in operating a public airport on such property or if FAA can exclude the City from future grant opportunities.

### C.    FAA's Order Does Not Implicate Article III Because It Does Not Impair Petitioner's Private Property Rights

In any event, there was no need for FAA, nor is there any need for this Court, to resolve petitioner's Article III challenge because the City cannot show that FAA has yet taken any enforcement action that impairs the City's property rights.

The City's asserted private right relates to its ability to sell (or lease) certain surplus property that it received without cost from the United States to be used for civil aviation purposes in accordance with the Surplus Property Act without then using the funds for civil aviation purposes. As explained, the City appears to argue that FAA's proceeding necessarily impinged on this private right because the County's administrative complaint "seek[s] specific performance of deeds and contracts between non-federal parties" and thus "is a classic private-rights case." *See* Pet'r Br. 17; Pet'r Br. 22-24. But the City fails to grapple with what FAA's order actually did and what it did not.

The challenged order does not take any enforcement action based on any such sale, much less resolve any questions of specific performance in contracts between non-federal parties. Indeed, FAA has not attempted to prohibit the sale, impounded any funds from the City, imposed a penalty, or ordered the transfer of

any revenues from such a sale or the ongoing lease revenues to the County.[2] Doing so would be premature because the City has only announced its attention to sell the property based on certain assumptions about its right to retain all of the proceeds but has not sold the property.

FAA's order instead instructs the City to supply clear information about its plans to structure any sale (or lease) of Seascape in light of FAA's formal statement (consistent with prior statements stemming back to the 1970s) of the agency's view of the City's ongoing Surplus Property Act obligations under the 1953 Deed Release. Specifically, the final administrative order requires the City to "submit a Corrective Action Plan … that will identify its proposal for how to use the proceeds to benefit civil aviation" if it "inten[ds] to continue with the sale" and instructs that the sale should "follow federal law and FAA policy on the sale of the property, including obtaining [fair market value]." FAA1425.

In that same paragraph, FAA explains that it "will evaluate the [plan] and its relative benefit to aviation" and that the agency "reserves its right to take further action if the sales price for the Seascape is less than [fair market value]." FAA1425; *see also* FAA1187 ("reserv[ing] FAA's right to pursue any available

---

[2] The City's decision to "voluntarily" hold 75% of its lease proceeds in a separate account pending the resolution of this litigation, Pet'r Br. 12 n.5, reflects the City's choice to hold the money in reserve in case its theory of its obligations is determined to be incorrect.

remedies," depending on the City's response, including by "commencing civil action"). That underscores that the agency is seeking additional information about whether the City still plans to sell Seascape in a manner that FAA has explained would, in its view, violate the City's obligations to FAA but is not currently taking any final enforcement action. A request for such accounting so that an agency can determine whether to take enforcement action in the future does not alter or impair any property right, and it fits squarely within the agency's jurisdiction.

There remain multiple potential outcomes that may obviate the City's Article III concerns. If the City's proposed plan indicates that it will use the proceeds for civil aviation purposes (including if it identifies an appropriate aviation use that does not go to the County) and shows that the sale will be for fair market value, there is no reason to think that FAA would seek to prohibit the sale in any forum. Even if the City submits a plan affirming that it will structure the sale in a manner that FAA believes would violate its Surplus Property Act obligations, FAA will still need to determine what, if any, enforcement action to take. One of those options—application to a federal district court to restrain any further violation of the City's Surplus Property Act obligations—would be an appropriate forum to consider any *Jarkesy* related claims and could provide petitioner with the Article III adjudication of such claims. *See* 49 U.S.C.

30

§ 47111(f); *see also King County*, 122 F.4th at 754-55. The City has thus failed to show that there has been an Article III violation.

## II. The City Has Ongoing Surplus Property Act Obligations to Use Seascape's Revenues for Civil Aviation Purposes Under the 1953 Deed Release

As discussed, the order on appeal simply instructs the City to explain how it plans to structure the sale and proceeds of the disposition of property covered by the Surplus Property Act but does not take any action that impairs any property rights. The Act vests FAA with discretion to "ensure compliance with an instrument conveying an interest in surplus property," which includes the authority to share its views of grantees' obligations and require grantees to explain whether they plan to comply with those obligations. 49 U.S.C. § 47151(b). In any event, it was proper to order an accounting because FAA's interpretation of the City's Surplus Property Act obligations under the 1948 Deed, 1953 Deed Release, and 1958 Agreement are correct as a matter of law.

### A. The Surplus Property Act Framework

The City contends that FAA misconstrued the City's obligations under the 1948 Deed, 1953 Deed Release, and 1958 Agreement by which the United States set out the City's obligations with respect to the transfer of federal lands, including Seascape, pursuant to the Surplus Property Act.

31

The Surplus Property Act permits such transfers to State and local governments like the City at no cost but only on the condition that FAA determines that the transfer would be desirable or reasonably necessary for "improving, operating, or maintaining a public airport" or "for developing sources of revenue from nonaviation businesses" for such public airports. 49 U.S.C. § 47151(a); *see also supra* pp. 2-5. Unlike traditional land grant acts, the Act imposes ongoing conditions and obligations that transferred property be used for such aviation purposes and reserves the right of reversion to the United States if such obligations are violated. 49 U.S.C. § 47152; *see also supra* pp. 3-5; *cf. Boesche*, 373 U.S. at 477-78 (differentiating the Mineral Leasing Act from land patents because it "not only reserved to the United States the fee interest in the leased land, but has also subjected the lease to exacting restrictions and continuing supervision by the Secretary"). Finally, Congress authorized FAA to "waive a term required by section 47152 of this title or add another term" but, again, only "if [FAA] decides it is necessary to protect or advance the interests of the United States in civil aviation or for national defense," and makes specific findings that waiver would not imperil those interests after the opportunity for public comment. 49 U.S.C. § 47153(b). The Act thus requires that the original transfer of this kind of surplus property to State and local governments and any subsequent alterations to the obligations governing such transfers be used for civil aviation.

32

The 1948 Deed, 1953 Deed Release, and 1958 Agreement pertain to the disposition of public lands. Thus, any ambiguities as to whether the United States reserved or conditioned the transfer of these public lands to the City are read in favor of the federal government. *Southern Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 769 (10th Cir. 2005). So too state law will only be incorporated into the interpretation of the City's obligations under the Act as set out by these documents to the extent that they will not "frustrate" the Act's purpose that property transferred thereunder be used to promote civil aviation. *See id.* at 763 (quoting *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 672 (1979)). Ultimately, it is a question of federal law how these lands were disposed under the Act and the City's continuing obligations with respect to them.

The City insists that the 1953 Deed Release and the 1958 Agreement are best understood as "mere contractual obligation[s]," which should be evaluated according to state law contract principles. Pet'r Br. 29-32. As described, that is incorrect because any analysis of deeds and agreements under the Surplus Property Act must be read against the backdrop of the Act and as an implementation of that federal law that imposes ongoing federal obligations. Regardless, FAA's conclusion that the City's obligations under the 1953 Deed Release remain ongoing accords with the plain reading of the text of the relevant instruments under

33

any standard and does not violate any other contractual principles on which the City relies.

### B. The 1948 Deed, 1953 Deed Release, and 1958 Agreement Confirm the City Has Ongoing Obligations to Use Seascape's Proceeds for Civil Aviation Purposes

As FAA correctly concluded, the plain terms of the deeds and agreements make clear that the City has ongoing obligations to use Seascape's revenues for civil aviation purposes at Myrtle Beach Airport or substitute public airport. *See* FAA1422-1424, 1177-1184. Indeed, such an obligation is required by the Surplus Property Act, which provided the source of authority for the 1948 Deed, 1953 Deed Release, and 1958 Agreement. And it also accords with the parties' intentions and the course of actions through which the United States conveyed title to valuable land at no cost to the City on the condition that the City use the property to support public airports. The City's proposal, to sell that land at a profit without regard to how it obtained the land or the obligations it undertook, should be rejected.

In a 1948 quitclaim deed, the United States conveyed several tracts to the City without charge to support a public airport that eventually became known as Myrtle Beach Airport. *See supra* p. 7. Among other obligations, the 1948 Deed required the City to obtain "written consent" from FAA before those tracts could be "used, leased, sold, salvaged, or disposed of … for other than airport purposes,"

34

and included a right of reverter if the City failed to comply with this or any other obligation. FAA221, 223.

In 1953, the City requested that FAA waive the obligations in the 1948 Deed as to two of the tracts to enable the City to lease or sell these two tracts to generate revenue to support Myrtle Beach Airport or to another public airport in the area, as set out in a City resolution that would be "binding" upon such waiver. *See* FAA230-232; *see also supra* p. 8. Pursuant to its authority under the Surplus Property Act to amend or waive terms in existing deeds where doing so would serve the Act's purposes, FAA granted written consent to the City's request in the 1953 Deed Release, which served as a substitute quitclaim deed for the 1948 Deed for these two tracts, while leaving intact the 1948 Deed as to the other tracts. *See* FAA234.

As FAA emphasized in the administrative proceedings, "the 1953 Release expressly referenced that the 1953 Resolution obligated the [City] to use the proceeds from the lease or disposition of the Seascape for airport purposes." FAA1422 (alteration in original); *see also supra* pp. 8-9. FAA "would not have released the property unless there was a commitment to benefit civil aviation in accordance with the" Surplus Property Act. FAA1423; *see also* FAA1179 (explaining that, "[u]nder its policies and procedures," FAA "require[s] such

commitment to be demonstrated by a resolution or ordinance of the governing body in order to allow sale of the property").

The 1958 Agreement did not alter this obligation. In 1958, FAA entered an agreement with the City and the Commission to enable the shift of civil aviation operations from Myrtle Beach Airport, which was needed for exclusively military purposes, to alternate facilities that FAA and the Commission would improve at Cresent Beach Airport. The City transferred its "right, title, and interest in and to the 'civil aviation activities area' of the Myrtle Beach Airport" back to the United States. FAA256. This transfer did not reflect valuable consideration from the City because those facilities were already limited to civil aviation purposes and the City would be gaining access to alternate civil aviation facilities. The United States invested $326,000 improving Cresent Beach Airport as "substitute facilities for civil aviation" for the City, and the Commission agreed to operate and maintain Crescent Beach Airport for at least 20 years subject to the conditions in the 1958 Agreement. FAA255-260. Because the Commission would "assume[] like obligations to the Government with respect to Cresent Beach Airport" to the ones the City previously owed with respect to Myrtle Beach Airport, the 1958 Agreement also "releases the City from any and all obligations created by and under the aforesaid deeds dated October 22, 1948, June 17, 1949, and March 22, 1950, and the aforesaid grant agreements dated December 24, 1949, and

36

September 22, 1951," which would be "[e]ffective upon completion" of that additional improvement of Crescent Beach Airport. FAA256-257. In other words, the City would be released from its ongoing obligations to operate an airport at Myrtle Beach.

As FAA explained in the administrative proceedings, the 1958 Agreement's release provision "only references the 1948, 1949, and 1950 deeds and the two grants that were issued for the Myrtle Beach Municipal Airport," but "does not contain broader language to encompass any prior instrument of release (1953 Release) and any new conditions included in such an instrument." FAA1181; *see also* FAA1423. Because "the City's obligations under the 1948 Deed for the Seascape Properties had already been released by the 1953 Release instrument," the City's obligations with respect to Seascape were "no longer governed by the 1948 Deed" and so were not altered by a subsequent release of obligations pertaining to the other tracts that were still governed by the 1948 Deed in 1958. FAA1181; *see also* FAA1423 (citing this portion of the analysis). In other words, because in 1958 FAA declined to alter that 1953 Deed Release, it envisioned that the new entity responsible for the local airport, the County, would have access to the preexisting funding stream relating to Seascape, just as that funding stream would otherwise have supported Myrtle Beach Airport.

Indeed, a different provision of the 1958 Agreement specifies that the City "agrees to pay to the Commission, upon the request of the [F]AA, all airport funds for which the City is now and may hereafter become accountable, derived from airport property transferred by the aforesaid deeds dated October 22, 1948, June 17, 1949, and March 22, 1950." FAA257. That provision—which uses the broader term "property transferred by the aforesaid deed[] dated October 22, 1948"—includes Seascape and thereby bound the City to direct revenues to the Commission if FAA so "request[ed]." FAA257. That provision contains no time limit on the City's commitment to direct funds at FAA's request under the 1958 Agreement, much less limit the City's ongoing obligations under the 1953 Deed Release to use Seascape's revenue to support Myrtle Beach Airport or another public airport.

Nor, as FAA confirmed during the administrative proceedings, has the agency been a party to any subsequent agreements altering the City's ongoing obligations under the 1953 Deed Release for civil aviation. *See* FAA1181, 1424.

The plain terms of the 1948 Deed, 1953 Deed Release, and 1958 Agreement thus make clear that the City remains obligated to use Seascape's revenues to support civil aviation. Even assuming arguendo there was any ambiguity, that interpretation must prevail because it accords with the purposes of the Surplus Property Act and the benefits to federal and local governments the Act is intended

38

to foster. *See Southern Utah Wilderness All.*, 425 F.3d at 769. The statutory purpose is best carried out by construing the obligations set out in deeds of conveyance of such federal lands and any subsequent agreements to ensure the land is used to support civil aviation, whether directly if the land is developed into a public airport or indirectly if the land is used to produce revenue to support such airports.

### C.     The City's Arguments to the Contrary Are Unavailing

The City's contention that it may nevertheless keep sale proceeds from Seascape is incorrect. Its arguments misunderstand the 1958 Agreement and the mandatory framework for waivers under the Surplus Property Act. Nor did FAA's order that the City submit a plan outlining how its proposed sale of Seascape would reflect fair market value and be used to support civil aviation exceed FAA's authority to oversee compliance with those existing obligations.

### 1.     The 1958 Agreement Does Not Waive the City's Obligations Under the 1953 Deed Release and the Surplus Property Act

The City argues that the 1958 Agreement released its obligation to use Seascape's proceeds for civil aviation once Crescent Beach Airport closed. *See* Pet'r Br. 31-38.[3] But the 1958 Agreement did no such thing. By its plain terms, the

---

[3] The City has forfeited any argument that the Surplus Property Act made its obligations under the terms of the 1953 Deed Release to use revenues from "sale

*Continued on next page.*

agreement only releases the City's "obligations created … under" the 1948 Deed and the other specifically-enumerated deeds and grants based on operations at Crescent Beach Airport, but it did not thereby extinguish any "obligations created … under" the 1953 Deed Release, which was the relevant instrument governing Seascape. *See* FAA1180, 1422-23 (quotation marks omitted). If FAA had intended to release or limit the obligations under the 1953 Deed Release, it would have referenced it in the relevant release, but it did not.

The City likewise misconstrues the relevance of the 1958 Agreement's requirement that Crescent Beach Airport be operated for at least 20 years as setting a time limit on the City's obligations to use Seascape's proceeds for civil aviation. *See* Pet'r Br. 33-34. As FAA has repeatedly advised, that 20-year obligation "fixes a minimum period of time in which the public is guaranteed the use of" that airport by the Commission, but "has no bearing on the obligation of the City … to use the proceeds from the former government surplus land for public airport purposes," which is instead governed by the 1953 Deed Release. FAA338; *see also*

_____

proceeds" "discretionary" after five years by raising it only in a footnote. *Compare* Pet'r Br. 30 n.9, *with e.g.*, *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 309 n.4 (4th Cir. 2020). Moreover, that argument is incorrect because the Act provides that FAA can add any conditions when releasing obligations under transfer instruments, and FAA did so in the 1953 Deed Release by expressly requiring that such proceeds be used to support public airports in the area in return for giving up marketable title to the Seascape tract. *See* FAA1177 & n.29, 1181; *see also* FAA1422-1423.

FAA1181.[4] Indeed, the City's position is also inconsistent with the City's enactment of a 1995 Resolution, which was well after the 1976 date it now identifies as the terminus of its obligations. That resolution recognized the United States only "released the conditions contained in the 1948 quitclaim deed upon the adoption by the City of a resolution which provided in relevant part that the City would use the income from the properties for the development, operation, maintenance, or improvement of a public airport serving the Myrtle Beach Area" and established a Trust fund to carry out these purposes without suggesting these obligations were not binding. *See* FAA333-334.

Nor does FAA's straightforward reading of the 1958 Agreement's release provision as applying only to the obligations in the enumerated deeds and grants have the result that the provision "means nothing," as the City contends, Pet'r Br. 36-37. The scope of FAA's release of certain of the City's obligations related to the City's prior ownership and operation of Myrtle Beach Airport is commensurate to the scope of the City's release of title to the property that made up that airport.

---

[4] Nor has FAA ever said otherwise. The City asserts that "FAA confirmed" that the City's "obligations had been discharged when it did not list the Myrtle Beach Airport … or Crescent Beach … as airports affected by Surplus Property Act obligations." Pet'r Br. 37-38 (referencing FAA581-587). But that list has no bearing on whether Seascape—which does not constitute a part of either of those public airports—is no longer bound by the City's Surplus Property Act obligations under the 1953 Deed Release.

Once the County was able to provide equivalent aviation facilities based on equivalent terms at Crescent Beach Airport, it no longer made sense to require the City to retain ongoing obligations of the same nature based on its prior ownership and operation of Myrtle Beach Airport. *See supra* pp. 9, 36-37. That is all the release provision encompasses. The City's interpretation, on the other hand, would result in a windfall to the City at the expense of FAA and the County without the benefit of the funding stream that was intended to support civil aviation.

Moreover, as the Director explained, the City received other consideration for returning title to the United States of surplus property that had been developed as part of Myrtle Beach Airport. *See* FAA1180 & n.38. The 1958 Agreement provides that the City has received "the benefits that will accrue to [the] City through the establishment of new civil airport facilities at [the] Cresent Beach Airport." FAA240; FAA248 (attesting that the City "agrees that [the] consideration" provided by "the benefits that will accrue to the City through the establishment of new civil airport facilities at Crescent Beach Airport" "constitutes full, just, and complete compensation" for conveying the "City's rights and property" at Myrtle Beach Airport to the United States).

42

2.    **Agreements Between the City and the County Cannot Alter the City's Obligations to FAA Under the 1953 Deed Release and the Surplus Property Act**

Nor, as FAA explained, can any agreements between the City and the County or state court rulings about those agreements override the City's Surplus Property Act obligations to FAA under the 1953 Deed Release. FAA1177.

The City contends the "County bargained away" the City's obligations to use Seascape's proceeds in the 2004 IGA that resolved a long-running dispute between those two parties about whether the City remained obligated to direct Seascape's revenues to the County. *See* Pet'r Br. 38. The agreement provided that the County would automatically receive 75% of Seascape's lease revenue and the City would receive the remaining 25%, FAA947, but did not address how to distribute any proceeds from the sale of Seascape, FAA946-50. Because the 2004 IGA states that it "supersedes any and all agreements and representations made earlier," the City argues that it supersedes the City's 1958 Agreement with FAA. Pet'r Br. 38-39 (emphasis omitted) (quoting FAA950).

The problem for the City is that FAA was not a party to the 2004 IGA, *see* FAA950, and the City and the County could not by private contract supersede their obligations to FAA under the Surplus Property Act. The City points to no case permitting two parties to extinguish the rights of a non-party through the fiat of entering their own private agreement, much less statutory obligations imposed by

43

Congress for waiver of Surplus Property Act obligations. *See* FAA1177 n.28, 1181. The City's proposal that the Court do so here to allow a County and a City to rewrite their obligations to the federal government is astonishing.

The City's contentions that FAA nevertheless was bound by the 2004 IGA are unpersuasive. *See* Pet'r Br. 38, 40-42. Not only is it undisputed that FAA did not sign the 2004 IGA, but the City also has not pointed to any FAA involvement in negotiating the 2004 IGA's terms, much less shown that FAA approved the City's current interpretation of those terms as extinguishing the City's obligations under the 1953 Deed Release to use such funds for airport purposes. The City's citation to several FAA letters fares no better. *See* Pet'r Br. 41 (first citing FAA336; then citing FAA338; and then citing FAA352). Those letters permit the City and the County to negotiate the manner and extent to which the City transfers the funds to the County (rather than some other civil aviation purpose), while simultaneously reiterating that the City retained its Surplus Property Act obligations under the 1953 Deed Release to use Seascape's revenues to support some civil aviation purpose. *See supra* pp. 10-11; FAA1423.

Likewise, even assuming arguendo that the City is correct as to any laches or estoppel arguments against the County, *but see* FAA1419-1421, such arguments cannot be used to "to prevent the County from informing the FAA of a potential violation by the City of its [Surplus Property Act] obligations," FAA1419, so that

44

FAA can make its own assessment. *Compare* FAA1421, *and supra* p. 13, *with* Pet'r Br. 46-52.

### 3. FAA's Instructions for the Corrective Action Plan Do not Exceed Its Authority

The City also contends that FAA improperly required it to "show any other use of the proceeds besides giving them to the County 'would have an equal or increased benefit for civil aviation'" and "comply with the fair market value requirements of the *FAA Airport Compliance Manual*." Pet'r Br. 42 (citing FAA1183 and FAA1185). But adjudication of this issue would be premature because FAA's order simply instructs the City to "identify its proposal" for how it would structure the sale if it went forward. FAA1186. The City's response, which may identify alternate civil aviation purposes for the funds or explain how the price reflects fair market value, could obviate the need for further action by FAA or judicial review.

In any event, FAA did not exceed its authority in interpreting the City's obligations to use the sale or lease proceeds for civil aviation as encompassing a fair market value requirement and some demonstration that the proceeds are being used for airport purposes. As FAA explained, the agency "has the authority under the [Act] to ensure the proceeds of the funds of the sale are benefitting civil aviation," including by adding or waiving such terms and conditions as are necessary. FAA1183 & nn.42, 43 (first citing 49 U.S.C. § 47153(a)(2); then citing

45

14 C.F.R. §§ 155.3 (2), 155.7(b); and then citing 49 U.S.C. § 47151(b)); *see also* FAA1424-25. The "conditions" the City identifies, Pet'r Br. 42, are natural outgrowths of such authority.

First, FAA explained that the 1953 Deed Release obligated the City to use Seascape's revenues for "'Myrtle Beach Municipal Airport, or … another public airport'" and the 1958 Agreement "reaffirmed" FAA's "ability to direct the proceeds from the disposition of surplus properties as it saw fit for the benefit of civil aviation." FAA1183 (alteration in original) (quoting FAA235). FAA agreed with the City that the 1953 Deed Release and the 1958 Agreement did not require the City to direct such funds to the Commission's successors but also reasonably requested that the City explain how alternate uses would benefit civil aviation given that the "County is the logical choice to receive the funds" as "the sponsor of four (4) public use airports serving Myrtle Beach." *See* FAA1183; FAA1424-25.

Second, requiring that such property be sold for fair market value is a longstanding FAA metric to ensure that resources are not squandered through fire sales for ready cash infusions that would not serve long-term goals of supporting public airports. *See* FAA1425; FAA1185-1186. Nor was the importance of fair market value unknown to the parties at the time of the 1948 Deed or 1953 Deed Release. Indeed, the Surplus Property Act as originally enacted would have required the City to have paid "fair value" for the original disposition of the

46

property. *See* Surplus Property Act of 1944, ch. 479, §§ 2(t), 13(a), (c), (f), 58 Stat. at 767, 770-72.

## CONCLUSION

For the foregoing reasons, the petition for review should be dismissed.

Respectfully submitted,

BRETT A. SHUMATE
 *Assistant Attorney General*

*Of Counsel:*

AUGUST E. FLENTJE

WILLIAM MCKENNA
 *Chief Counsel*

 s/ Caroline D. Lopez

CAROLINE D. LOPEZ

ANDREW WILLIAMSON
JESSIE DI GREGORY
 *Attorneys, Office of the Chief Counsel*

 *Attorneys, Appellate Staff*
 *Civil Division, Room 7535*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-4825*
 *caroline.d.lopez@usdoj.gov*

*Federal Aviation Administration*

January 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and the word-limit of this Court's September 30, 2025, order because it contains 10,996 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman, a 14-point font, a proportionally spaced typeface.

*s/ Caroline D. Lopez*
Caroline D. Lopez

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

*s/ Caroline D. Lopez*
Caroline D. Lopez

**ADDENDUM**

## TABLE OF CONTENTS

49 U.S.C. § 47151 ................................................................................A1

49 U.S.C. § 47152 ................................................................................A2

49 U.S.C. § 47153 ................................................................................A3

**49 U.S.C. § 47151**

**§ 47151. Authority to transfer an interest in surplus property**

**(a) General authority.**--Subject to sections 47152 and 47153 of this title, a department, agency, or instrumentality of the executive branch of the United States Government or a wholly owned Government corporation may convey to a State, political subdivision of a State, or tax-supported organization any interest in surplus property-

(1) that the Secretary of Transportation decides is--

(A) desirable for developing, improving, operating, or maintaining a public airport (as defined in section 47102 of this title);

(B) reasonably necessary to fulfill the immediate and foreseeable future requirements for developing, improving, operating, or maintaining a public airport; or

(C) needed for developing sources of revenue from nonaviation businesses at a public airport; and

*** 

**(b) Ensuring compliance.**--Only the Secretary may ensure compliance with an instrument conveying an interest in surplus property under this subchapter. The Secretary may amend the instrument to correct the instrument or to make the conveyance comply with law.

***

**(d) Waiver of condition.**--The Secretary may not waive any condition imposed on an interest in surplus property conveyed under subsection (a) that such interest be used for an aeronautical purpose unless the Secretary provides public notice not less than 30 days before the issuance of such waiver and determines that such waiver--

(1) will not significantly impair the aeronautical purpose of an airport;

(2) will not result in the permanent closure of an airport (unless the Secretary determines that the waiver will directly facilitate the construction of a replacement airport); or

(3) is necessary to protect or advance the civil aviation interests of the United States.

****

A1

**49 U.S.C. § 47152**

**§ 47152. Terms of conveyances**

Except as provided in section 47153 of this title, the following terms apply to a conveyance of an interest in surplus property under this subchapter:

**(1)** A State, political subdivision of a State, or tax-supported organization receiving the interest may use, lease, salvage, or dispose of the interest for other than airport purposes only after the Secretary of Transportation gives written consent that the interest can be used, leased, salvaged, or disposed of without materially and adversely affecting the development, improvement, operation, or maintenance of the airport at which the property is located.

\*\*\*

**(8)** When a term under this section is not satisfied, any part of the interest in the property reverts to the Government, at the option of the Government, as the property then exists.

A2

**49 U.S.C. § 47153**

**§ 47153. Waiving and adding terms**

**(a) General authority.--(1)** The Secretary of Transportation may waive, without charge, a term of a conveyance of an interest in property under this subchapter if the Secretary decides that--

    (A) the property no longer serves the purpose for which it was conveyed; or

    (B) the waiver will not prevent carrying out the purpose for which the conveyance was made and is necessary to advance the civil aviation interests of the United States.

**(2)** The Secretary of Transportation shall waive a term under paragraph (1) of this subsection on terms the Secretary considers necessary to protect or advance the civil aviation interests of the United States.

**(b) Waivers and inclusion of additional terms on request.**--On request of the Secretary of Transportation or the Secretary of a military department, a department, agency, or instrumentality of the executive branch of the United States Government or a wholly owned Government corporation may waive a term required by section 47152 of this title or add another term if the appropriate Secretary decides it is necessary to protect or advance the interests of the United States in civil aviation or for national defense.

**(c) Restrictions on waiver.**--Notwithstanding subsections (a) and (b), the Secretary may not waive any term under this section that an interest in land be used for an aeronautical purpose unless--

    (1) the Secretary provides public notice not less than 30 days before the issuance of a waiver; and

    (2) the Secretary determines that such waiver--

        (A) will not significantly impair the aeronautical purpose of an airport;

        (B) will not result in the permanent closure of an airport (unless the Secretary determines that the waiver will directly facilitate the construction of a replacement airport); or

        (C) is necessary to protect or advance the civil aviation interests of the United States.