No. 25-1910

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**
_____

CITY OF MYRTLE BEACH, SOUTH CAROLINA,

Petitioner,

v.

HORRY COUNTY, SOUTH CAROLINA;
FEDERAL AVIATION ADMINISTRATION,

Respondents.

_____

On Petition for Review from the Federal Aviation Administration
_____

**CORRECTED PAGE-PROOF BRIEF OF RESPONDENT
HORRY COUNTY, SOUTH CAROLINA**
_____

W. Eric Pilsk
epilsk@kaplankirsch.com
Caitlin McCusker
cmccusker@kaplankirsch.com
David Y. Bannard
dbannard@kaplankirsch.com
Kaplan Kirsch LLP
1634 I Street NW, Suite 300
Washington, DC 20006
(202) 955-5600

Kevin A. Hall
kevin.hall@wbd-us.com
M. Todd Carroll
todd.carroll@wbd-us.com
Bryant S. Caldwell
bryant.caldwell@wbd-us.com
Womble Bond Dickinson (US), LLP
1221 Main Street, Suite 1600
Columbia, South Carolina 29201
(803) 454-6504

Counsel for Respondent Horry County, South Carolina

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __25-1910__     Caption: __City of Myrtle Beach v. Horry County & Federal Aviation Admin.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Horry County, South Carolina__
(name of party/amicus)

_____

 who is _____Respondent_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                    ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
        If yes, identify all such owners:

4.	Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?	☐YES ☑NO
If yes, identify entity and nature of interest:

5.	Is party a trade association? (amici curiae do not complete this question)	☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.	Does this case arise out of a bankruptcy proceeding?	☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.	Is this a criminal case in which there was an organizational victim?	☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ W. Eric Pilsk	Date: January 28, 2026

Counsel for: Horry County, South Carolina

- 2 -

Print to PDF for Filing

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ..........................................................................i

TABLE OF AUTHORITIES ......................................................................iv

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ............................................................2

STATEMENT OF ISSUES ..........................................................................2

STATEMENT OF THE CASE.....................................................................3

I.      Statutory and Regulatory Background ...........................................3

II.     Factual Background ..........................................................................6

        A.      The Surplus Property Act Instruments Limiting the City's
                Use of the Seascape Properties and Associated Revenue ....6

        B.      The 1958 Agreements.........................................................8

        C.      The County Assumes Control of the Civil Airports in the
                Myrtle Beach Area.............................................................10

        D.      Seascape Properties Revenue .............................................11

        E.      The Agency's Determination .............................................15

SUMMARY OF ARGUMENT....................................................................17

STANDARD OF REVIEW ........................................................................20

ARGUMENT ..............................................................................................20

I.      FAA's Determination Is Consistent with Law and Supported by
        Substantial Evidence......................................................................20

II.     The City's Arguments All Lack Merit ..........................................23

A.   This Action is Within FAA's Jurisdiction, and *Jarkesy* Does Not Dictate Otherwise..................................................23

B.   The City's Merits Arguments Also Fail............................27

    1.   FAA Correctly Found That the 1958 Agreements Did Not Modify or Release the City's Obligations Under the 1953 Release. ..........................................28

    2.   The City's Surplus Property Act Obligations Cannot Be Contracted Away without FAA's Consent.......................................................34

    3.   The Intergovernmental Agreement Does Not and Could Not Disturb the City's Surplus Property Act Obligations. ..................................................36

    4.   FAA Did Not Exceed Its Authority by Ordering the City to Submit a Corrective Action Plan Demonstrating Compliance. ....................................41

C.   FAA Correctly Declined to Apply Equitable Doctrines and the Statute of Limitations ............................................44

CONCLUSION AND RELIEF SOUGHT ............................................48

STATEMENT ON ORAL ARGUMENT................................................48

iii

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                           **Page(s)**

*Am. Fed. Bank, FSB v. United States*,
    62 Fed. Cl. 185 (Fed. Cl. 2004) ..........................................................................32

*Cameron v. United States*,
    252 U.S. 450 (1920)................................................................................................26

*Com. Credit Corp. v. Nelson Motors, Inc.*,
    147 S.E.2d 481 (S.C. 1966) ...................................................................................39

*Consol. Servs. Eng'rs & Constructors, Inc. v. City of Palm Springs*,
    FAA Dkt. No. 16-03-05, 2004 FAA LEXIS 578, Director's
    Determination (June 10, 2004) ...............................................................................45

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024)................................................................................................47

*DeGeer v. Gillis*,
    707 F. Supp. 2d 784 (N.D. Ill. 2010) ....................................................................39

*In re Felts Field Aviation*,
    FAA Dkt. No. 2016-9210, 2020 FAA LEXIS 89 (July 31, 2020) .......................45

*Friends of Richards-Gebaur Airport v. FAA*,
    251 F.3d 1178 (8th Cir. 2001)..........................................................................30, 31

*Haddock v. Babbitt*,
    488 Fed. App'x 686 (4th Cir. 2012).......................................................................20

*Heide v. Molnau*,
    FAA Dkt. Nos. 16-04-11, 16-05-02, 2005 FAA LEXIS 996,
    Director's Determination (Apr. 26, 2005), *aff'd on other grounds*,
    2006 FAA LEXIS 511 (July 7, 2006) ....................................................................47

*Judge Rotenberg Educ. Ctr., Inc. v. FDA*,
    3 F.4th 390 (D.C. Cir. 2021) .................................................................................33

*Leisner v. Finnerty*,
    250 A.2d 641 (Md. 1969)........................................................................................32

iv

*Mineta v. Bd. of County Comm'rs*,
   2006 U.S. Dist. LEXIS 67566 (N.D. Okla. 2006) ...............................................35

*Phoenix Power Partners, L.P. v. Colorado PUC*,
   952 P.2d 359 (Colo. 1998) ...............................................................................32

*SEC v. Jarkesy*,
   603 U.S. 109 (2024) ..............................................................16, 17, 23, 24, 26

*Westlands Water Dist. v. United States*,
   109 Fed. Cl. 177 (Fed. Cl. 2013) .....................................................................34

**Statutes**

28 U.S.C. § 2401(a) ...........................................................................................47

49 U.S.C. § 46110(a) ...........................................................................................2

49 U.S.C. § 46110(c) .........................................................................................20

49 U.S.C. § 47151 ...............................................................................................3

49 U.S.C. § 47151(a) ...........................................................................................3

49 U.S.C. § 47151(b) ...........................................................................5, 41, 42, 43

49 U.S.C. § 47151(d) .....................................................................................33, 35

49 U.S.C. § 47152 ...............................................................................................3

49 U.S.C. § 47152(1) ...........................................................................................4

49 U.S.C. § 47153 ...........................................................................................3, 37

49 U.S.C. § 47153(a) ...........................................................................................4

49 U.S.C. § 47153(b) ..........................................................4, 33, 35, 42, 44

49 U.S.C. § 47153(c) ........................................................................................4, 5

**Regulations**

14 C.F.R. § 16.33(f) ...........................................................................................23

**Other Authorities**

19 Fed. Reg. 4591, 4604 (July 27, 1954)....................................................36

FAA, Compliance Requirements
    (July 1961) ............................................................................................5

FAA Airports Compliance Requirements, FAA Order 5190.6
    (Aug. 24, 1973) ....................................................................................5

FAA Airports Compliance Manual, FAA Order 5190.6A
    (Oct. 2, 1989) ........................................................................................5

## **INTRODUCTION**

This dispute arises from the City of Myrtle Beach's ("City") effort to shirk its statutory obligation to use revenue generated by federal surplus property land for the benefit of civil aviation in the Myrtle Beach area. Instead, the City seeks to retain tens of millions of dollars for its sole benefit. The law and the record bar this attempt.

In 1948, the United States conveyed land to the City pursuant to the Surplus Property Act ("Act") for no monetary consideration but on the condition that the City use the property for public airports. Five years later, the City asked that one nearby coastal tract, a detached former bombing range now known as the Seascape Properties, be released from this condition. Consistent with the Act's requirements, the United States authorized the release, provided that any revenue from that land be used to benefit local public airports. Since then, the United States has never released or modified that requirement; the City remains bound to it.

The City now seeks to evade its statutory obligations and reap an enormous financial windfall through a no-bid sale of the Seascape Properties. In support of that effort, the City slings an assortment of meritless arguments. Fundamentally, it attempts to transform its Surplus Property Act obligations into a voluntary undertaking, which it claims has since been either waived, modified, or terminated. But the City's obligations are not voluntary, nor are they contractual obligations owed merely to the County. They are statutorily required obligations to the United

1

States and the public.  The Federal Aviation Administration ("FAA") alone can release or modify these statutory obligations, and it must do so in accordance with the statutory framework.  It never did.

FAA concluded correctly and with substantial record support that the City must use any revenue generated by the lease or a fair market sale of the Seascape Properties to benefit local public airports.  The petition for review should be denied.

## JURISDICTIONAL STATEMENT

Horry County ("County") filed an administrative complaint with FAA on April 15, 2021, JA____ [FA00001], and FAA issued a final agency decision on July 18, 2025, JA _____ [FA001425-01426].  The City filed its petition for review within 60 days of that final agency decision.  This Court has jurisdiction pursuant to 49 U.S.C. § 46110(a) [Add. 2].[1]

## STATEMENT OF ISSUES

The County adopts and incorporates by reference the Statement of Issues of Respondent FAA.

---

[1] Relevant parts of statutes, regulations, and FAA guidance documents relied on in this brief are collected in the attached Addendum ("Add.").

2

## <u>STATEMENT OF THE CASE</u>

### I.    Statutory and Regulatory Background

The Surplus Property Act of 1944, as amended, 49 U.S.C. §§ 47151-53 [Add. 4-9], authorizes the conveyance of surplus military airfields to State or local governments without requiring monetary consideration.

The Act requires designated government officials to make certain determinations before surplus property can be conveyed, and it provides specific terms, conditions, reservations, and restrictions upon such conveyances. Specifically, the Secretary of Transportation must determine that the conveyance is "desirable for developing, improving, operating, or maintaining a public airport," "reasonably necessary to fulfill the immediate and foreseeable future requirements for developing, improving, operating, or maintaining a public airport," or "needed for developing sources of revenue from nonaviation businesses at a public airport." *Id.* § 47151(a)(1)(A)-(C). Once these findings are made, the federal government can convey surplus property under the Act, subject to certain default terms and conditions. *Id.* § 47151(a).

Section 47152 requires that an interest in surplus property can only be used for non-airport purposes if the Secretary of Transportation gives written consent that the alternative use will not "materially and adversely affect[] the development,

improvement, operation, or maintenance of the airport at which the property is located." *Id.* § 47152(1).

Section 47153 allows the Secretary of Transportation to waive or supplement the default terms of conveyance but only if the Secretary finds that "the property no longer serves the purpose for which the conveyance was made" or "the waiver will not prevent carrying out the purpose for which the conveyance was made and is necessary to protect or advance the civil aviation interests of the United States." *Id.* § 47153(a)(1)(A)-(B). The terms of any waiver must be those "necessary to protect or advance the civil aviation interests of the United States." *Id.* § 47153(a)(2). The Act also permits the Secretary to "add another term" to a conveyance if he "decides it is necessary to protect or advance the interests of the United States in civil aviation or for national defense." *Id.* § 47153(b).

The Act restricts the Secretary's authority to "waive any term ... that an interest in land be used for an aeronautical purpose," *Id.* § 47153(c), by requiring the Secretary to first determine that the waiver "will not significantly impair the aeronautical purpose of an airport," "will not result in the permanent closure of an airport" (unless the waiver will directly facilitate construction of a replacement

airport), or "is necessary to protect or advance the civil aviation interests of the United States." *Id.* § 47153(c)(2)(A)-(C).[2]

To further ensure that any release "protects or advances the interests of the United States in civil aviation," FAA has consistently required that, if surplus property is sold, it must be sold at fair market value as determined by appraisals. *See* Compliance Manual, FAA Order 5190.6A ¶ 7-8(a)(1), (d), (d)(3) (Oct. 2, 1989) [Add. 37].[3]

Importantly, the Act authorizes the Secretary of Transportation—and only the Secretary—to ensure "compliance with an instrument conveying an interest in surplus property" under the Act. *Id.* § 47151(b). It likewise allows the Secretary to "amend the instrument to correct the instrument or to make the conveyance comply with law." *Id.*

---

[2] The Secretary must also provide public notice at least 30 days before waiving an aeronautical purpose requirement. 49 U.S.C. § 47153(c)(1).

[3] This longstanding requirement dates to at least 1961 and has been repeatedly reiterated by FAA. FAA, Compliance Requirements § 6.140110 (July 1961) [Add. 23] (permitting consent to release for purpose of sale only for fair market value based on appraisal); Airports Compliance Requirements, FAA Order 5190.6 ¶¶ 124(c) & (d) (Aug. 24, 1973) [Add. 32] (same).

## II.     Factual Background

### A.     The Surplus Property Act Instruments Limiting the City's Use of the Seascape Properties and Associated Revenue

In 1948, the United States conveyed the Myrtle Beach Army Airfield, for use as the Myrtle Beach Municipal Airport, and two coastal tracts of nearby land to the City pursuant to the Act.  *See* JA____ [FAA00212]; JA____-____ [FAA00214-00216]; JA____ [FAA01224].  One of those coastal tracts, located approximately two miles southwest of the airfield and formerly used as a bombing range, is now known as the "Seascape Properties."  JA____-____ [FAA00214-00216].  The conveyance instrument—a quitclaim deed—specified that, by accepting the deed and rights under it, the City received the transferred property subject to restrictions "imposed pursuant to" the Surplus Property Act.  JA____ [FAA00221].  The deed provided that the transferred land "shall be used for public airport purposes for the use and benefit of the public."  JA____ [FAA00221].  It further states that "no property transferred by this instrument shall be used, leased, sold, salvaged, or disposed of ... for other than airport purposes without the written consent of the Civil Aeronautics Administrator" and that such consent "shall be granted only if" the Administrator determines that the other proposed use or disposition would not "materially and adversely affect[] the development, improvement, operation or maintenance of the airport at which such property is located."  JA____ [FAA00223].

6

In 1953, the City sought and obtained a partial release of its obligations under both the Act and the 1948 deed to allow the sale or lease of the Seascape Properties. Pursuant to its statutory authority, FAA agreed that the City could use the Seascape Properties for non-aeronautical purposes provided that all revenue from this use would go toward supporting the public airport serving the Myrtle Beach area. The parties achieved this result via two steps.

First, on February 6, 1953, the City adopted a "Resolution constituting agreement with the United States regarding the use of proceeds from lease or sale of certain lands conveyed to Town of Myrtle Beach under ... the Surplus Property Act." JA____ [FAA00230]. The City explained that it sought the release "for the purpose of obtaining funds needed to defr[ay] the cost of conducting civil aviation operations on Myrtle Beach Municipal Airport, or in the development and operation of another civil airport" should military operations prevent the use of that airport for civil aviation. JA____ [FAA00230]. The City also committed to "covenant and agree with the United States to utilize any revenue derived from the use, lease or disposition of the release of the [property] for public airport purposes as a further consideration for the release of the said [property] from the terms, conditions, reservations and restrictions of the said quitclaim deed[.]" JA____ [FAA00230].

Second, the United States issued, and the City signed, a release establishing the City's obligation "to utilize any revenue derived from the use, lease or disposition

of the [property] in connection with the civil use of the Myrtle Beach Municipal Airport, or for the development, improvement, operation or maintenance of another public airport[.]" JA____ [FAA00235]. The release reflected the federal government's determination that the release "will not prevent accomplishment of the purpose" of the original property conveyance and "is necessary to protect and advance the interest of the United States in civil aviation." JA____ [FAA00235].

**B.    The 1958 Agreements**

In 1958, the United States decided to reassume control over the Myrtle Beach Municipal Airport to create the Myrtle Beach Air Force Base. Understanding that the Myrtle Beach area would need a replacement airport for civil aviation, the City and the United States entered into two separate agreements to achieve these goals. These agreements concern only the airfield portion of the surplus property that had been transferred to the City; they do not mention the 1953 release at all.

In an April 21, 1958 agreement, the City, the South Carolina Aeronautics Commission, and the United States (acting through the U.S. Army Corps of Engineers) undertook a series of commitments whereby the Commission agreed to construct and develop the "substitute" airport, known as Crescent Beach Airport, JA____-____ [FAA00240-00241]; the City agreed to convey the Myrtle Beach Municipal Airport property (but not the Seascape Properties) to the United States JA____ [FAA00241]; and the United States agreed to help fund necessary

8

improvements to the Crescent Beach Airport, JA____ [FAA00241].  As part of the transfer of civil aviation functions from the City to the Commission, the City agreed to:

> contribute to the Commission all funds presently available and which may become available in the Airport Fund representing proceeds received by the City from property which was transferred to the city for Public Airport purposes under [the Act] and which said funds shall be used for the operation, maintenance and development of the Myrtle Beach Airport at Crescent Beach.

JA____ [FAA00241].

To implement the April 21 Agreement, the same parties executed an agreement dated October 7, 1958.  In Article I of the October agreement, FAA approved the conveyance of the Myrtle Beach Airport property to the United States pursuant to the April 21 agreement.  JA____ [FAA00256].  As consideration, the United States released the City from "any and all obligations created by and under the aforesaid deeds dated October 22, 1948, June 17, 1949, and March 22, 1950, and the aforesaid grant agreements dated December 14, 1949, and September 22, 1951." JA____ [FAA00257].  The October agreement does not waive, or even mention, the 1953 release.

In Article II, the City agreed to complete the conveyance to the United States. JA____ [FAA00257].  The City further agreed to pay the South Carolina Aeronautics Commission "all airport funds for which the City is now and may hereafter become

accountable, derived from airport property transferred by" the same deeds listed in Article I.  JA____ [FAA00257].

In Article III, the South Carolina Aeronautics Commission agreed to "operate and maintain the Crescent Beach Airport as a public airport on the terms and conditions hereafter set forth, for a period of twenty (20) years from the date of this Agreement."  JA____ [FAA00257].  The agreement then set out the terms and conditions for the Commission's operation and maintenance of the Crescent Beach Airport.  JA____-____ [FAA00257-00260].  Neither of the 1958 agreements released or modified the City's obligations under the 1953 release.

### C.     The County Assumes Control of the Civil Airports in the Myrtle Beach Area

On February 27, 1974, the South Carolina State Legislature transferred the property and operation of the Crescent Beach Airport to the Horry County Airport Commission.  JA____ [FAA00265].  By approximately 1976, the United States and the County operated the Myrtle Beach Air Force Base as a joint use facility, and the County shifted commercial operations from Crescent Beach to the joint use facility, which is now known as Myrtle Beach International Airport.  JA____ [FAA00011] ¶ 26.  Crescent Beach Airport continued to operate as a general aviation facility.  In the early 1990s, the U.S. Air Force closed the Myrtle Beach Air Force Base and transferred the property to the County.  JA____ [FAA00011] ¶ 26.  Presently, the County operates the only four airports serving the Myrtle Beach area, including

10

Myrtle Beach International Airport and Crescent Beach Airport.   JA_____ [FAA01183] (Director's Determination); *see also* JA_____-_____ [FAA00607-00608].

### D.    Seascape Properties Revenue

Since at least 1982, the City has leased the Seascape Properties to the current tenants or their predecessors for use as campgrounds.  JA_____ [FAA01165].  As of approximately four years ago, when the City stopped making any payments to the County, the leases generated approximately $3.6 million annually in revenue.  JA_____ [FAA00012] ¶ 27; JA_____-_____ [FAA000265-00331] (lease agreements).

Notwithstanding the express terms of the 1953 Release and 1958 Agreements, the City has made repeated attempts to wrest control of the lease proceeds from the Seascape Properties, only to be rebuffed by FAA.  For example, in 1976, an FAA official told the City that funds due to the Commission under the 1958 Agreements should instead be paid to the County.  JA_____ [FAA00336].  In March 1977, the same FAA official[4] explained that the 1953 resolution and the 1953 release established the City's "continuing obligation" to "use proceeds from the former government surplus land for public airport purposes."  JA_____ [FAA00338].  FAA clarified that the October 1958 agreement's reference to the Commission's 20-year

---

[4] The 1976 and 1977 letters were written by the Chief of the Airports District Office in College Park, Georgia, which is the local FAA office with immediate regulatory authority over the Myrtle Beach area.

obligation to operate the Crecent Beach Airport established only the "minimum period of time in which the public is guaranteed the use of the airport" and "had no bearing on the obligation of the [City] to use the proceeds from the former government surplus land for public airport purposes." JA____ [FAA00338].

By 1995, the City more formally memorialized its obligations by passing a "Resolution to Adopt a Policy Governing the Use of Airport Trust Fund Assets," in which the City set forth policies on how to use revenue from the Seascape Properties for airport purposes. JA____-____ [FAA00333-00334]. The 1995 resolution explicitly states that it governs expenditure of funds held in trust by the City Council pursuant to the 1953 resolution. JA____ [FAA00333]. It explains that the Airport Trust Fund is funded by income from the "properties conveyed to the City by quitclaim deed from the United States of America on October 22, 1948." JA____ [FAA00333] ¶ 1. The resolution then provides that the Airport Trust Fund "corpus and interest income thereon shall be used only for capital improvements, which directly relate to the development, operation, maintenance, or improvement of a public airport which serves the Myrtle Beach area." JA____ [FAA00333] ¶ 2.[5]

---

[5] The City asserts that that the 1995 resolution reflects only a "policy" choice regarding the Seascape Properties revenue. Pet'r's Br. at 7. But the resolution demonstrates that the City understood that the Act required it to use Seascape Properties revenue to benefit civil aviation.

12

In 2001, FAA reviewed "all historical documents contained in our files" and again confirmed that the funds generated from the use of the Seascape Properties "are under obligation from the original 1953 release and subsequent agreements to be used for public airport purposes." JA____ [FAA00350]. The agency "found no evidence of a later agreement nullifying this federal obligation." JA____ [FAA00350].

Nevertheless, the City continued to claim control of the revenue from the Seascape Properties, leading FAA to once again reject its position. In 2002, FAA advised the City that "there is still an important and enforceable agreement related to the proper allocation of funds derived from the collection of rent for certain real properties" and that the agency maintained an "interest in the proper execution of the terms underlying agreements to which it was a party." JA____ [FAA00352]. FAA therefore directed the City to "transfer to Horry County at the end of each quarter the total proceeds and value of use for City purposes that are contained in or owed to the Airport Fund." JA____ [FAA00352].

The City continued to resist providing all Seascape Properties revenue to the County notwithstanding this clear and consistent direction from FAA. In 2002, the County thus filed a Part 16 administrative complaint to compel compliance with the Surplus Property Act. JA____ [FAA00875]. Shortly after, and to resolve the dispute over the lease proceeds, the City and the County entered into an Intergovernmental

Agreement. JA____-____ [FAA00355-00364]. Under that agreement, the City would retain 25% of Seascape Properties lease revenue and pay the remaining 75% to the County. JA____ [FAA00361] ¶ 4. The County subsequently dismissed the Part 16 Complaint. FAA did not approve the Intergovernmental Agreement. Between 2004 and 2021, the City paid the County 75% of the rental income from the Seascape Properties pursuant to the Intergovernmental Agreement.

On or about November 6, 2020, the County learned that the City had contracted to sell the Seascape Properties to its current lessees, apparently to continue the non-aeronautical use of the property. JA____ [FAA01167]. When the City refused to stop the sale, the County sought an emergency injunction in state court to block the sale to preserve the County's rights.

On March 17, 2021, FAA advised the City that it remained obligated by the terms of the 1953 release. JA____ [FAA00210]. Thus, if the City sold the Seascape Properties, it should "promptly remit the proceeds of the sale to Horry County to be used for appropriate airport purposes." JA____ [FAA00210]. The City did not agree.

On January 25, 2021, the state court denied the County's preliminary injunction. JA____ [FAA00138]. The County moved to voluntarily dismiss the state court action on March 5, JA____ [FAA000171], and initiated these administrative proceedings on April 15, JA____ [FAA000001]. On October 14,

2021, while the administrative matter was pending, the City informed the County that it was unilaterally terminating the Intergovernmental Agreement and would hold the County's portion of Seascape Properties revenues in "escrow" pending final resolution of this proceeding.[6]  JA____ [FAA01168] (Director's Determination). The City has not paid any Seascape Properties proceeds to the County since then.

### E.      The Agency's Determination

On July 17, 2023, the Director of FAA's Office of Airport Compliance and Management Analysis issued a Director's Determination finding that the City remained subject to its obligation in the 1953 release to use all revenue from the Seascape Properties for the benefit of the Myrtle Beach Airport or another public airport serving the Myrtle Beach area.  JA____ [FAA01179].  The Director concluded that "nothing in the 1958 Agreements change[d] or supersede[d] the 1953 Release."  JA____ [FAA01181].  Further, "no other agreements between the City and the United States ... have altered the 1953 Release conditions."  JA____ [FAA01181].  Therefore, "[t]he City remains bound by the obligation to use the proceeds from the Seascape Properties" to benefit a public airport serving Myrtle Beach. JA____ [FAA01181].

---

[6] The City is not holding these revenues in a true escrow account but simply recording them as a separate ledger entry on its books.  JA____ [FAA01232].

The Director further found that FAA has the authority to determine if the proposed use of the sale of the Seascape Properties would benefit civil aviation. JA____ [FAA01186]. Although Horry County was the "logical choice" to receive the funds, the Director concluded that the City did not necessarily need to pay them to the County if it could demonstrate a viable alternative that would have an equal or greater benefit to civil aviation. JA____ [FAA01183]. He thus directed the City to submit a corrective action plan to propose how it would use the proceeds of any sale to benefit civil aviation. JA____ [FAA01186]. Although the parties provided information about the appraisals and the proposed sale price, the Director did not make factual findings regarding the fair market value of the Seascape Properties. He concluded only that "the City must follow FAA procedures for determining [fair market value] and must sell the property in accordance with these procedures." JA____ [FAA01186].

The City filed its administrative appeal on September 15, 2023. JA____ [FAA01218]. On July 9, 2024, and on the heels of the Supreme Court's decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024), the City moved to dismiss the Complaint for lack of jurisdiction. JA____ [FAA01399]. FAA's Associate Administrator for Airports issued his final decision on July 18, 2025, which affirmed the Director's Determination in all relevant respects and denied the City's motion. JA____

16

[FAA01410], JA____-____ [FAA01425-01426]. The City then filed the present petition for review.

## SUMMARY OF ARGUMENT

I.      Consistent with the requirements of the Act, the United States initially transferred the Seascape Properties to the City on the condition that it be used for airport purposes. Later the City sought a release from its obligation to use the Seascape Properties only for airport purposes. Following the statutory framework, the United States agreed to the release on the condition that any revenue generated by the properties would be used to support civil aviation. The United States never agreed to any further modification of this obligation. FAA thus correctly concluded that the City remains obligated to use any proceeds from the intended sale of the Seascape Properties for the benefit of local public airports. This determination is well-reasoned, consistent with law, and abundantly supported by the facts.

II.      The City fails to offer any grounds for overturning FAA's well-reasoned and supported decision. To begin, FAA had jurisdiction to adjudicate the administrative complaint. The Supreme Court's decision in *SEC v. Jarkesy*, 603 U.S. at 109, does not dictate otherwise, because the claim at issue in the administrative proceeding sounded in equity rather than law and, in any case, FAA did not in fact adjudicate private rights.

17

The City's merits arguments fail to clear the high bar necessary to show that FAA decision was not supported by substantial evidence. They are based on a series of mischaracterizations of facts and law. In essence, the City claims that two subsequent contracts signed in 1958 somehow limited its statutory obligations, reflected in the 1953 release, and that it has long since satisfied these circumscribed duties. FAA rejected these arguments for good reason. It was not even party to one of these later agreements, and at any rate, neither makes any mention whatsoever of the 1953 release (despite carefully detailing the release of other, preexisting agreements). The 1958 agreements' plain text, structure, and context make clear that they left the 1953 release, and the City's obligations reflected in it, undisturbed.

The City's broader effort to recast its statutory obligations into ordinary contract duties that can be bargained away, and its related attempt to style its obligations as "personal" in nature, miss the mark. The City's duties arise under federal statute, not state contract law, and can only be modified in accordance with the statutory framework.

The City's reliance on the Intergovernmental Agreement, which it also contends contracted away its obligations, is likewise misplaced. FAA alone has the authority to release Surplus Property Act obligations, and it was not a party to the Intergovernmental Agreement. Regardless, the County entered into the agreement with the City to resolve longstanding disputes about lease proceeds. It did not accept

18

the City's legal position in doing so, nor does the agreement bear on the separate issue of use of sale proceeds. The City's suggestion that the Intergovernmental Agreement's boilerplate merger clause waived its obligations under the 1953 release—an entirely different contract between different parties—also fails. The Intergovernmental Agreement does not and could not have the import the City seeks to give it.

The City's suggestion that FAA imposed "new" conditions on it without authority to do so also falls short. FAA merely required submission of a corrective action plan detailing how the City would use any sales proceeds to benefit civil aviation and advised that any such sale must be made in accordance with FAA policies including that it be sold for fair market value. These requirements are reasonable measures to ensure that the City satisfies its statutory obligations, and they are well within FAA's authority.

Finally, FAA acted properly by declining to excuse the City's shortcomings through application of equitable doctrines or the statute of limitations. Such doctrines are disfavored in FAA administrative proceedings where the ultimate issue is compliance with federal law (not conduct of the complainant) and unwarranted based on the record here.

Because the City's arguments lack merit, the petition should be denied.

19

## STANDARD OF REVIEW

The Court reviews FAA's decision to determine whether it is "arbitrary and capricious, an abuse of discretion, or otherwise contrary to law." 5 U.S.C. § 706(2)(A). FAA's factual findings are conclusive if supported by substantial evidence. 49 U.S.C. § 46110(c) [Add. 2]; *Haddock v. Babbitt*, 488 Fed. App'x 686, 688 (4th Cir. 2012).

## ARGUMENT

### I.      FAA's Determination Is Consistent with Law and Supported by Substantial Evidence.

FAA correctly determined that the City remains obligated to use the proceeds of any sale of the Seascape Properties for airport purposes. All the City's rights in the Seascape Properties derive from, and are limited by, the Surplus Property Act. As detailed above, the fundamental purpose of the Surplus Property Act is to ensure that surplus government airport property is used to benefit civil aviation. *Supra* at 3-5. The United States and the City memorialized that statutory obligation in two sequential legal instruments regarding the Seascape Properties.

First, when FAA originally transferred property to the City in 1948, it did so on the condition that the transferred property, which included the Seascape Properties, could not be "used, leased, sold, salvaged or disposed of ... for other than airport purposes" without FAA's written consent. JA____ [FAA00223]. The deed further stated that FAA should not provide such consent unless the "Administrator

20

determines that the property can be used, leased, sold, salvaged or disposed of for other than airport purposes without materially and adversely affecting the development, improvement, operation or maintenance of the airport at which such property is located ... ."  JA____ [FAA00223].

Second, when the City sought partial release of its obligations with respect to the Seascape Properties, the United States again insisted on conditions for the public benefit.  JA____ [FAA00234].  Specifically, the United States allowed the City to use the Seascape Properties for non-aeronautical purposes if, and only if, it used the revenue generated by the property to support civil aviation in the area.  JA____ [FAA00235].  The City exhibited its commitment in a resolution reflecting that its obligations "regarding the use of proceeds from lease or sale of" the Seascape Properties were statutory in nature and owed to the United States.  JA____ [FAA00230].  The resolution affirmed the City's commitment to "covenant and agree with the United States to utilize any revenue derived from use, lease, or disposition of [the Seascape Properties] for public airport purposes as a further consideration of release."  JA____ [FAA00230].  The United States and the City then entered into an agreement releasing the Seascape Properties from the obligation to use the property for aeronautical purposes subject to the City's obligation "to utilize any revenue derived from the [Seascape Properties] in connection with the civil use of the Myrtle Beach Municipal Airport, or for the development,

21

improvement, operation or maintenance of another public airport." JA_____ [FAA00235].

The Director rightly found, after a careful reading of the controlling documents, that "no other agreements between the City and the United States [] have altered the 1953 Release conditions." JA_____ [FAA01181]. He thus correctly concluded that "[t]he City remains bound by the obligation to use the proceeds from the Seascape Properties for airport purposes at Myrtle Beach Airport or another public use airport." JA_____ [FAA01181]. FAA further emphasized that it had "never altered its position," citing to the line of FAA letters stretching back to the 1970s reaching the same conclusion. JA_____ [FAA01181]. The Associate Administrator agreed, finding no basis to change FAA's long-held position that the City "is obligated to provide all funds from the proceeds of the Seascape Properties for airport purposes." JA_____ [FAA01423].

Fundamentally, the City does not, and cannot, point to any document, action, or decision by FAA releasing or altering the condition that the City "utilize any revenue derived from the [Seascape Properties] in connection with the civil use of the Myrtle Beach Municipal Airport, or for the development, improvement, operation or maintenance of another public airport." JA_____ [FAA00235]. FAA's findings are thus mandated by the Surplus Property Act, the express terms of the

controlling documents, and the City's own admissions.  In short, there is overwhelming support for FAA's decision in the record.

## II.    The City's Arguments All Lack Merit.

Faced with the absence of any waiver or release of its Surplus Property Act obligations, the City proffers a barrage of meritless arguments in hopes of voiding its statutory obligations to the United States and the public and securing a $60 million windfall.  At its core, the City attempts a form of legal alchemy whereby its statutory obligations under the Surplus Property Act are transmuted into "mere" contract obligations.  The City then goes one step further, insisting that agreements about different subject matters with different parties modify its federal obligations. The Court should not be fooled by this sleight of hand.

### A.    This Action is Within FAA's Jurisdiction, and *Jarkesy* Does Not Dictate Otherwise.

The City's jurisdictional argument under *SEC v. Jarkesy*, 603 U.S. 109 (2024), cannot withstand scrutiny.  The City argues that *Jarkesy* compels a finding that FAA lacks jurisdiction because Congress cannot remove matters concerning so-called private rights from Article III courts.  Pet'r's Br. at 20.  As an initial matter, the City forfeited this argument by failing to present it to the Director.  14 C.F.R. § 16.33(f) [Add. 10].

The City also fundamentally misconstrues *Jarkesy* by collapsing its two-step framework.  The City suggests that the sole inquiry is whether the underlying right

23

can be characterized as "private" in some fashion. *Jarkesy*, however, draws a clear line between the threshold Seventh Amendment question and the subsequent public rights exception analysis, which courts should reach only if the Seventh Amendment applies. *Jarkesy*, 603 U.S. at 120 ("The threshold issue is whether this action implicates the Seventh Amendment."). In blurring this line, the City confuses what *Jarkesy* says about the threshold Seventh Amendment issue, and the crucial distinction it draws between law and equity, with the secondary "public rights" analysis. Considering these questions separately, as *Jarkesy* requires, makes plain the flaws in the City's argument.

The first question for the Court is whether the underlying claim implicates the Seventh Amendment, which turns on whether the claim at issue is "legal in nature," as opposed to equitable. *Jarkesy*¸ 603 U.S. at 122 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)); *id.* (Seventh Amendment's reference to "common law" is "in contradistinction to equity"). To determine whether a suit is legal in nature, courts must "consider the cause of action and the remedy it provides," but the remedy is the "more important consideration." *Id.* at 123 (quoting *Tull v. United States*, 481 U.S. 412, 418-21 (1987)).

Here, there is no question that this proceeding is equitable in nature. The City itself admits that this proceeding "is a traditional equitable claim" for specific performance, Pet'r's Br. at 22, which dooms its argument. Indeed, the City fails to

24

make *any* argument under the Court's Seventh Amendment analysis, attempting instead to skip over the law versus equity distinction. The undisputed equitable nature of this proceeding takes it out of the Seventh Amendment's orbit. That ends the Court's inquiry.

Even if this matter did implicate the Seventh Amendment, FAA would nevertheless have jurisdiction over the underlying proceeding. The City's argument to the contrary is premised on its view that FAA decided a matter of private, not public, rights. *See, e.g.*, Pet'r's Br. at 20-21. This argument is flawed for two reasons.

First, the specifics of the agency's action make clear that it did not go so far. FAA's action, and the corrective action that it ordered, are notably narrow. FAA affirmed its longstanding position that the City is legally obligated to use revenue generated by the Seascape Properties to benefit local airports and this obligation requires that any sale of the property be for fair market value. JA____ [FAA01186]. It then directed the City to submit a proposal for complying with these obligations. JA____ [FAA01425]. This action does not alter any private rights or even require the City to take any specific action. It merely requires the City to submit further information without any penalties, damages, or punishment. Such action is well within FAA's jurisdiction.

25

Of course, FAA expressly reserved the possibility of future enforcement action. JA____ [FAA01425]. However, a proper assessment of any future proceeding, and a broader analysis of the public rights exception, would depend upon the specifics of any action taken. Those questions are not presented by the action challenged here.

Second, to escape the public rights exception, the City mischaracterizes the nature of its rights in the Seascape Properties as being wholly private. That is inconsistent with the Act, which does not provide for free and clear transfer of public property into private hands as the City suggests.[7] Instead, the Act contemplates ongoing restrictions on the use of property, even after conveyance, and continuing federal oversight of compliance with those restrictions. The United States thus retains a public interest in the property and its use, including revenue generated by the property, and requires FAA to protect that interest. FAA's action falls comfortably within the history of Congress entrusting federal agencies with the general care of public lands and the authority to preserve the rights of the public with respect to them. *Jarkesy*, 603 U.S. at 130 (citing *Crowell v. Benson*, 285 U.S. 22, 51 (1932)); *Cameron v. United States*, 252 U.S. 450, 459-60 (1920).

---

[7] The City's reliance on cases involving distinct land-use and mineral rights statutes are therefore inapposite. Pet'r's Br. at 26. Those cases turn on the specifics of the relevant statutory schemes and do not establish any categorical rule.

The City argues repeatedly that the County's request for preliminary relief in state court somehow concedes that the agency proceeding concerns private, rather than public, rights. Pet'r's Br. at 24, 27. That is incorrect. True, the County sought temporary and preliminary relief on an emergency basis to halt the sale of the Seascape Properties and preserve the status quo. That action concedes nothing, however, about the nature of the City's underlying obligation. Nor does it concede that FAA lacks the exclusive authority to enforce the City's obligation to use Seascape Properties revenue to benefit civil aviation. Indeed, the County has consistently maintained that the Act is the source of that obligation and has repeatedly raised this issue to the attention of FAA. Regardless, the state court proceeding is irrelevant. The County's litigation strategy does not and cannot dictate the bounds of FAA's jurisdiction.

## B.    The City's Merits Arguments Also Fail.

Turning to the merits, the City also argues that any obligations it had under the Act expired decades ago. Pet'r's Br. at 29, 31. But it fails entirely to point to any support for the notion that FAA (or the United States generally) authorized such termination. Instead, it launches a volley of theories based on tortured readings of the law and of various documents, none of which pass muster.

1.    FAA Correctly Found That the 1958 Agreements Did Not
      Modify or Release the City's Obligations Under the 1953
      Release.

The crux of the City's merits arguments turns on its reading of two agreements, signed in April and October of 1958. The City argues that these agreements superseded the 1953 release by replacing the City's obligation to use revenue from the Seascape Properties to support public airports with a limited duty to pay those revenues only (i) to the State Commission (ii) for the purpose of redeveloping the Crescent Beach Airport (iii) for 20 years. *Id.* at 33-35, 35-38. The City therefore argues its obligations have long since been met, because the State Commission no longer operates Crescent Beach Airport and, in any event, any obligation was satisfied in 1978. It claims it is now free to pocket the proceeds from the sale of the Seascape Properties for its own benefit. *Id.* at 34-35.

FAA rightly rejected these arguments. The 1958 agreements are clear about which prior obligations they released. Article I(B) of the October 1958 agreement provides that the "Government hereby releases the City from any and all obligations created by and under the aforesaid deeds." JA____ [FAA00257]. That list of specific deeds and grants includes the 1948 quitclaim deed, but excludes the 1953 release, JA____ [FAA00255], making clear that it was *not* released. The October agreement's recitals state "the understanding of all parties ... as well as that of FAA" of the April 1958 agreement was that it would act as "a complete release of the City

28

from its obligations *with respect to the Myrtle Beach Airport* under the aforesaid deeds and grant agreements ...," which, again, exclude the 1953 release.  JA____ [FAA00256] (emphasis added).

In fact, as the Director noted, the 1958 agreements make no reference at all to the 1953 release.  JA____ [FAA01181].  Thus, "nothing in the 1958 Agreements changes or supersedes" that release.  JA____ [FAA01181].  The City nevertheless urges the Court to read the 1958 agreements as superseding that release *sub silentio*. Pet'r's Br. at 36-37.  Indeed, they claim that the parties' mutual intention to discharge the City from all restrictions on the Seaside Properties is "unmistakable."  *Id.* at 36. But wishing does not make it so, and as described above, the City failed to offer any evidence of this shared intent in the agreements or elsewhere.  The 1958 agreements' conscious choice to not release the City's obligations under the 1953 release from the list of overwritten obligations flatly refutes the City's warped reading.

The structure of the October 1958 agreement reinforces this reading.  The City unconvincingly links two provisions that appear in separate articles of the contract. Pet'r's Br. at 33-34, 36-37.  Read as a whole, the contract clearly sets out different obligations in each of its articles, undermining the City's interpretation.  Article I establishes the federal government's obligations under the contract to approve the proposed conveyance of the Myrtle Beach Airfield and to release the City from certain obligations regarding the airport.  JA____ [FAA00256], art. I ¶¶ A-B.  As

29

noted, Article I did *not* release the City's obligations under the 1953 release. *Supra* at 28-29.

Article II addresses the City's obligations to make the conveyance to the United States and to direct revenue from surplus property to the State Commission. JA____ [FAA00257], art. II ¶¶ A-B. It then implements the 1953 release based on these changed circumstances, by redirecting the flow of revenue to the new airport and airport operator, while leaving the underlying obligation wholly intact. JA____ [FAA00257].

Article III then establishes the State Commission's obligations regarding its sponsorship of the Crescent Beach Airport. JA____ [FAA00257], art. III ("*The Commission, for itself, its successors and assigns*, agrees to operate and maintain the Crescent Beach Airport as a public airport on the terms and conditions hereinafter set forth, for a period of twenty (20) years from the date of this Agreement ... ." (emphasis added)); JA____ [FAA00257], art. III ¶¶ A-H (establishing terms and conditions similar to an airport sponsor's obligations under FAA's Grant Assurances). The *Commission's* obligations were limited to Crescent Beach Airport and to a 20-year term. But Article III does not relate at all to the *City's* obligations in Article II or under the 1953 release, much less limit them.[8]

---

[8] The City states that "[t]he FAA has a history of limiting proceeds use restrictions to 20 years," but cites only one case. Pet'r's Br. at 33 n.10 (citing *Friends*

A comparison of the 1953 release and the 1958 agreements offers further support. The 1953 release was specific to the Seascape Properties and imposed a perpetual condition to use lease or sale proceeds from those properties for the benefit of a civil airport. The 1958 agreements, by contrast, establish how the City would satisfy that obligation given the relocation of the public airport from the Myrtle Beach Airfield property to Crescent Beach. JA____ [FAA01180]; *see also supra* at 8-10. Specifically, the later agreements direct the City to use "proceeds received by the City from [the Seaside Properties] ... for the operation, maintenance and development of the Myrtle Beach Airport at Crescent Beach." JA____ [FAA00241], art. I ¶ f. The 1958 agreements were never meant to replace the City's ongoing obligation to use revenue generated by the Seascape Properties to support airports serving the Myrtle Beach area.

The City's attempt to rely on general contract principles are unavailing. Pet'r's Br. at 31, 36; *see also infra* at Section II.B.2. The City cites cases for general contract principles like limiting interpretation to plain language absent ambiguity or reading contracts holistically. Pet'r's Br. at 31. As explained at length, FAA

---

*of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1183-84 (8th Cir. 2001)). That case shows only that in the "highly unusual circumstances" there, lease proceeds generated by surplus property should be paid into an aviation account for 20 years. 251 F.3d at 1193 (quoting parties' memorandum agreement). Suffice to say, a single example does not demonstrate a history, and neither the 1953 release nor the 1958 agreements contain any such limit on the City's obligations.

correctly interpreted the various instruments here consistent with these precepts. *Supra* at 28-31.

Moreover, the citation to cases regarding substitute contracts is inapt. It may be true that, in some circumstances, a contract is so clearly intended to supersede an earlier agreement that it need not explicitly mention it. For example, the City cites *Phoenix Power Partners, L.P. v. Colorado Public Utilities Commission*, in which the Supreme Court of Colorado considered whether a subsequent power purchase agreement superseded an earlier one. 952 P.2d 359, 365 (Colo. 1998) (applying Colorado law and noting that "specific facts surrounding the contractual relationship dictate whether or not [the transformed] terms are essential to the agreement"). It found that it had, because the subsequent agreement "differ[ed] radically" and in it, "virtually every contract term [wa]s altered," including the "technology, location, fuel source, legal entities, and capacity payment." *Id.* at 363, 365; *see also Leisner v. Finnerty*, 250 A.2d 641, 641-43, 645 (Md. 1969) (a letter agreement between joint owners of a property "so altered" the initial agreement by effectuating a full buy-out of one owner that the court concluded that the parties "intended to extinguish the original agreement"); *Am. Fed. Bank, FSB v. United States*, 62 Fed. Cl. 185, 192-194, 199 (Fed. Cl. 2004) (finding that parties intended to be bound by later agreement based on extensive factual evidence and observing in dicta that a common substitute contract "is one that contains a term that is inconsistent" with the earlier

32

one (quoting Restatement (Second) of Contracts § 279 cmt. a)).  That is a far cry from the circumstances here, however, where the 1958 agreements address different property, involve different parties, and reflect a conscious choice to preserve the City's obligations under the 1953 release.

The City also claims that FAA "disregarded" the April 1958 agreement because FAA was not a signatory to it.  Pet'r's Br. at 35.  The City contends that the Army Corps of Engineers signed that agreement on behalf of the United States as a whole and that, in any event, FAA concurred in that contract and incorporated it into the October 1958 agreement, which it did sign.  *Id.*  This argument misunderstands the law.  Although the Army Corps signed the April 1958 Agreement, only FAA has the statutory authority to release Surplus Property Act obligations, and it must do so in accordance with the Act's substantive and procedural requirements.  49 U.S.C. §§ 47151(d), 47153(b).  The Army Corps does not have the authority to release those obligations, and FAA's mere concurrence is insufficient to do so.  *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021) ("Federal agencies are creatures of statute.  They possess only those powers that Congress confers upon them." (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

In any event, FAA did not disregard the April 1958 agreement.  Rather, it disagreed with the City's tortured reading of that agreement and explained why.  JA____ [FAA01180]; JA____ [FAA00180] n.38 (agreement "did not set a limit on

33

the obligation to use the proceeds of the Seascape Properties for airport purposes"); JA____ [FAA01181] (agreement does not "reference the 1953 Release" and therefore does not "change[] or supersede[]" it); JA____ [FAA001181] (describing City's arguments regarding April 1958 agreement as "erroneous[]").  It need do no more.  The City's brief does not even bother to identify which provisions of the April 1958 agreement the City believes FAA failed to sufficiently consider.

> 2.    The City's Surplus Property Act Obligations Cannot Be Contracted Away without FAA's Consent.

Over and over again, the City insists that Surplus Property Act obligations are "mere[ly]" contractual and that "ordinary" contract principles govern this dispute even though the federal government is a contractual party.  *See, e.g.*, Pet'r's Br. at 31 (citing *Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 191 (Fed. Cl. 2013)).  To be sure, the federal government occasionally acts akin to a private commercial actor, such as when it procures from or provides contractual services to another party.  Such was the case in *Westlands*.  109 Fed. Cl. at 183-84.  But the analogy to ordinary contract law makes little sense here, where the United States acts in an enforcement capacity and the relevant contracts implement the statutory regime.  Regardless, as explained at length, FAA correctly interpreted the relevant contracts under both the Act and contract law.  *Supra* at 28-31.

The City also argues that any obligations imposed by the 1953 release or any subsequent instrument are personal covenants of the City.  Pet'r's Br. at 29-31.  It is

unclear what the City's point is. Even if the City's obligation were personal, it would nevertheless be binding. *See Mineta v. Bd. of County Comm'rs*, 2006 U.S. Dist. LEXIS 67566, at *24 (N.D. Okla. Sep. 19, 2006) (state law principles do not limit the enforceability of contracts with FAA).

Nor does the City explain how a release that binds the City personally would somehow render the Act inapplicable. Under the Act, the United States only had authority to agree to the 1953 release because of the City's agreement to use the Seascape Properties revenue to benefit the flying public. That condition can only be altered with the agreement of the United States. As a factual matter, the United States never agreed to any alteration of that condition. *Supra* at 8-10, 28-31. As a legal matter, it could not do so unless authorized by the Act, including by making the requisite findings and following the statutory procedure. 49 U.S.C. §§ 47151(d), 47153(b); *see also* JA____ [FAA001423] (FAA "would not have released the property unless there was a commitment to benefit civil aviation in accordance with" the Act). This requisite framework does not stem from and, indeed, departs meaningfully from general contract law requirements. The mere fact that FAA implements that authority through covenants and agreements does not limit its statutory obligations, nor provide a means for beneficiaries, like the City, to evade their obligations under the Act.

35

The Federal Register notice on which the City relies says nothing to the contrary. It states that no release from the Act's obligations will be granted "unless the public agency involved has obligated itself to use the proceeds derived from such sale exclusively for the development, improvement, operations or maintenance of a public airport." 19 Fed. Reg. 4591, 4604 (July 27, 1954) (Section 565.4(c)) [Add. 14]. That is precisely what the City did in 1953, and the City remains bound to that commitment.

> 3.    The Intergovernmental Agreement Does Not and Could Not Disturb the City's Surplus Property Act Obligations.

The City's next theory rests on the Intergovernmental Agreement between the City and the County regarding the Seascape Properties, in which the City and County agreed that the City would pay 75% of the rental proceeds to the County for airport purposes and would retain 25% with no use restriction. JA____ [FAA00361]. According to the City, the County contracted away any remaining City obligation to use the Seascape Properties' proceeds for airport purposes when it entered the Intergovernmental Agreement. Pet'r's Br. at 38-42.

The Director correctly rejected this argument because FAA was not a party to that agreement and only FAA has the authority to release the City from its Surplus Property Act obligations. JA____ [FAA01181]. Further, Surplus Property Act obligations can only be released in accordance with the Act's requirements, including that the Secretary of Transportation make certain findings about the impact

on civil aviation interests and that FAA provide public notice. 49 U.S.C. § 47153. There were no such findings in connection with the Intergovernmental Agreement. Accordingly, the City and the County could not modify those obligations, even if they wanted to.

The City tries to square this circle by claiming that FAA tacitly consented to the arrangement in 1977 by directing the City and the County to "mutually reach a new agreement." Pet'r's Br. at 40, 41 (quoting JA____ [FAA00338]). That is a gross misreading of the letter. There is no indication whatsoever that FAA believed it possible, let alone advisable, for the City and County to modify the City's statutory obligations via private agreement to which FAA was not a party. The letter does, however, demonstrate FAA's view of, and ongoing role in, the dispute. Specifically, it advised the City to pay all Seascape Properties revenue to the County, as the operator of the airports near Myrtle Beach. JA____ [FAA00338]. More broadly, it confirmed that the 1958 agreements did not limit the City's Surplus Property Act obligation, which was "a continuing obligation until the parties mutually reach a new agreement." JA____ [FAA00338]. The reference to "the parties" that the City puts so much stock in plainly means the parties to the prior agreements, including the 1953 release, between the City and FAA. Moreover, it beggars belief that a 1977 letter by an FAA official in the Atlanta District office could confer FAA "consent" to some *future* agreement (here, nearly thirty years later), binding the agency

37

perpetually to unknown terms.  The City's argument also ignores subsequent FAA communications making clear that the City's statutory obligations persisted in the wake of the Intergovernmental Agreement.  *See* JA____ [FAA00210] (2021 letter directing the City to "promptly remit the proceeds of the sale to Horry County to be used for appropriate airport purposes.").

Regardless, the City overreads the Intergovernmental Agreement in at least three ways.  *First*, it suggests that the agreement reflects the County's acceptance of the City's legal position.  It does not.  It merely reflects the parties' agreement to an allocation of lease proceeds in exchange to avoid continued controversy, without resolving the merits of the dispute.  Such settlements are commonplace.

*Second*, the City argues that the Intergovernmental Agreement already answers the same question decided by FAA: whether the City is required to use the proceeds of the sale of the Seascape Properties to benefit civil aviation.  It does not. The agreement concerns allocation of *lease* proceeds; it is silent as to *sale* proceeds. JA____-____ [FAA00360-00361] ¶¶ 1-4.  The distinction matters.  Leases provide an ongoing source of revenue; sales are a one-time, final influx of revenue.  The County's (and the City's) considerations about whether and under what circumstances to settle claims would undoubtedly differ in the context of sale proceeds.  The Intergovernmental Agreement indicates nothing about either party's position on that issue.

38

*Third*, the City overreads the Intergovernmental Agreement's standard merger clause, Pet'r's Br. at 38-39, which provides only that the agreement itself "sets forth the full and complete understanding of the parties ..., and it supersedes any and all agreements and representations made earlier."  JA____ [FAA00364].  As the City acknowledges, the purpose of a merger clause is to prevent parties from relying on evidence extrinsic to the written terms of the contract to dispute it.  *See* Br. at 38-39.  But the City cites nothing for its more radical proposition that a boilerplate merger clause in agreement between two parties could replace separate written agreements between different parties.  Courts have rightly rejected such efforts.  *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 792-93 (N.D. Ill. 2010) (rejecting application of integration clause to separate agreement involving different parties because merger occurs "when the same parties to an earlier agreement later enter into a written integrated agreement covering the same subject matter"); *see also Com. Credit Corp. v. Nelson Motors, Inc.*, 147 S.E.2d 481, 485 (S.C. 1966) (declining to apply one agreement's merger clause to prior agreements outside of its scope).  The City cannot rely on the Intergovernmental Agreement with the County to modify, much less replace, the City's 1953 agreement with FAA under the Surplus Property Act.

The City's policy argument also fails to persuade.  *See* Pet'r's Br. at 40-41.  It claims that parties would be discouraged from settling Part 16 disputes if the Court allows FAA to void their settlement later.  *Id.* at 41.  But, as explained, FAA did not

39

void the Intergovernmental Agreement, which concerned the distinct matter of rental (not sales) proceeds. *Supra* at 38. Moreover, private settlement agreements entered into against the backdrop of federal enforcement necessarily carry some risk that the enforcement agency will not accept the agreed upon arrangement. The City's argument that FAA's silence regarding a private agreement, to which it is not a party, could somehow tie the federal government's hands poses the real policy danger. In any event, declining to exercise enforcement discretion is certainly not tantamount to acquiescence.

Finally, the City's argument that the Court should adopt the City's preferred construction of the Intergovernmental Agreement to avoid rendering it illegal is unavailing. Pet'r's Br. at 40. The City conveniently omits the fact that it has unilaterally declared that same agreement void. JA____ [FAA01168]. That is, the City offers a "heads I win, tails you lose" argument in which the Intergovernmental Agreement is void insofar as it obligates the City to pay lease revenue to the County but in effect at least enough to bar FAA's enforcement of the City's Surplus Property Act obligations. In any event, FAA did not construe the Intergovernmental Agreement one way or another in reaching its decision. JA____ [FAA01177] (describing the Intergovernmental Agreement as "not dispositive" and instead focusing its analysis on agreements to which the City and United States were parties).

40

4.    FAA Did Not Exceed Its Authority by Ordering the City to Submit a Corrective Action Plan Demonstrating Compliance.

The City's repeated suggestion that FAA somehow re-wrote decades-old agreements or imposed new substantive obligations on the City again reflects a misunderstanding of FAA's order.  FAA acted within its express and exclusive authority to "ensure compliance with an instrument conveying an interest in surplus property."  49 U.S.C. § 47151(b).  FAA identified the relevant legal instrument as the 1953 release, which required the City to use the Seascape Properties for the benefit of civil aviation by dedicating revenue from the Seascape Properties to benefit airports serving the Myrtle Beach area.

Having identified this obligation, FAA exercised its authority to ensure compliance with it.  Specifically, the Director concluded that the City must follow FAA procedures for determining fair market value and directed that any sale be conducted in accordance with those procedures.  JA____ [FAA01186].  He also ordered the City to submit a corrective action plan that would demonstrate how it planned to use the sales proceeds to benefit civil aviation.  JA____-____ [FAA01186-01187].

The City claims that these were impermissible "new conditions" because FAA's authority is limited to imposing conditions only at the time of the original conveyance or release.  Pet'r's Br. at 42-43.  FAA considered and rejected this argument.  JA____-____ [FAA01424-01425].  It explained that it was not imposing

41

new conditions, but rather, that the conditions to which the City is subject were established long ago, in the 1953 release.  JA____-____ [FAA01424-01425].  FAA merely directed the City to comply with its longstanding statutory obligations.  JA____-____ [FAA01425-01426].  FAA did not re-write, modify, or change any prior agreement; it merely enforced the City's long-standing Surplus Property Act obligations.  That is consistent with the role Congress granted it.  49 U.S.C. § 47151(b).  Regardless, the Act specifically authorizes FAA to impose a new condition if it determines one is "necessary to protect or advance the interests of the United States in civil aviation."  49 U.S.C. § 47153(b).

The City's specific complaints thus fail.  For example, the City claims that FAA "fundamentally alter[ed]" the terms of the 1953 release by requiring it to pay all proceeds to Horry County unless it can prove another use would at least equally benefit civil aviation.  Pet'r's Br. at 42-44.  But FAA did not order any payment to the County.  To be sure, the Director took note of the undisputed fact that the County, as the operator of the only four airports serving the Myrtle Beach area, was the "logical choice" to receive the funds.  JA____ [FAA01183]; *see also* JA____-____ [FAA00607-00608] (zoning map showing no available land for new airport).  Notwithstanding that observation, FAA ordered the City only to "identify its proposal for how to use [sales proceeds] to benefit civil aviation."  JA____ [FAA01425].  That compliance order is consistent with FAA's conclusion that the

42

1953 release obligated the City to use those proceeds in that manner and fits squarely within its enforcement authority. 49 U.S.C. § 47151(b).

Next, the City argues that FAA lacked authority to require the City to comply with the agency's fair market value policies. Pet'r's Br. at 44. Further, it contends that the requirements of the Compliance Manual do not apply because the manual's first edition was not issued until 24 years after the 1953 release, is not binding, and has no relevance because its provisions apply only when an obligated party seeks release of federal obligations, whereas the City was released from its obligations in 1953. *Id.*

The City's argument is at odds with the very purpose of the Act, which is to convey surplus federal property to local governments in exchange for a commitment to use the property to further public aviation. If the City's title to the Seascape Properties was "impair[ed]," Pet'r's Br. at 44, then it was so from the start. That is how the Surplus Property Act works. The 1953 release modified the City's obligations but retained the requirement that the City use the property for the benefit of public airports in the Myrtle Beach area. Pursuant to 49 U.S.C. § 47151(b), FAA may reasonably exercise its discretion to enforce the City's statutory obligation, and the 1953 release, to require any sale be made for fair market value. That is all FAA did here. Such action is not a modification of the underlying obligation but a means of ensuring compliance with it. The City's suggestion of surprise that FAA would

43

require fair market value for any sale of property received under the Act is disingenuous. Although the City protests that the current Compliance Manual was issued only in September 2023, FAA has consistently advised obligated parties like the City that it viewed a fair sale price established by appraisals to be part-and-parcel of a surplus property recipient's obligation to support civil aviation. *Supra* at 5 (citing FAA compliance orders). Furthermore, as noted, 49 U.S.C. § 47153(b) allows FAA to add that requirement if necessary to protect civil aviation. The City fails to show that the order to satisfy longstanding requirements is arbitrary or capricious.

The City also insists that the proposed sale price does actually reflect the properties' fair market value, because it was negotiated at arms' length and following two qualified appraisals. Pet'r's Br. at 45. FAA did not make any findings about whether the proposed sale price reflects fair market value, although the County provided ample evidence that it did not. JA____ [FAA01292]; JA____-____ [FAA00030-00031] ¶ 81. In any case, because FAA made no such finding, there is nothing for this Court to review.

### C.  FAA Correctly Declined to Apply Equitable Doctrines and the Statute of Limitations.

The City further asks the Court to set aside FAA's action based on equitable principles and the statute of limitations. Pet'r's Br. at 46-52. The City first argues that the County should have been estopped from arguing that Seascape Properties

proceeds must be used for airport purposes based on the same merits arguments it raised regarding the Intergovernmental Agreement and a County bond issuance. *Id.* at 46-48.

As an initial matter, equitable defenses like estoppel are not generally available in Part 16 proceedings because the focus of such proceedings is on compliance with federal law, not the conduct of the complainant. *Consol. Servs. Eng'rs & Constructors, Inc. v. City of Palm Springs*, FAA Dkt. No. 16-03-05, 2004 FAA LEXIS 578, Director's Determination, at \*75 (June 10, 2004); *cf. In re Felts Field Aviation*, FAA Dkt. No. 2016-9210, 2020 FAA LEXIS 89, at \*9-10, \*14-15 (July 31, 2020) (estoppel claims against the government are subject to heightened requirements and a "rigid and sparing review," and respondent failed to clear this "high hurdle" (citations omitted)). This principle is consistent with FAA's independent obligation to enforce the Act. It applies with particular force here where the City argues that FAA should be estopped based on alleged actions by the County. It would make little sense to shield a party's legal violation from FAA enforcement based on the conduct of another private party. The City offers no support for such a proposition.

Furthermore, these arguments fail for the same reasons as the City's merits arguments. The City again points to the Intergovernmental Agreement as proof of the County's acquiescence to the City's unrestricted use of 25% of lease proceeds

and claims the County cannot now take a different position. Petr's' Br. at 47-48. As explained, however, the County never accepted the City's legal position with respect to its Surplus Property Act obligations regarding lease proceeds from the Seascape Properties. It simply agreed to a financial compromise. And because a sale of the properties had never been considered, the parties have never settled their dispute over the City's obligations regarding the proceeds of a sale.

The City's reliance on a statement made during a bond issuance in 2010 is a red herring that the City does not even bother to explicate. The statement merely reflects the County's accounting treatment of "Non-System Amounts" *i.e.*, lease proceeds from the Seascape Properties received pursuant to the Intergovernmental Agreement. Nothing in that disclosure contradicts the County's longstanding understanding that the Seascape Properties revenues must be used for airport purposes. As the County explained to FAA, none of these monies ever flowed through the County's general fund; all were applied to airport uses. JA____ [FAA01293] (citing JA____-____ [FAA00502-00503]). And again, the City cannot use statements by the County to alter its obligations under the Surplus Property Act because only FAA has that authority. FAA was legally and factually right to reject the City's estoppel argument. JA____-____ [FAA01419-01420].

The City then argues that the County's claim should be time-barred or subject to the doctrine of laches, because the County had known since the 1980s that the

City believed it had no obligations under the Act. Pet'r's Br. at 49-51. The City suggests the County should have sought relief as to sales proceeds at that time, even absent any indication that a sale would take place. *Id.* at 51. Nonsense. The issue in the underlying proceedings is the City's intention to retain all proceeds from the sale of the Seascape Properties. The County was unaware of that position or the City's intention to sell until November 2020 when the City, with no prior notice, approved the sale. The County's claim could not have accrued until then. *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 820 (2024) (a claim accrues under 28 U.S.C. § 2401(a) when a plaintiff has a "complete and present cause of action"). The County immediately sought emergency relief in state court and then filed this proceeding in April 2021, five months later, well within any conceivable statute of limitations. The City does not dispute this.

Moreover, the City does not identify any statute of limitations that it posits would bar the County's claim. The only even arguable statute of limitations is the six-year statute of limitations in 28 U.S.C. § 2401(a), which is applicable in FAA proceedings only at the discretion of the agency. *Heide v. Molnau*, FAA Dkt. Nos. 16-04-11, 16-05-02, 2005 FAA LEXIS 996, Director's Determination, at *32 (Apr. 26, 2005), *aff'd on other grounds*, 2006 FAA LEXIS 511 (July 7, 2006). Substantial evidence supports FAA's finding that the County did not unduly delay in filing its Part 16. JA____ [FAA01421].

47

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, the petition for review should be dismissed.

## STATEMENT ON ORAL ARGUMENT

Pursuant to Circuit Rule 34(a), the County respectfully submits that oral argument would assist the Court's consideration of this case.

Respectfully submitted,

*/s/ W. Eric Pilsk*

W. Eric Pilsk
epilsk@kaplankirsch.com
Caitlin McCusker
cmccusker@kaplankirsch.com
David Y. Bannard
dbannard@kaplankirsch.com
KAPLAN KIRSCH LLP
1634 I Street, NW, Suite 300
Washington, D.C. 20006
Telephone: (202) 955-5600

Kevin A. Hall
kevin.hall@wbd-us.com
M. Todd Carroll
todd.carroll@wbd-us.com
Bryant S. Caldwell
bryant.caldwell@wbd-us.com
WOMBLE BOND DICKINSON (US), LLP
1221 Main Street, Suite 1600
Columbia, South Carolina 29201
Telephone: (803) 454-6504

*Counsel for Horry County, South Carolina*

48

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limits of Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B), and 32(f) and the word limit of this Court's September 30, 2025 order because, excluding the parts of the document exempted by Fed. R. App. R. 32(f), this brief contains 10,976 words. This brief complies with the typeface and typeface style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

/s/ W. Eric Pilsk_____
W. Eric Pilsk

## CERTIFICATE OF SERVICE

I certify that on January 28, 2027, I electronically served the foregoing document with the Clerk of the Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ W. Eric Pilsk*_____
W. Eric Pilsk

# **ADDENDUM**

## <u>TABLE OF CONTENTS</u>

28 U.S.C. § 2401 ...................................................................Add. 1

49 U.S.C. § 46110 ...............................................................Add. 2

49 U.S.C. §§ 47151 ............................................................Add. 4

49 U.S.C. §§ 47152 ............................................................Add. 6

49 U.S.C. §§ 47153 ............................................................Add. 8

14 C.F.R. § 16.33 ...............................................................Add. 10

19 Fed. Reg. 4591 (July 27, 1954) .....................................Add. 12

FAA, Compliance Requirements
    (July 1961) .....................................................................Add. 22

FAA Airports Compliance Requirements, FAA Order 5190.6
    (Aug. 24, 1973) .............................................................Add. 25

FAA Airports Compliance Manual, FAA Order 5190.6A
    (Oct. 2, 1989) ................................................................Add. 36

**28 USCS § 2401**

Current through Public Law 119-68, approved December 29, 2025, with a gap of Public Law 119-60.

*United States Code Service  >  TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE (§§ 1 — 5001)  >  Part VI. Particular Proceedings (Chs. 151 — 190)  >  CHAPTER 161. United States as Party Generally (§§ 2401 — 2460)*

## § 2401. Time for commencing action against United States

**(a)**  Except as provided by chapter 71 of title 41 [41 USCS §§ 7101 et seq.], every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

**(b)**  a [A] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

## History

**HISTORY:**

June 25, 1948, ch 646, 62 Stat. 971; April 25, 1949, ch 92, § 1, 63 Stat. 62; Sept. 8, 1959, P. L. 86-238, § 1(3), 73 Stat. 472; July 18, 1966, P. L. 89-506, § 7, 80 Stat. 307; Nov. 1, 1978, P.L. 95-563, § 14(b), 92 Stat. 2389; Jan. 4, 2011, P. L. 111-350, § 5(g)(8), 124 Stat. 3848.

United States Code Service
Copyright © 2026 All rights reserved.

### 49 USCS § 46110

Current through Public Law 119-68, approved December 29, 2025, with a gap of Public Law 119-60.

*United States Code Service  >  TITLE 49. TRANSPORTATION (§§ 101 — 80504)  >  Subtitle VII. Aviation Programs (Pts. A — E)  >  Part A. Air Commerce and Safety (Subpts. I — IV)  >  Subpart IV. Enforcement and Penalties (Chs. 461 — 465)  >  CHAPTER 461. Investigations and Proceedings (§§ 46101 — 46111)*

## § 46110. Judicial review

(a) **Filing and venue.**  Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title [49 USCS § 41307 or 41509(f)], a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator of the Federal Aviation Administration) in whole or in part under this part [49 USCS §§ 40101 et seq.], part B [49 USCS §§ 47101 et seq.], or subsection (l) or (r) of section 114 [49 USCS § 114] may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

(b) **Judicial procedures.**  When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, as appropriate. The Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28 [28 USCS § 2112].

(c) **Authority of court.**  When the petition is sent to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Administrator of the

Transportation Security Administration, or Administrator of the Federal Aviation Administration to conduct further proceedings. After reasonable notice to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, if supported by substantial evidence, are conclusive.

**(d) Requirement for prior objection.**    In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration only if the objection was made in the proceeding conducted by the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration or if there was a reasonable ground for not making the objection in the proceeding.

**(e) Supreme Court review.**    A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

## History

**HISTORY:**

July 5, 1994, P. L. 103-272, § 1(e), 108 Stat. 1230; Nov. 19, 2001, P. L. 107-71, Title I, § 140(b)(1), (2), 115 Stat. 641; Dec. 12, 2003, P. L. 108-176, Title II, Subtitle B, § 228, 117 Stat. 2532; Oct. 5, 2018, P.L. 115-254, Div K, Title I, Subtitle I, § 1991(f)(1)-(4), 132 Stat. 3642; May 16, 2024, P.L. 118-63, Title XI, § 1101(s), 138 Stat. 1414.

United States Code Service

Copyright © 2026 All rights reserved.

**49 USCS § 47151**

Current through Public Law 119-68, approved December 29, 2025, with a gap of Public Law 119-60.

*United States Code Service > TITLE 49. TRANSPORTATION (§§ 101 — 80504) > Subtitle VII. Aviation Programs (Pts. A — E) > Part B. Airport Development and Noise (Chs. 471 — 475) > CHAPTER 471. Airport Development (Subchs. I — III) > Subchapter II. Surplus Property for Public Airports (§§ 47151 — 47153)*

## § 47151. Authority to transfer an interest in surplus property

(a) **General authority.**   Subject to sections 47152 and 47153 of this title [49 USCS §§ 47152 and 47153], a department, agency, or instrumentality of the executive branch of the United States Government or a wholly owned Government corporation may convey to a State, political subdivision of a State, or tax-supported organization any interest in surplus property—

   (1)  that the Secretary of Transportation decides is—

      (A)  desirable for developing, improving, operating, or maintaining a public airport (as defined in section 47102 of this title [49 USCS § 47102]);

      (B)  reasonably necessary to fulfill the immediate and foreseeable future requirements for developing, improving, operating, or maintaining a public airport; or

      (C)  needed for developing sources of revenue from nonaviation businesses at a public airport; and

   (2)  if the Administrator of General Services approves the conveyance and decides the interest is not best suited for industrial use.

(b) **Ensuring compliance.**   Only the Secretary may ensure compliance with an instrument conveying an interest in surplus property under this subchapter [49 USCS §§ 47151 et seq.]. The Secretary may amend the instrument to correct the instrument or to make the conveyance comply with law.

(c) **Disposing of interests not conveyed under this subchapter [49 USCS §§ 47151 et seq.].**   An interest in surplus property that could be used at a public airport but that is not conveyed under this subchapter [49 USCS §§ 47151 et seq.] shall be disposed of under other applicable law.

(d) **Waiver of condition.**   The Secretary may not waive any condition imposed on an interest in surplus property conveyed under subsection (a) that such interest be

Add. 4

used for an aeronautical purpose unless the Secretary provides public notice not less than 30 days before the issuance of such waiver and determines that such waiver—

(1)  will not significantly impair the aeronautical purpose of an airport;

(2)  will not result in the permanent closure of an airport (unless the Secretary determines that the waiver will directly facilitate the construction of a replacement airport); or

(3)  is necessary to protect or advance the civil aviation interests of the United States.

(e) **Requests by public agencies.**   Except with respect to a request made by another department, agency, or instrumentality of the executive branch of the United States Government, such a department, agency, or instrumentality shall give priority consideration to a request made by a public agency (as defined in section 47102 [49 USCS § 47102]) for surplus property described in subsection (a), or section 2905 of the Defense Base Closure and Realignment Act of 1990 (10 U.S.C. 2687 note)) for use at a public airport.

## History

**HISTORY:**

July 5, 1994, P. L. 103-272, § 1(e), 108 Stat. 1278; April 5, 2000, P. L. 106-181, Title I, Subtitle B, §§ 125(c), 135(d)(1), 136, 114 Stat. 75, 84, 85; Feb. 14, 2012, P. L. 112-95, Title I, Subtitle D, § 152(f), 126 Stat. 34; May 16, 2024, P.L. 118-63, Title VII, Subtitle A, § 719(b)(1), 138 Stat. 1261.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

**49 USCS § 47152**

Current through Public Law 119-68, approved December 29, 2025, with a gap of Public Law 119-60.

*United States Code Service  >  TITLE 49. TRANSPORTATION (§§ 101 — 80504)  >  Subtitle VII. Aviation Programs (Pts. A — E)  >  Part B. Airport Development and Noise (Chs. 471 — 475)  >  CHAPTER 471. Airport Development (Subchs. I — III)  >  Subchapter II. Surplus Property for Public Airports (§§ 47151 — 47153)*

## § 47152. Terms of conveyances

Except as provided in section 47153 of this title [49 USCS § 47153], the following terms apply to a conveyance of an interest in surplus property under this subchapter [49 USCS §§ 47151 et seq.]:

**(1)** A State, political subdivision of a State, or tax-supported organization receiving the interest may use, lease, salvage, or dispose of the interest for other than airport purposes only after the Secretary of Transportation gives written consent that the interest can be used, leased, salvaged, or disposed of without materially and adversely affecting the development, improvement, operation, or maintenance of the airport at which the property is located.

**(2)** The interest shall be used and maintained for public use and benefit without unreasonable discrimination.

**(3)** A right may not be vested in a person, excluding others in the same class from using the airport at which the property is located—

**(A)** to conduct an aeronautical activity requiring the operation of aircraft; or

**(B)** to engage in selling or supplying aircraft, aircraft accessories, equipment, or supplies (except gasoline and oil), or aircraft services necessary to operate aircraft (including maintaining and repairing aircraft, aircraft engines, propellers, and appliances).

**(4)** The State, political subdivision, or tax-supported organization accepting the interest shall clear and protect the aerial approaches to the airport by mitigating existing, and preventing future, airport hazards.

**(5)** During a national emergency declared by the President or Congress, the United States Government is entitled to use, control, or possess, without charge, any part of the public airport at which the property is located. However, the Government shall—

49 USCS § 47152

    **(A)** pay the entire cost of maintaining the part of the airport it exclusively uses, controls, or possesses during the emergency;

    **(B)** contribute a reasonable share, consistent with the Government's use, of the cost of maintaining the property it uses nonexclusively, or over which the Government has nonexclusive control or possession, during the emergency; and

    **(C)** pay a fair rental for use, control, or possession of improvements to the airport made without Government assistance.

**(6)** The Government is entitled to the nonexclusive use, without charge, of the landing area of an airport at which the property is located. The Secretary may limit the use of the landing area if necessary to prevent unreasonable interference with use by other authorized aircraft. However, the Government shall—

    **(A)** contribute a reasonable share, consistent with the Government's use, of the cost of maintaining and operating the landing area; and

    **(B)** pay for damages caused by its use of the landing area if its use of the landing area is substantial.

**(7)** The State, political subdivision, or tax-supported organization accepting the interest shall release the Government from all liability for damages arising under an agreement that provides for Government use of any part of an airport owned, controlled, or operated by the State, political subdivision, or tax-supported organization on which, adjacent to which, or in connection with which, the property is located.

**(8)** When a term under this section is not satisfied, any part of the interest in the property reverts to the Government, at the option of the Government, as the property then exists.

## History

**HISTORY:**

July 5, 1994, P. L. 103-272, § 1(e), 108 Stat. 1279; April 5, 2000, P. L. 106-181, Title I, Subtitle B, § 135(d)(2), 114 Stat. 85.

United States Code Service
Copyright © 2026 All rights reserved.

# 49 USCS § 47153

Current through Public Law 119-68, approved December 29, 2025, with a gap of Public Law 119-60.

*United States Code Service  >  TITLE 49. TRANSPORTATION (§§ 101 — 80504)  >  Subtitle VII. Aviation Programs (Pts. A — E)  >  Part B. Airport Development and Noise (Chs. 471 — 475)  >  CHAPTER 471. Airport Development (Subchs. I — III)  >  Subchapter II. Surplus Property for Public Airports (§§ 47151 — 47153)*

## § 47153. Waiving and adding terms

**(a) General authority.**

**(1)** The Secretary of Transportation may waive, without charge, a term of a conveyance of an interest in property under this subchapter [49 USCS §§ 47151 et seq.] if the Secretary decides that—

**(A)** the property no longer serves the purpose for which it was conveyed; or

**(B)** the waiver will not prevent carrying out the purpose for which the conveyance was made and is necessary to advance the civil aviation interests of the United States.

**(2)** The Secretary of Transportation shall waive a term under paragraph (1) of this subsection on terms the Secretary considers necessary to protect or advance the civil aviation interests of the United States.

**(b) Waivers and inclusion of additional terms on request.** On request of the Secretary of Transportation or the Secretary of a military department, a department, agency, or instrumentality of the executive branch of the United States Government or a wholly owned Government corporation may waive a term required by section 47152 of this title [49 USCS § 47152] or add another term if the appropriate Secretary decides it is necessary to protect or advance the interests of the United States in civil aviation or for national defense.

**(c) Restrictions on waiver.** Notwithstanding subsections (a) and (b), the Secretary may not waive any term under this section that an interest in land be used for an aeronautical purpose unless—

**(1)** the Secretary provides public notice not less than 30 days before the issuance of a waiver; and

**(2)** the Secretary determines that such waiver—

**(A)** will not significantly impair the aeronautical purpose of an airport;

49 USCS § 47153

**(B)** will not result in the permanent closure of an airport (unless the Secretary determines that the waiver will directly facilitate the construction of a replacement airport); or

**(C)** is necessary to protect or advance the civil aviation interests of the United States.

## History

**HISTORY:**

July 5, 1994, P. L. 103-272, § 1(e), 108 Stat. 1280; April 5, 2000, P. L. 106-181, Title I, Subtitle B, §§ 125(d), 135(d)(3), 114 Stat. 76, 85; May 16, 2024, P.L. 118-63, Title VII, Subtitle A, § 719(b)(2), 138 Stat. 1261.

United States Code Service

Copyright © 2026 All rights reserved.

**End of Document**

USCA4 Appeal: 25-1910    Doc: 34    Filed: 01/28/2026    Pg: 70 of 100

14 CFR 16.33 (up to date as of 1/16/2026)
Final decisions without hearing.

14 CFR 16.33 (Jan. 16, 2026)

This content is from the eCFR and is authoritative but unofficial.

# Title 14 —Aeronautics and Space
# Chapter I —Federal Aviation Administration, Department of Transportation
# Subchapter B —Procedural Rules
# Part 16 —Rules of Practice for Federally-Assisted Airport Enforcement Proceedings
# Subpart C —Special Rules Applicable to Complaints

**Authority:** 49 U.S.C. 106(g), 322, 1110, 1111, 1115, 1116, 1718(a) and (b), 1719, 1723, 1726, 1727, 40103(e), 40113, 40116, 44502(b), 46101, 46104, 46110, 47104, 47106(e), 47107, 47108, 47111(d), 47122, 47123-47125, 47133, 47151-47153, 48103.

**Source:** Docket No. 27783, 61 FR 54004, Oct. 16, 1996, unless otherwise noted.

## § 16.33 Final decisions without hearing.

(a) The Associate Administrator may transfer to the FAA Assistant Administrator for Civil Rights the responsibility to prepare and issue Final Agency Decisions pursuant to this section for appeals with issues concerning civil rights.

(b) The Associate Administrator will issue a final decision on appeal from the Director's Determination, without a hearing, where—

　(1) The complaint is dismissed after investigation;

　(2) A hearing is not required by statute and is not otherwise made available by the FAA; or

　(3) The FAA provides opportunity for a hearing to the respondent and the respondent waives the opportunity for a hearing as provided in subpart E of this part.

(c) In the cases described in paragraph (b) of this section, within 30 days after the date of service of the initial determination, a party adversely affected by the Director's Determination may file in accordance with § 16.13 and serve in accordance with § 16.15 a simultaneous Notice of Appeal and Brief.

(d) A reply to an appeal brief may be filed within 20 days after the date of service of the appeal.

(e) On appeal, the Associate Administrator will consider the issues addressed in any order on a motion to dismiss or motion for summary judgment and any issues accepted in the Director's Determination using the following analysis:

　(1) Are the findings of fact each supported by a preponderance of reliable, probative, and substantial evidence contained in the record?

　(2) Are conclusions made in accordance with law, precedent and policy?

　(3) Are the questions on appeal substantial?

　(4) Have any prejudicial errors occurred?

(f) Any new issues or evidence presented in an appeal or reply will not be considered unless accompanied by a petition and good cause found as to why the new issue or evidence was not presented to the Director. Such a petition must:

　(1) Set forth the new matter;

Add. 10

**14 CFR 16.33 (up to date as of 1/16/2026)**
**Final decisions without hearing.**

  (2)  Contain affidavits of prospective witnesses, authenticated documents, or both, or an explanation of why such substantiation is unavailable; and

  (3)  Contain a statement explaining why such new issue or evidence could not have been discovered in the exercise of due diligence prior to the date on which the evidentiary record closed.

(g)  The Associate Administrator will issue a final decision and order within 60 days after the due date of the reply.

(h)  If no appeal is filed within the time period specified in paragraph (c) of this section, the Director's Determination becomes the final decision and order of the FAA without further action. A Director's Determination that becomes final, because there is no administrative appeal, is not judicially reviewable.

(i)  No requests for rehearing, reargument, reconsideration, or modification of a final order will be considered without a finding of good cause.

*[Amdt. 16-1, 78 FR 56145, Sept. 12, 2013]*

4602

exporting carrier for return to the U. S., under assurances acceptable to him.

This amendment shall become effective as of 12:01 p. m., e. s. t., July 26, 1954.

(Sec. 3, 63 Stat. 7; 65 Stat. 43; 67 Stat. 62; 50 U. S. C. App. Sup. 2023. E. O. 9630, Sept. 27, 1945; 10 F. R. 12245, 3 CFR, 1945 Supp., E. O. 9919, Jan. 3, 1948, 13 F. R. 59, 3 CFR, 1948 Supp.)

KARL L. ANDERSON,
*Acting Director*
*Bureau of Foreign Commerce.*

[F. R. Doc. 54–5761; Filed, July 26, 1954; 10:56 a. m.]

---

# TITLE 14—CIVIL AVIATION

## Chapter I—Civil Aeronautics Board

[Civil Air Regs., Interpretation 1]

PART 60—AIR TRAFFIC RULES

MINIMUM SAFE ALTITUDES OF FLIGHT

Adopted by the Civil Aeronautics Board at its office in Washington, D. C., on the 22d day of July 1954.

In the Civil Air Policy Report of the Air Coordinating Committee, released by the President under date of May 26, 1954, the following policy statement appears:

Existing federal regulations relating to minimum altitudes of flight should be re-examined by the appropriate agencies to determine whether revision of such regulations is necessary or desirable in order to dispel any possible inference that the federal government has not exercised its regulatory jurisdiction over the entire flight of an aircraft in the airspace above the United States navigable in fact.

The textual material that accompanies this policy statement indicates that the re-examination called for is desirable because of doubts which have been expressed as to whether current minimum safe altitude regulations of the Board specifically apply to aircraft while landing or taking off. Directly involved is the question whether the airspace which lies at and above the flight path of an aircraft making normal take-offs and landings comes within the term "navigable airspace" as defined in the Civil Aeronautics Act. If it does, a public right of freedom of transit is recognized and proclaimed to exist for citizens of the United States by section 3 of that Act.

The current minimum safe altitudes for flight, so far as here pertinent, are set forth in § 60.17 of the Civil Air Regulations, and read as follows:

§ 60.17  *Minimum safe altitudes.* Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes:

(a) *Anywhere.* An altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface;

(b) *Over congested areas.* Over the congested areas of cities, towns or settlements, or over an open-air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft. Helicopters may be flown at less than the minimum prescribed herein if such

operations are conducted without hazard to persons or property on the surface and in accordance with paragraph (a) of this section; however, the Administrator, in the interest of safety, may prescribe specific routes and altitudes for such operations, in which event helicopters shall conform thereto;

(c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In such event, the aircraft shall not be operated closer than 500 feet to any person, vessel, vehicle, or structure.. Helicopters may be flown at less than the minimums prescribed herein if such operations are conducted without hazard to persons or property on the surface and in accordance with paragraph (a) of this section.

The particular part of the regulations to which this interpretation relates is that contained in the initial clause of the section: "Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes"  Is this to be read as establishing a rule prescribing a changing but continuously effective minimum altitude for each instant of the climb after take-off and approach to landing; or is it simply an exception to the general minimum altitude rule, relieving the pilot of the obligation of complying therewith on his way up to and down from the higher reaches?

In accordance with the recommendation of the Air Coordinating Committee, the Board has reviewed these minimum safe altitude regulations, taking into consideration past regulations on the subject, the legislative intent of the Congress, the powers and duties of the Board in this field, and the technical aspects of aircraft operation. In arriving at its conclusion that the revision of this aspect of its minimum altitude rules is neither necessary nor desirable, the Board does so because in its opinion the application of the rule as herein interpreted is productive of optimum safety in landing and take-off operations. This was so at the time the rule was promulgated. It remains so now.

In arriving at its interpretation of the current regulation the Board considers that the following factors are the ones which should be taken primarily into account:

a. The legislative history of the Air Commerce Act of 1926 shows that the Congress intended the navigable airspace to extend down to the surface at airports. The regulation should therefore be interpreted so as to give effect to this expression of Congressional intent, if such an interpretation is possible.

b. The duty of the Board under the act is primarily to prescribe safe altitudes of flight, not to proclaim what is navigable airspace. Although navigable airspace has been defined by the Congress—in terms of minimum altitudes, these must be fixed by the Board solely on the basis of safety.

c. The matter of safety of flight in terms of safe altitudes is dependent upon many variables, including the type of aircraft flown, the weather conditions at the time, and the terrain below. An altitude which may be wholly safe and de-

sirable for cruising flight at one time for one aircraft may be wholly unsafe for it under different conditions, or for other aircraft under the same conditions. For these reasons, minimum safe altitudes for flight cannot be described with the geometrical particularity of a conveyance. As a consequence the overriding minimum safe altitude rule is phrased in terms of performance of the particular aircraft related to the terrain below—or that "altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface."

d. Landing and take-off operations require special treatment. This need arises by reason of the slanting nature of the flight path. However, as in the case of the en route rules, maximum safety may be achieved only by relating the requirement to the particular performance capabilities of the aircraft under existing conditions. It is true that, in the case of some airports, full compliance with the en route minimum altitude rules is possible even during landing or take-off: in many others, however, particularly in the case of those airports close to urban centers, compliance with the en route rules is not possible, and the Board's safety concern therefore lies in getting aircraft on and off such airports and up to and down from cruising altitude with the greatest degree of safety. Because of individual variations in aircraft performance, this goal of maximum safety cannot be achieved by a meets and bounds description of airspace surrounding airports applicable to all aircraft alike, or by a uniform formula prescribing a given angle of climb and descent. Any such fixed requirement might be appropriate to the performance capabilities of some aircraft, unduly lax with respect to others, and impossible of achievement by others. Either a meaningless average would have to be struck, or a minimum requirement fixed which could be met at all times by every aircraft possessing an airworthiness certificate. In either case the Board would not be fulfilling its obligation under the Act to provide safe altitudes of flight. To achieve the proper high level of safety, it is vital that every pilot, consistently with sound and conservative operating practices, take full advantage of the performance capabilities of his aircraft so as to spend as little time as possible at altitudes below the minimums established for cruising flight. The "when necessary" language used in current § 60.17 achieves this result simply and directly. It prohibits low altitude flying-except when a departure from the otherwise applicable minimum is necessary for landing and taking off. It prohibits unnecessary low flying during the execution of those maneuvers. At every point along the proper flight path for approach to landing or climb after take-off, an unnecessary dip would place the pilot in potential violation of this regulation. In effect, it requires the pilot to do the best he can consistently with sound flying practice and the machine at his disposal to avoid unduly prolonged low flight.

(e) Possibly other formulae could be devised which express the same standard of safety in specific terms of mini-

---

Add. 12

mum altitudes linked to the normal and necessary downward or upward flight path of the particular airplane under the particular conditions. In this connection it makes no difference whether the prescribed minimum flight path is described directly by reference to the ground below or whether it is fixed in relation to the minimum en route altitudes which themselves have been ascertained by reference to the surface. In adopting this second solution, § 60.17 fixes the flight path in terms of permissible deviation from the otherwise applicable norm. It applies the standard of necessity to accomplish specified ends and in so doing produces the maximum flight paths for climb and descent that are consistent with the safest operating techniques and practices. However worded, no other formula could do more or do it better.

In consideration of the foregoing, the Board construes the words "Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes" where such words appear in § 60.17 of the Civil Air Regulations, as establishing a minimum altitude rule of specific applicability to aircraft taking off and landing. It is a rule based on the standard of necessity, and applies during every instant that the airplane climbs after take-off and throughout its approach to land. Since this provision does prescribe a series of minimum altitudes within the meaning of the act, it follows, through the application of section 3, that an aircraft pursuing a normal and necessary flight path in climb after take-off or in approaching to land is operating in the navigable airspace.

(Sec. 205; 52 Stat. 984; 49 U. S. C. 425. Interpret or apply § 601; 52 Stat. 1007; 49 U. S. C. 551)

By the Civil Aeronautics Board.

[SEAL] M. C. MULLIGAN,
*Secretary.*

[F. R. Doc. 54–5740; Filed, July 26, 1954; 8:53 a. m.]

---

## Chapter II—Civil Aeronautics Administration, Department of Commerce

**PART 565—RELEASE OF AIRPORT PROPERTY FROM RESTRICTIONS OF SURPLUS AIRPORT PROPERTY INSTRUMENTS OF DISPOSAL**

The purpose of adopting the regulations of this part is to codify and publish the policies and procedures of the Administrator of Civil Aeronautics with respect to the application for and granting of releases of airport property from the terms, conditions, reservations and restrictions of surplus property instruments of disposal, pursuant to section 4 of Public Law 311, 81st Congress (63 Stat. 700; 50 U. S. C. 1622 (c)) The policies and procedures set forth herein do not represent or reflect any substantial change in existing policies and procedures but are consistent with the position heretofore taken by the Administrator with respect to applications for such releases. Acting pursuant to the authority vested in me by section 301 of the

Civil Aeronautics Act of 1938, as amended (52 Stat. 973, 54 Stat. 1233, 1235, 1236; 49 U. S. C. 401, 451), the Surplus Property Act of 1944 (58 Stat. 765) as amended by the act of July 30, 1947 (61 Stat. 678) and the act of October 1, 1949 (63 Stat. 700), I hereby adopt a new part, Part 565, of the regulations of the Administrator of Civil Aeronautics, reading as follows:

Sec.
565.1 Definitions.
565.2 Applicable law.
565.3 Scope of part.
565.4 Policies.
565.5 Delegations of authority.
565.6 Procedures.
565.7 Hearings.

AUTHORITY: §§ 565.1 to 565.7 issued under sec. 4, 63 Stat. 700; 50 U. S. C. app. 1622c.

§ 565.1 *Definitions.* (a) "Administrator" means the Administrator of Civil Aeronautics, Department of Commerce.

(b) "Public Law 311" means the Act of October 1, 1949 (63 Stat. 700) which amended section 13 (g) (2) (A) of the Surplus Property Act of 1944, as amended.

(c) "Regional Administrator" means the director of a regional office of the Civil Aeronautics Administration.

(d) "Instrument of disposal" means any deed, surrender of leasehold, or other instrument of transfer or conveyance by which some right, title, or interest of the United States in real or personal property has been conveyed to a non-Federal public agency under authority of section 13 of the Surplus Property Act of 1944 as approved October 3, 1944 (58 Stat. 765) or as amended by the act of July 30, 1947 (Pub. Law 289, 80th Cong., 61 Stat. 678) for use by such public agency for the development, improvement, operation or maintenance of a public airport or to provide a source of revenue from non-aviation business at a public airport.

§ 565.2 *Applicable law.* (a) (1) Section 4 of Public Law 311 authorizes the Administrator to grant a release from any of the terms, conditions, reservations and restrictions contained in, and to convey, quitclaim, or release any right or interest reserved to the United States by, any instrument of disposal under which surplus airport property was conveyed to a non-Federal public agency pursuant to section 13 of the Surplus Property Act of 1944 (58 Stat. 765) if he determines that:

(i) The property to which the proposed release relates no longer serves the purpose for which it was made subject to such terms, conditions, reservations and restrictions; or

(ii) Such release, conveyance or quitclaim will not prevent accomplishment of the purpose for which the property was made subject to such terms, conditions, reservations and restrictions and is necessary to protect or advance the interests of the United States in civil aviation.

(2) That section further provides that no such release, conveyance or quitclaim may be granted except upon the condition that in the event the property to which the release relates is sold to a third party within five years from October 1, 1949, the proceeds from such sale

shall be devoted exclusively to the development, improvement, operation or maintenance of a public airport. In addition, the section authorizes the Administrator of Civil Aeronautics to grant any releases, conveyances or quitclaims authorized thereunder, subject to such other terms and conditions as he deems necessary to protect or advance the interests of the United States in civil aviation.

(b) Section 2 of Public Law 311 provides that the restriction against use of structures for industrial purposes, as contained in any instrument of disposal issued pursuant to section 13 (g) (2) (A) of the Surplus Property Act of 1944, as amended by the act of July 30, 1947 (61 Stat. 678), shall, from and after October 1, 1949, be deemed extinguished and of no force and effect. That Section also authorizes the Administrator of Civil Aeronautics to issue such instruments of release or correction as may be necessary to effect the removal of record of such restriction from any instrument of disposal, without monetary consideration to the United States.

§ 565.3 *Scope of part.* The regulations of this part are applicable to:

(a) All classes and types of real and personal property which is subject to the terms, conditions, reservations and restrictions of instruments of disposal, and

(b) All types of releases from any or all of the terms, conditions, reservations and restrictions contained in such instruments, including but not limited to:

(1) Releases of personal property, equipment, buildings and other structures from such terms, conditions, etc., as are necessary to permit disposition of such property for salvage purposes.

(2) Releases of land, personal property, equipment, structures, etc., from the provisions requiring that such property be used for airport purposes, in order to permit the use, lease or sale thereof for non-airport use in place.

(3) Releases of land, personal property, equipment, structures, etc., from the provisions requiring their maintenance for airport use;

(4) Releases of land, personal property, equipment, structures, etc., from all terms, conditions, restrictions and reservations in order to permit the use, lease, sale or other disposal of such property for non-airport purposes, and

(5) Releases of land, personal property, equipment, structures, etc., from the reservation of right of use by the United States during the time of national emergency or war, or from the reverter provision, in whole or in part, in order to facilitate the financing of the operation and maintenance or the further development of the airport for civil airport purposes.

§ 565.4 *Policies.* (a) In accordance with the provisions of Executive Order 9908, approved December 5, 1947 (12 F. R. 8223), no release will be granted conveying or relinquishing any right reserved to the United States in any uranium, thorium, or materials determined pursuant to section 5 (b) (1) of the Atomic Energy Act of 1946 (60 Stat. 761) to be particularly essential to the production of fissionable materials, or any right of the United States to enter

4604            **RULES AND REGULATIONS**

upon any land in which such material is reserved, for the purpose of prospecting for, mining and removing the same.

(b) In accordance with the provisions of section 2 of Public Law 311, such instrument as may be necessary to effect removal of record of any restriction against use of property for industrial purposes contained in an instrument of disposal, will be issued by the Administrator of Civil Aeronautics or his duly authorized representative upon request therefor submitted in accordance with the requirements of the regulations of this part.

(c) No release of property from any of the terms, conditions, reservations or restrictions of an instrument of disposal which would permit or authorize the sale of such property to a third party, will be granted unless and until the public agency involved has obligated itself to use the proceeds derived from such sale exclusively for the development, improvement, operation or maintenance of a public airport.

(d) No release of property from any of the terms, conditions, reservations or restrictions of an instrument of disposal, except releases from the restriction against use of property for industrial purposes, will be granted unless the facts and circumstances surrounding the request for release support and justify one of the above determinations required by Public Law 311, namely either that:

(1) The property no longer serves the purpose for which it was made subject to such terms, conditions, reservations and restrictions, or

(2) The release requested will not prevent accomplishment of the purpose for which the property was made subject to such terms, conditions, reservations and restrictions and is necessary to protect or advance the interests of the United States in civil aviation.

(e) While it was the primary purpose of every transfer of surplus airport property under section 13 of the Surplus Property Act of 1944 to make the property available to serve public or civil airport needs, it was also the purpose of each such transfer to ensure the availability of the property transferred and of the entire airport, for use by the United States during time of national emergency or war, if the need therefor should arise. That such purpose was also intended to be served by conveyance of surplus airport property under authority of section 13 of the Surplus Property Act of 1944, is evidenced by the fact that practically all instruments of disposal of such property contain a provision reserving or granting to the United States a right of exclusive possession and control of the airport involved during time of war or national emergency. To effect such a reservation or grant of a right of exclusive possession and control, there was incorporated in instruments of disposal issued pursuant to War Assets Administration Regulation No. 16, as in effect prior to the enactment of Public Law 289, 80th Congress (50 U. S. C. 1622) a provision reading substantially as follows:

That during the existence of any emergency declared by the President or the Congress, the Government shall have the right without charge except as indicated below to

the full, unrestricted possession, control, and use of the landing area, building areas, and airport facilities or any part thereof, including any additions or improvements thereto made subsequent to the declaration of the airport property as surplus: *Provided, however* That the Government shall be responsible during the period of such use for the entire cost of maintaining all such areas, facilities, and improvements, or the portions used, and shall pay a fair rental for the use of any installations or structures which have been added thereto without Federal aid.

Similarly, there was incorporated in instruments of disposal issued pursuant to the said Public Law 289, a somewhat like provision, reading substantially as follows:

During any national emergency declared by the President or by Congress, the United States shall have the right to make exclusive or nonexclusive use and have exclusive or nonexclusive control and possession, without charge, of the airport at which the surplus property is located or used or of such portion thereof as it may desire: *Provided, however* That the United States shall be responsible for the entire cost of maintaining such part of the airport as it may use exclusively, or over which it may have exclusive possession and control, during the period of such use, possession, or control, and shall be obligated to contribute a reasonable share, commensurate with the use made by it, of the cost of maintenance of such property as it may use nonexclusively or over which it may have nonexclusive control and possession: *Provided further* That the United States shall pay a fair rental for its use, control, or possession, exclusively or nonexclusively, of any improvements to the airport made without United States aid.

The primary purpose of incorporating such provisions in instruments of disposal was to serve the needs of the military agencies of the United States. Furthermore, the legislative history of Public Law 311 clearly indicates that the Congress intended that in the administration of that statute the interests and needs of the military agencies in properties subject to instruments of disposal be adequately safeguarded. Accordingly, no release from any of the terms, conditions, reservations or restrictions of an instrument of disposal which, in the opinion of the Administrator, might be prejudicial to the interests or needs of the military agencies of the United States, will be granted until after consultation with the Department of Defense. As an example, any requested release which would involve any abrogation or limitation of the rights of the United States under a national emergency use provision such as quoted above, other than a requested release which could be granted by a Regional Administrator pursuant to § 565.5, will be considered a release which might be prejudicial to the interests or needs of the military agencies of the United States and therefore require consultation with the Department of Defense.

(f) Release from the terms, conditions, reservations or restrictions of instruments of disposal will be made subject to such other terms and conditions as the Administrator or his duly authorized representative, in each individual case, deems necessary to protect or advance the interests of the United States in civil aviation. The terms and conditions to which releases are made subject, including conditions regarding the use

of proceeds derived from the sale of property, will be imposed in the form of personal covenants or obligations of the public agency involved rather than in the form of conditions to the release or covenants running with the land, except in those cases in which the Administrator or his duly authorized representative determines that the purpose of a particular term or condition would be better effectuated by making it a condition or covenant running with the land.

(g) Any letter or other document issued by the Administrator or his representative which merely grants consent to or approval of a lease, or consent to or approval of the use of property for other than the airport use contemplated by the instrument of disposal to which it is subject, shall not be considered as otherwise releasing such property from the terms, conditions, reservations and restrictions of such instrument of disposal.

§ 565.5 *Delegations of authority.* (a) Authority is hereby delegated to the Regional Administrators, to:

(1) Execute such instruments of release or correction or other instruments as may be necessary to effect the removal of record of any restriction against use of structures for industrial purposes contained in any instrument of disposal;

(2) Consent to or grant approval of the leasing or use of any real or personal property for other than the airport use or purpose contemplated by the instrument of disposal to which such property is subject, as provided in § 565.4 (g), during and for temporary periods when, in the opinion of the Regional Administrator, such property is not needed for such airport use or purpose; and

(3) Execute such instruments of release or correction or other instruments as may be necessary to release from any or all of the terms, conditions, reservations, and restrictions of instruments of disposal, (i) any structures, facilities or items of personal property (except electric, water, gas, heating, sewerage, aircraft fuel and other similar utility systems and the component parts thereof) which, in the opinion of the Regional Administrator, have outlived their useful life or deteriorated beyond economical repair; notwithstanding the performance of such maintenance work by the airport owner as it could reasonably have been expected to perform in maintaining the property in accordance with the applicable instrument of disposal, (ii) any structures or facilities which, in the opinion of the Regional Administrator, must be removed to permit the accomplishment of needed airport improvement or expansion, and (iii) any equipment such as machinery, machine tools, and vehicular equipment (other than component parts of electric, water, gas, heating, sewerage, aircraft fuel and other similar utility systems) which, in the opinion of the Regional Administrator, is no longer needed for the purpose for which it was conveyed or, because of size, type or other reason, is uneconomical to use for the purpose for which it was conveyed.

(b) Except as set forth in paragraph (a) of this section, all authority con-

Add. 14

taned in Public Law 311 is reserved to the Administrator and will be exercised only by the Administrator.

§ 565.6 *Procedures.* (a) Requests for releases of surplus airport property from the terms, conditions, reservations or restrictions of surplus airport property an instruments of disposal need not be in any particular form but must be in writing and signed by a duly authorized officer of the airport owner. All requests shall be submitted in triplicate to the Regional Administrator having jurisdiction over the area in which the airport is located and should contain or include at least the following:

(1) Identification of the instrument or instruments of disposal to which the property involved is subject;

(2) Description of the property to which the release relates;

(3) Condition of the property to which the release relates;

(4) Purpose for which the property was transferred, i. e., for use as part of or in connection with the operation of the airport or for the production of revenues from non-aviation businesses;

(5) Nature of the release desired;

(6) Purpose to be accomplished by the release;

(7) Statement of the facts and circumstances necessitating and justifying the release on the basis set forth in § 565.4 (d) namely, that either (i) the property involved is no longer needed for the purpose for which it was made subject to the terms, conditions, reservations and restrictions of the instrument of disposal, or (ii) the release will not prevent accomplishment of the purpose for which the property was made subject to such terms, conditions, reservations and restrictions and is necessary to protect or advance the interests of the United States in civil aviation;

(8) Documentary evidence substantiating and supporting the statement referred to in subparagraph (7) of this paragraph;

(9) Copies of such maps, photographs, plans, etc., of the airport and the property involved as may be appropriate or necessary to the consideration of the request and determination as to whether the release is justified on the basis set forth in § 565.4 (d);

(10) Proposed use or disposition to be made of the property (including the terms and conditions of any proposed sale or lease and the status of negotiations therefor)

(11) If the requested release would permit sale of the property or any part thereof, a certified copy of a resolution or ordinance of the governing body of the airport owner obligating itself to devote the proceeds derived from the sale of the property exclusively to the development, improvement, operation or maintenance of a public airport; and

(12) A suggested form of letter or deed or other instrument of release which would meet all requirements of state and local law for the purpose of effecting the release requested.

(b) (1) Upon receipt of a request and supporting documents by the Regional Administrator, they will be examined by his office for the purpose of determining whether the request involves a matter within the cognizance of his office as provided in § 565.5. If it is determined by the Regional Administrator that the request involves a matter so within the cognizance of his office he will determine and advise the airport owner whether the release requested or a modification thereof may be granted. If such advice is to the effect that the release requested may be granted, the Regional Administrator will execute and transmit to the airport owner with such advice, such instrument as may be necessary to effect the release. If such advice is that the release requested may not be granted but that a modification thereof may be granted, the Regional Administrator, upon receipt of advice from the airport owner that such a modified release would be acceptable, will execute and forward to the airport owner such instrument as may be necessary to effectuate such modified release.

(2) If the request involves a matter that is not within the cognizance of the Regional Administrator's office as provided in § 565.5, he will forward it to the Administrator with such recommendation and other comment as may be pertinent to the issues presented.

(c) (1) Upon receipt of a request by the Administrator, it will be examined for the purpose of determining whether, in the opinion of the Administrator, the requested release meets the requirements of Public Law 311, insofar as concerns the interests of the United States in civil aviation, and whether it might be prejudicial to the interests of the military agencies of the United States. If, in his opinion, the requested release might prejudice the interests of the military agencies of the United States, he will consult with the Department of Defense in regard thereto, as provided in § 565.4 (e) through appropriate channels.

(2) Upon completion of his review of the request and other appropriate documents and information, and upon receipt of advice from the Department of Defense where the case was referred to that Department, the Administrator will advise the appropriate Regional Administrator whether the release requested, or a modification thereof, may be granted. If such advice is that the release may be granted, the Administrator will execute and forward to the Regional Administrator for delivery to the airport owner, such instrument or instruments as may be necessary to effectuate such release, or will authorize the Regional Administrator to execute and deliver such instrument or instruments to the owner.

(3) If the Administrator's advice to the Regional Administrator is that the requested release may not be granted but that a modification thereof may be granted, the Regional Administrator will so advise the airport owner. Upon receipt of advice from the airport owner, submitted through the Regional Administrator, that such a modified release would be acceptable to the airport owner, the Administrator will execute and forward to the Regional Administrator for delivery to the airport owner, such instrument or instruments as are necessary to effectuate such a modified release, or

will authorize the Regional Administrator to execute and forward to the airport owner such instrument or instruments.

§ 565.7 *Hearings.* (a) If, upon receipt of a request for the release of property from the terms, conditions, reservations or restrictions of an instrument of disposal, the Administrator deems it necessary in connection with his consideration of the request to hold a hearing thereon, at which written and oral testimony of the facts and circumstances pertinent to the request shall be submitted under oath, the airport owner will be notified promptly and will be advised of the time and place set for such hearing. All hearings held pursuant to the regulations of this Part will be held in the Office of the Administrator in Washington, D. C., unless otherwise specified in the notice to the airport owner. The time of the hearing will be set so as to avoid undue delay in disposing of the subject request for release, but so as to afford a reasonable time for all parties concerned to prepare for the hearing.

(b) A hearing will be held pursuant to the Regulations of this Part only for the purpose of ascertaining all the facts and circumstances which should be considered by the Administrator in determining whether (1) the property to which the request for release relates any longer serves the purpose for which such property was made subject to the terms, conditions, reservations and restrictions of the applicable instrument of disposal, or (2) the release requested will prevent accomplishment of the purpose for which the property was made subject to such terms, conditions, reservations and restrictions and is necessary to protect or advance the interests of the United States in civil aviation.

(c) All hearings pursuant to the regulations of this part will be regarded as hearings in which there are no adverse interests, and in which there will be no defendant or respondent. They are not hearings of the type described in sections 5, 7 and 8 of the Administrative Procedures Act (60 Stat. 237; 5 U. S. C. 1001) and will not terminate in an "adjudication" as defined in that act.

(d) Hearings under the regulations of this part will be conducted on behalf of the Administrator by such examiner or examiners as the Administrator may designate. Such hearings will be recorded in such form and manner as may be determined by the examiner or examiners and the record shall become a part of the permanent file of the Civil Aeronautics Administration. However, decisions of the Administrator with respect to a request for release of property from the terms, conditions, reservations or restrictions of an instrument of disposal will not be made solely upon the record of any such hearing, but upon all relevant facts and circumstances within the knowledge of the Administrator, from whatever source obtained.

This part shall become effective upon publication in the FEDERAL REGISTER.

[SEAL]   F. B. LEE,
*Administrator of Civil Aeronautics.*

[F. R. Doc. 54-5704; Filed, July 26, 1954; 8:45 a. m.]

4606

## RULES AND REGULATIONS

[Amdt. 98]

### PART 609—STANDARD INSTRUMENT APPROACH PROCEDURES

#### PROCEDURE ALTERATIONS

The standard instrument approach procedure alterations appearing hereinafter are adopted to become effective when indicated in order to promote safety of the flying public. Compliance with the notice, procedures and effective date provisions of section 4 of the Administrative Procedure Act would be impracticable and contrary to the public interest, and therefore is not required

Part 609 is amended as follows:

1 The low frequency range procedures prescribed in § 609 6 are amended to read in part;

#### LFR STANDARD INSTRUMENT APPROACH PROCEDURE

Bearings, headings and courses are magnetic. Distances are in statute miles unless otherwise indicated. Elevations and altitudes are in feet, MSL. Ceilings are in feet above airport elevation.

1 an LFR instrument approach is conducted at the below named airport, it shall be in accordance with the following instrument approach procedure, unless an approach is conducted in accordance with a different procedure authorized by the Administrator of Civil Aeronautics for such airport Initial approaches shall be made over specified routes Minimum altitude(s) shall correspond with those established for on route operation in the particular area or as set forth below

| City and State; airport name, elevation; facility; class and identification; procedure No.; effective date | Initial approach to facility from— | Course and distance | Minimum altitude (ft.) | Procedure turn (—) side of final approach course (outbound) and inbound altitudes; limiting distances | Minimum altitude over final approach course (ft.) | Course and distance, facility to airport | Ceiling and visibility minimums | | | If signal contact not established as authorized landing minimums after passing facility within distance specified, or if landing not accomplished |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Condition | Type aircraft | | |
| | | | | | | | | 75 m. p. h. or less | More than 75 m p h | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| CHICAGO, ILL. Midway Arp. SBRA,Z-D'Y-V OHI Procedure No 1 July 30, 1954 | Wilson Intersection (final) | 162—12 0 | 1,800 | W side of course: 342° outbound, 162° inbound, 2,000' within 10 miles, 2,500 within 25 miles | 1 800 | 162—2 2 | T-dn C-dn S-dn A-dn | 300-1 300-1 500-1 500-2 | 300-1 600-1½ 500-2 | Within 2.2 miles climb to 2,000 on N and S legs of Midway LFR proceeding S to Addmore Intersection or if directed by ATC as follows: 1. Climb straight out on SE course Chicago LFR proceed to Thornton Intersection at 2,000'. 2. Make left climbing turn, proceed out NE course Chicago LFR at 2,000' to Lakeshore Intersection at 2,000'. 3. Make right climbing turn, proceed out W course Chicago LFR at 2,000' to Downers Grove Intersection. |
| DETROIT, MICH. Detroit Wayne Major, 639' SBRA,Z-D'Y-V RML Procedure No 1 July 30, 1954 | Salem VOR * | 144—10 0 | 2,300 | S side W course: 261° outbound, 081° inbound, 1,900' within 10 miles, 2,000 within 25 miles | 1 800 | 107—1 6 | T-dn C-dn S-dn A-dn | 300-1 300-1 500-1 500-2 | 300-1 600-1½ 500-2 | Within 1.6 miles, climb to 2,300' on E course of RML/LFR or as directed by ATC as follows: Make right turn climb to 2,300' proceeding via SE course RML-LFR to Flat Rock (Int). |
| | Willow Run LOM | 075—11 0 | Final 1,600 | | | | | | | |
| | Detroit VOR | 164—5 0 | 2,000 | 2,000' within 25 miles | | | | | | |
| HOUSTON, TEX. SBRA,Z-D'Y-V HOU Procedure No 2 July 29 1954 | Intersection SE course 309° and 059° M bearing from PBR radio beacon | 309—5 0 | 1,200 | W side NW course: 309° outbound, 129° inbound, 1,700' within 25 miles | 1 500 over HOU FM | 129—5 6 | T-dn C-dn S-dn A-dn 12 | 300-1 600 1 500-2 | 300-1½ 600-1 500-2 | Within 5.6 miles from Houston FM climb to 1 100' on SE course within 15 miles |
| | Areola FM | 033—16 0 | 1,200 | | | | | | | |
| | Intersection NW course HOU LFR and NE course RIM LFR (final) | 129—10.0 to HOU FM | 1,500 | | | | | | | |
| | Houston VOR | 138—2.0 | 1 200 | | | | | | | |
| MINOT, N. DAK. Port O'Minot, 1,723 BMRLZ-D'Y MOT Procedure No 1 July 17, 1954 | MOT VOR — | 209—6 0 | 2 900 | E side of SE course: 122° outbound, 302° inbound, 2 900' within 15 miles, 3,400' within 25 miles | 2 400 | 302—3 3 | T-dn C-dn S-30 A-dn | 300-1 600-1 500-1 500-2 | 300-1 600-1½ 500-2 | Within 3.3 miles, climb to 3,600' on NW course within 25 miles of MOT LFR. Notice: ADF approach not authorized. |
| PIERRE, S. DAK. Pierre, 1,742 BSRA,Z-D'Y-V PIR Procedure No 1 July 17 1954 | PIR VOR | 223—2.5 | 6 000 | N side E course: 083° outbound, 263° inbound, 3,000' within 25 miles | 2 600 | 263—3 3 | T-dn C-dn S-dn A-dn | 300-1 500-1 500-1 500-2 | 300-1 500-1 600-1½ 500-2 | Within 3.3 miles, turn left, climb to 3 000' on W course within 25 miles Takeoff to the NW restricted to 600-1. |

Add. 16

USCA4 Appeal: 25-1910    Doc: 34    Filed: 01/28/2026    Pg: 77 of 100

**2  The automatic direction finding procedures prescribed in § 609.8 are amended to read in part:**

ADF STANDARD INSTRUMENT APPROACH PROCEDURE

Bearings, headings, and courses are magnetic.  Distances are in statute miles unless otherwise indicated.  Elevations and altitudes are in feet, MSL.  Ceilings are in feet above airport elevation.
Procedure turn shall be completed on the approach side of the named airport; it shall be in accordance with the following instrument approach procedure, unless an approach is conducted with a different procedure authorized by the Administrator for Civil Aeronautics for such airport.  Initial approaches shall be made over specified routes.  Minimum altitude(s) shall correspond with those established for en route operation in the particular area or as set forth below.

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | Ceiling and visibility minimums | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| City and State; airport name, elevation; facility; class and identification; procedure No; effective date | Initial approach to facility from— | Course and distance | Minimum altitude (ft.) | Procedure turn (—) side of course, final approach course (outbound and inbound); altitudes; limiting distances | Minimum altitude over facility on final approach course (ft.) | Course and distance, facility to airport | Condition | Type aircraft | | If visual contact not established at outbound leg, landing minimums after passing facility within distance specified, or if landing not accomplished |
| | | | | | | | | 75 m. p. h or less | More than 75 m p h | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| CAPE SPENCER LIGHT HOUSE, ALASKA. Coast Guard Marine Radio Beacon and Light Beacon. No airport or aerodrome. 800 watt continuous carrier keyed signal "P," "I," fre quency 313 kc. Procedure No 1. July 20, 1954 | ... | 174—4.5 | . | No procedure turn. SHUTTLE: 110° within 10 miles to 4,600'. 290° outbound. 020° inbound. | 4 600 | Final approach course from facility-200° to 700' with in 25 miles. Flight to con tinue to des tination VFR ∮ | C-d / A-∮ | 200-2 / 800-2 | 1 000-3 / 1,000-3 | Turn left at Cape Spencer Intersection, climb to 5,300' on course of 112° to Sitka ILS procedure, or turn right at Cape Spencer Intersection, then climb-out from VFR conditions of: 700-2. *No other conditions authorized except climb-out from VFR conditions of: 1,000-3. **CAUTION: Manuvering over facility below 4,600' not authorized. ∮This procedure will explain use for descent to VFR conditions to harbor destinations near Cape Spencer and Cross Sound |
| DALHART, TEX. Municipal, 4,052'. NH-DHT. Procedure No. 1. August 10, 1954 | Dalhart BVOR | | 5,200 | E side of course. 200° inbound. 5 200' within 25 miles. | 4 700 | Facility ,at airport. | C-da / C-da / A-da | 200-1 / 200-2 / 800-2 | 200-1½ / 200-2 / 800-2 | Within 0 mile, climb to 5 200' on course 311° within 25 mile. |
| FIVE FINGER STATION, ALASKA. Coast Guard Marine Radio Beacon and Light Beacon. No airport or aerodrome, 460 watt continuous carrier, keyed signal "D," fre quency 314 kc. Procedure No 1. July 20, 1954 | ... | ... | | W side. 325° outbound. 140° inbound. 3,500' within 15 miles. Beyond 15 miles not au thorized. SHUTTLE: Within 10 miles to 3,550'. 325° outbound. 145° inbound. | 720 | 10—3.0 Flight to con tinue to des tination VFR ∮ | C-d / A-d / No other condi tions au thorized. | 720-2 / 550 2 | 200-3 / BCOD / 1,000-3 | Within 3 miles after passing station, climb on course of 162° to 1,600' within 25 mile. This procedure designed for descent to VFR conditions to destinations at NDU or FSO. CAUTION: Terrain with elevations to 1,650' within 20 miles of facility and final approach course. Manuvering 2° of let-down course not authorized due to high terrain. |
| LUBBOCK, TEX. Municipal, 3,252'. ILS LOM LD. Procedure No 1. May 1, 1953 | SUPERSEDED BY COMBINATION ADF-ILS PROCEDURE, DATED AUGUST 2, 1954. | | | | | | | | | |
| OTTUMWA, IOWA. Municipal, 813'. HF-O-FW. Procedure No 1. June 1, 1954 | PROCEDURE CANCELLED EFFECTIVE UPON JUNE 8, 1954. | | | | | | | | | |
| SAGINAW, MICH. Tri-City, 662'. IMIC-FV SQW. Procedure No 1. July 14, 1954 | ... | ... | | W side of course. 350° outbound. 170° inbound. 2 600' within 25 miles. | 1,500 | At airport. | T-da / A-da | 200-1 / 800-2 | 200-1½ / 800-2 | Within 0.0 mile, climb to 2 600' on course of 350° within 25 miles of airport lower. CAUTION: 0 000' mean sea level radio lower 3.5 miles 170° from airport. 670' mean sea level elevator 2.5 miles W of airport. |
| SIOUX FALLS, S. DAK. Municipal, 1,423'. LOM-SD. Procedure No 1. February 16, 1952 | PROCEDURE CANCELLED JULY 9, 1954. | | | | | | | | | |

4608

## RULES AND REGULATIONS

### ADF Standard Instrument Approach Procedures—Continued

| City and State; airport name, elevation; facility; class and identification; procedure No.; effective date | Initial approach to facility from— | Course and distance | Minimum altitude (ft) | Procedure turn (→) side of final approach course (outbound and inbound); altitudes; limiting distances | Course and distance, facility to airport | Minimum altitude over facility on final approach course (ft) | Ceiling and visibility minimums | | | If visual contact not established at authorized landing minimums after passing facility within distance specified, or if landing not accomplished |
| | | | | | | | Condition | Type aircraft | | |
| | | | | | | | | 75 m, p, b or less | More than 75 m p b | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| YAKUTAT, ALASKA.<br>Yakutat Airport, 29'.<br>RBN-LP-A-DWL YAK<br>Procedure No. 1<br>July 20, 1954 | | | | W side of course;<br>283° outbound,<br>103° inbound,<br>1,200' within 20 miles,<br>Beyond 20 miles not authorized | 100—9 1 | 700 | T-dn<br>C-dn<br>S-dn<br>A-dn | 300-1<br>500-1<br>500-1<br>800-2 | 300-1½<br>500-1<br>500-1<br>800-2 | Within 3.1 miles YAK LFR climb to 1,200' on magnetic course 111° within 25 miles |

3  The very high frequency omnirange procedures prescribed in § 609.9 (a) are amended to read in part:

### VOR STANDARD INSTRUMENT APPROACH PROCEDURE

Bearings, headings, and courses are magnetic.  Distances are in statute miles unless otherwise indicated.  Elevations and altitudes are in feet, MSL.  Ceilings are in feet above airport elevation.
If a VOR instrument approach is conducted at the below named airport, it shall be in accordance with the following instrument approach procedure, unless an approach is conducted in accordance with a different procedure authorized by the Administrator for Civil Aeronautics for such airport.  Initial approaches shall be made over specified routes.  Minimum altitude(s) shall correspond with those established for en route operation in the particular area or as set forth below.

| City and State; airport name, elevation; facility; class and identification; procedure No.; effective date | Initial approach to facility from— | Course and distance | Minimum altitude (ft) | Procedure turn (→) side of final approach course (outbound and inbound); altitudes; limiting distances | Course and distance, facility to airport | Minimum altitude over facility on final approach course (ft) | Ceiling and visibility minimums | | | If visual contact not established at authorized landing minimums after passing facility within distance specified, or if landing not accomplished |
| | | | | | | | Condition | Type aircraft | | |
| | | | | | | | | 75 m, p, b or less | More than 75 m p b | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| DALHART, TEX.<br>Dalhart Airport, 4,087'.<br>BVOR-DU<br>Procedure No. 1<br>August 2, 1954 | Dalhart MH | 354—4.5 | 5,200 | W side of course;<br>332° outbound,<br>152° inbound,<br>5,200' within 25 miles | 172—4.0 | 4,700 | T-dn<br>C-dn<br>S-17<br>A-dn | 300-1<br>500-1<br>500-1<br>800-2 | 300-1½<br>500-1<br>500-1<br>800-2 | Within 4 miles, climb to 5 100' on course of 172° within 25 miles |
| GALVESTON, TEX.<br>Scholes Field, 6'.<br>BVOR-GLS<br>Procedure No. 1<br>Approved on date of commissioning of facility | GLS LFR | 272—4.5 | 1,100 | S side of course;<br>291° outbound,<br>111° inbound,<br>1,600' within 10 miles,<br>Not authorized beyond 10 miles | 111—9 6 | 1 100 | T-dn<br>C-dn<br>S-13<br>A-dn | 300-1<br>500-1<br>500-1<br>800-2 | 300-1½<br>500-1<br>500-1<br>800-2 | Within 8.6 miles climb to 1,200' on course of 111° within 10 miles of GLS VOR, CAUTION: 331' television tower 13 miles NE of airport |
| GREEN BAY, WIS.<br>Austin Straubel, 694'.<br>BVOR-DTW-GRB<br>Procedure No. 1<br>July 10, 1954 | | 314—2 0 | | W side of course;<br>324° outbound,<br>144° inbound,<br>1,600' within 25 miles | 144—4 3 | 1,400 | T-dn<br>C-dn<br>S-dn<br>A-dn | 300-1<br>500-1<br>500-1<br>800-2 | 300-1½<br>500-1<br>500-1<br>800-2 | Within 4.3 miles, climb to 2 200' on 144° course within 25 miles ORB. CAUTION: If approach missed climb immediately 140° course in vicinity of Radio towers in vicinity of 1 Degree |
| HOUSTON, TEX.<br>Municipal, 89'<br>BVOR-HOU<br>Procedure No. 2<br>July 29 1954 | HOU LFR<br>Intersection NE radial HOU and 285° radial RIM LFR or 124° radial BUJ (fan) | 125—10.0 to HOU FM | 1,200<br>1 600 | W side, course;<br>305° outbound,<br>125 inbound,<br>1,500' within 25 miles of HOU FM | 125—5.6 from HOU FM | 1,500 over HOU FM | T-dn<br>C-dn<br>S-dn<br>A-dn | 300-1<br>500-1<br>500-1<br>800-2 | 300-1½<br>500-1<br>500-1<br>800-2 | Within 5.6 miles of Houston FM, climb to 1 400' on course of 125° within 16 miles |
| PIERRE, S. DAK.<br>BVOR-PIR<br>Pierre, 1,742'.<br>Procedure No. 1<br>July 17 1954 | PIR LFR | 035—2.5 | 3,000 | N side of course;<br>058° outbound,<br>238° inbound,<br>3,000' within 25 miles | 243—6.0 | 2,600 | **T-dn<br>C-1<br>S-dn<br>A-dn | 300-1<br>500-1<br>500-1<br>800-2 | 300-1½<br>500-1½<br>500-1<br>800-2 | Within 6.0 miles, climb to 3,500' on course of 243° from Pierre VOR within 25 miles Takeoff to NW restricted to 400-1 |

Add. 18

**Tuesday, July 27, 1954** — FEDERAL REGISTER — 4609

4  The instrument landing system procedures prescribed in § 609.11 are amended to read in part:

Bearings, headings, and courses are magnetic. Distances are in statute miles unless otherwise indicated. Elevations and altitudes are in feet, MSL. Ceilings are in feet above airport elevation. If an ILS instrument approach is conducted at the below named airport, it shall be in accordance with the following instrument approach procedure, unless an approach is conducted in accordance with a different procedure authorized by the Administrator for Civil Aeronautics for such airport. Initial approaches shall be made over specified routes. Minimum altitude(s) shall correspond with those established for en route operation in the particular area or as set forth below:

### ILS STANDARD INSTRUMENT APPROACH PROCEDURE

| City and State; airport name, elevation; facility class and identification; procedure No.; effective date | Transition to ILS | | Course and distance | Minimal altitudes (ft.) | Procedure turn (—) side of final approach course (outbound and inbound); and inbound; limiting altitudes; limiting distances | Minimum altitude at glide slope interception inbound (ft.) | Altitude of glide slope and distance to approach end of runway at— | | Ceiling and visibility minimums | | | If visual contact not established upon descent to authorized landing minimums or if landing not accomplished |
| | From— | To— | | | | | Outer marker | Middle marker | Condition | Type aircraft | | |
| | | | | | | | | | | 75 m p h or less | More than 75 m p h | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| CHICAGO, ILL.; Midway, 615'; ILS-OH; LOM-OH; ADF; Combination No. 1 ILS-; Procedure No. 1; July 30, 1954 | Intersection NE course OH LFR and SE course NDB | LOM | 200—13.0 | 2,300 | W side of final approach course; 312° outbound 132° inbound; 2,300' within 10 miles; 2,000' within 25 miles | ILS 2,300  ADF 1,800 | 2,255—5.8 | 663—0.8 | T-dn | 300-1 | 300-1 | Within 8.8 miles climb to 2,000' and proceed S on the N and S course Elroy LFR to Maengs Intersection or if directed by ATC as follows: 1. Climb to 2,000' on SE course OH-LFR and proceed to Thornton Intersection. 2. Make left climbing turn to 2,200' proceed out NE course OH-LFR to Lake Shore Intersection. 3. Make right climbing turn to 2,700' proceed out NW course OH-LFR to Downers Grove Intersection. 4. Climb on SE course OH-LFR to 2,500' proceed to Kedzie radiobeacon or Gary Intersection. |
| | Intersection SW course NIU and NW bearing LOM | Glide path intersection (limit) | 132—16.0 | 2,600 | | | | | C-d | 500-1 | 500-1½ | |
| | OH-LFR | NW course ILS | 200—2.0 | 2,300 | | | | | C-n | 500-1 | 500-1½ | |
| | Intersection SE course OH-LFR and NW course ILS | LOM | 312—6.0 | 2,300 | | | | | S-dn 13⅛ ILS | 400-¾ | 400-¾ | |
| | Intersection NE course JOT LFR and NW course OH-LFR | NW course ILS | 159—7.0 | | | | | | ADF | 500-1 | 500-1 | |
| | Intersection NE course JOT and NW course ILS | LOM | 132—7.0 | 2,300 | | | | | A-dn | 500-2 | 500-2 | |
| | Naperville VOR | SE course ILS (Kedzie radiobeacon) | 033—22.0 | 2,300 | | | | | | | | |
| | Naperville VOR | LOM | 057—15.0 | 2,300 | | | | | | | | |
| | Naperville VOR | NW course Elim bush intcr ection | 010—14.0 | 2,300 | | | | | | | | |
| | Lake Forest Intersection | NW course ILS | 167—03.0 | 2,100 | | | | | | | | |
| | Chicago Heights VOR | SE course ILS-Kedzie radiobeacon | 333—17.0 | 2,600 | | | | | | | | |
| | Intersection SE course OH-LFR and 168° bearing to LOM (ADF) | LOM | 312—3.6 | 2,300 | | | | | | | | |
| | Intersection NE course JOT LFR and 168° bearing to LOM (ADF) | LOM | 165—9.0 | 2,300 | | | | | | | | |
| | Intersection NE course JOT LFR and 168° bearing to LOM | LOM | 063—10.0 | 2,300 | | | | | | | | |

Add. 19

# RULES AND REGULATIONS

ILS STANDARD INSTRUMENT APPROACH PROCEDURES—Continued

| City and State; airport name, elevation; facility; class and identification; procedure No.; effective date (1) | Transition to ILS — From— (2) | Transition to ILS — To— (3) | Course and distance (4) | Minimum altitudes (ft.) (5) | Procedure turn (→) side of final approach course (outbound and inbound); altitudes; limiting distances (6) | Minimum altitude at glide slope interception inbound (ft.) (7) | Altitude of glide slope and distance to approach end of runway at— Outer marker (8) | Altitude of glide slope and distance to approach end of runway at— Middle marker (9) | Condition (10) | Ceiling and visibility minimums — Type aircraft — 75 m.p.h. or less (11) | Ceiling and visibility minimums — Type aircraft — More than 75 m.p.h. (12) | If visual contact not established upon descent to authorized landing minimums or if landing not accomplished (13) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FLINT, MICH. 781 Bishop Field ILS-FNT LOM-FN Procedure No. 1 Combination ADF July 16, 1954 | Intersection N course RML LFR and 180° bearing to LOM | LOM | 180–19 0 | 2,200 | S side W course: 271° outbound 091° inbound 2,000′ within 10 miles, 2,100′ within 25 miles | ILS 2,000 ADF 1 600 | 1078–4.7 | 982–0 71 | T-dn C-dn S-dn 9 ILS ADF A-dn | 300–1 500–1 400–¾ 400–1 800–2 | 300–1½ 500–1½ 400–¾ 400–1 800–2 | Within ±7 miles of LOM (ADF) climb to 2,300′ on course 110° within 25 miles of LOM. No approach lights |
|  | Intersection NW course QC-LFR and W course 2R–LFR |  | 299–27 0 |  |  |  |  |  |  |  |  |  |
|  | Intersection N course RML LFR and E course LAN FR | LOM | 331–28 0 | 2,300 |  |  |  |  |  |  |  |  |
| FORT WORTH, TEX. 602′ Meacham Field ILS-FTW Procedure No. 2 July 29 1954 | Fort Worth VOR | South course ILS | 133–13 | 2 000 | W side W course: 174° outbound 354° inbound 2,000′ within 25 miles* | No glide slope Rockwood FM, 1,600′ | No outer marker, Rockwood FM, 2 6 | No middle marker # | T-dn C-dn S-dn A-dn | 300–1 500–1 400–1 800–2 | 300–1½ 500–1½ 400–1 800–2 | Within 2 6 miles from Rockwood FM, climb to 3,000′ on N course of FTW ILS within 25 miles of FTW ILS; within 25 miles of LOM. Procedure turn not authorized due to obstruction #63 feet per minute descent required at 130 miles per hour. CAUTION: Water tank 803′ mean sea level 1¼ miles SW of approach end of runway. Building 990′ mean sea level 2 miles N of airport |
|  | Intersection W course Dal LFR and S course ILS |  | 354–5 |  | 1 500 |  |  |  |  |  |  |  |
|  | Intersection 132 radial FTW VOR and S course ILS | Rockwood FM (final) | 354–7 |  | 1,500 |  |  |  |  |  |  |  |
| GUSTAVUS, ALASKA Gustavus Airport, 28′ ILS-GUS Procedure No. 1 July 29, 1954 | Pleasant Isle FM | LOM | 285–7 3 | 1 500 | W side NW course: 285° outbound 105° inbound 1 600′ within 5 miles, 2 700′ within 10 miles. Not authorized beyond 10 miles | 1 100 | 1 130–4 5 | 234–0 7 | *T-dn C-d O-c S-dn A-dn | 300–1 500–1½ 700–2 400–1 800–2 | 300–1½ 500–1½ 700–2 400–1 800–2 | Climb to 4,500 on SE course Gustavus LFR within 25 miles Item 10—Takeoff runway 1 N, day and night, 700–2. CAUTION: Maneuvering N and E of airport not authorized due to high terrain |
| LANSING, MICH. 833′ ILS-LAN LOM-LA Procedure No. 1 Combination ILS-ADF July 11, 1954 | Lansing VOR | LOM | 070–11 0 | 2,400 | N side W course: 093° outbound 273° inbound 2,000′ within 25 miles | ILS 2,000 ADF 1,950 at LOM | 1 803–4 3 | 1,160–0 63 | T-dn C-dn S-dn 27 ILS ADF A-dn | 300–1 500–1 400–¾ 600–1 800–2 | 300–1 500–1½ 400–¾ 600–1 800–2 | Within 4 3 miles of LOM (ADF) climb to 2,200′ on W course ILS (273° from LOM) within 25 miles of LOM. CAUTION: To make climbing right turn, climb to 1,300′ on W course LAN LFR within 25 miles. CAUTION: Tower 1 859′ mean sea level 0 5 miles SE of LOM NOTE: No approach lights |
|  | Lansing LFR |  | 680–2 0 |  | (Final) ILS 2,000 ADF 1 600 |  |  |  |  |  |  |  |
|  | Intersection 093° course from LAN VOR and ILS course or 275° bearing to LOM | LOM | 273–2 0 | 2,000 |  |  |  |  |  |  |  |  |
|  | Intersection 318° course from RML VOR and ILS course or 275° bearing to LOM | LOM | 273–18 0 | 2,000 |  |  |  |  |  |  |  |  |
|  | Intersection 101° course from LAN VOR and 313° course from RML VOR | ILS course via 313° course from RML VOR | 313–14.0 | 2,400 |  |  |  |  |  |  |  |  |
|  | Intersection 293° course from LAN VOR and ILS course or 93° bearing to LOM | LOM | 093–21 0 | 2,400 |  |  |  |  |  |  |  |  |

Add. 20

utory duties pertaining to secondary roads by receiving and approving a statement certified by the State highway department, all as more fully set forth in, and pursuant to, the second, third, and fourth provisos of section 1 of the Federal-Aid Highway Act of 1954.

§ 1.2 *Purpose.* * * *

(c) To provide for a more comprehensive rural-road program through co-operation between the State highway department, the county or other appropriate local road officials, and the Bureau of Public Roads in connection with the Federal-aid secondary system;

§ 1.4 *Selection and designation of highway systems.* (a) The highway systems designated to become the pattern for the long-range development of adequate highway service shall be so selected as to form an integrated net within each State and with like systems at State boundaries. There is no pre-determined time limit for the submission of the full selection of the systems and no fixed maximum for the mileage of the systems other than the specific limitations of the act.

(b) The extent of the over-all mileage of the systems as finally approved shall be determined by the ratio of the estimated annual income that will be available from all sources for, and the estimated annual costs of, the maintenance, construction, and reconstruction of the mileage included in the long-range program and shall be so balanced as to permit completion of the initial improvements within a reasonable period of years. The conservation and development of natural resources and of economic and social values, particularly those encouraging desirable land utilization, by providing adequately improved and maintained highways are to be given greater weight in the selection of routes for inclusion in the several systems than is the existing numerical traffic volume.

(c) The highway systems to be selected and designated in accord with the requirements of the act are:

(1) A national system of interstate highways as required by section 7 of the Federal-Aid Highway Act of 1944.

(2) The Federal-aid highway system as now constituted and approved, with such revisions as may be approved.

(3) A Federal-aid secondary system as required by the act. The roads selected shall be roads not included in the Federal-aid highway system and shall be exclusively within "rural areas" except that in States which have a population density exceeding 200 per square mile, roads and streets within "urban areas" may be included; and also except for approved extensions of the secondary system within urban areas. The system so selected in cooperation with local road officials shall be submitted to the Commissioner of Public Roads in the form required by him and shall be subject to his approval.

(d) An extension of a secondary system into an urban area may be approved where such extension connects the point from which the extension is made with another point on the secondary system outside of the urban area either by direct connection, using the secondary system exclusively, or an indirect connection which uses a portion of another Federal-aid system. Any such extension may be financed only with urban funds. This paragraph does not affect the statutory right of those States which have a population density exceeding 200 per square mile to include in the secondary system roads and streets within urban areas.

(e) All revisions of systems, including transfers from one system to another, are subject to approval by the Commissioner. However, approval of revisions of any section of the national system of interstate highways between such control points as may be established, on which section an interstate project has been constructed, or is under actual construction, with Federal-aid funds, will be given only under the most unusual circumstances and conditions, which would clearly justify such approval.

§ 1.6 *Programs of proposed projects.* Each State highway department shall prepare and submit to the Commissioner for approval detailed programs of proposed projects for the utilization of any apportionment of funds made to the State under the provisions of the act. Projects for construction on the Federal-aid secondary system shall be selected and the specifications with respect thereto shall be determined by the State highway department and the appropriate local officials in cooperation with each other, subject to approval by the Commissioner as provided by the act. Specifications for individual secondary road projects in those States adopting the 1954 Secondary Road Plan are not subject to approval by the Commissioner. These programs shall be in such form and shall be supported by such information as the Commissioner may require. Prior to the inclusion in the program of projects lying off the approved systems, the routes of which such projects form an integral part shall be submitted by the State highway department and approved by the Commissioner as routes of the appropriate system.

§ 1.10 *Construction and contracts.* (a) Actual construction work shall be performed by contract awarded by competitive bidding under such procedures as may be required by this part and by the operating procedures and instructions issued by the Commissioner unless the Commissioner shall affirmatively find that under the circumstances relating to a given project some other method is in the public interest. Before any work is undertaken by direct labor, the State highway department shall determine that the organization that is to undertake the work is able and equipped to perform such work at costs which are reasonable and which compare favorably with similar contract work.

(e) No contract for any project or part thereof shall be entered into or award therefor made by any State without prior concurrence in such action by the Commissioner, and no alteration in the contract subsequently shall be made without the approval of the Commissioner. Prior to concurrence by the Commissioner in any proposed award of a contract for work financed in whole or in part with funds made available under the Federal-Aid Highway Act of 1954 or subsequent acts, the State shall furnish a sworn statement executed by, or on behalf of, the successful bidder to whom such contract is to be awarded, certifying that such person, firm, association, or corporation has not, either directly or indirectly, entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with such contract.

•   •   •   •   •

(k) The procedures being followed in each State with respect to the award of contracts by competitive bidding shall be designed to bring about the letting of contracts at the lowest cost consonant with capable performance under circumstances permitting a fair and adequate opportunity for the submission of bids. Such procedures shall conform with all pertinent provisions of this part and with all pertinent operating procedures and instructions now or hereafter issued. In the event a review by the Commissioner discloses any procedures deemed by him to be contrary to the aforesaid purposes, the provisions of this part, or the operating procedures and instructions, then the Commissioner shall require that such procedures shall be changed in order to conform to such purposes, regulations of this part, operating procedures and instructions.

§ 1.25 *1954 Secondary Road Plan.* Any State, the District of Columbia, the Territory of Hawaii, or Puerto Rico may come under the 1954 Secondary Road Plan with the approval of the Commissioner pursuant to such operating procedures and instructions as the Commissioner may from time to time prescribe. Such approval will remain in effect at the discretion of the Commissioner. Any State, District, or Territory which comes under the 1954 Secondary Road Plan shall not be subject in connection with secondary road projects to the following sections of this part: § 1.8 (a) (b) (3) and (c) any paragraph of § 1.10 except paragraph (i) and § 1.12 (b), (c) and (d)

(Sec. 18, 42 Stat. 216; 23 U. S. C. 19)

[SEAL]      F. V. du PONT,
*Commissioner of Public Roads.*
SINCLAIR WEEKS,
*Secretary of Commerce.*

[F. R. Doc. 54-5739; Filed, July 26, 1954; 8:53 a. m.]

# TITLE 36—PARKS, FORESTS, AND MEMORIALS

## Chapter II—Forest Service, Department of Agriculture

[Reg. U-17, Amdt.]

PART 251—LAND USES

PERMIT FOR COMMUNITY IMPROVEMENTS

By virtue of the authority vested in the Secretary of Agriculture by the act of

## 6.140107  Utility Distribution Systems(Continued)

utility company, shall be granted until the Washington Office has advised that the Department of Defense has no objection to such release.

## 6.140108  Structures.

Any structures or facilities which have deteriorated beyond economical repair, or which have outlived their useful life, notwithstanding reasonable maintenance under all pertinent circumstances, may be released from the terms, conditions, reservations and restrictions of the surplus airport property instrument of disposal to permit their salvage, sale or other disposal.

In addition, any structure or facility, whether useable or not, which should be removed to permit the accomplishment of definitely needed airport improvements or expansion may be released from the terms, conditions, reservations and restrictions of the surplus airport property instrument of conveyance to permit salvage, sale or disposal thereof, provided, however, it has been determined that any useable structure which should be removed under such circumstances cannot feasibly be relocated on the airport.

## 6.140109  Use of Proceeds from Sale or Lease of Property for Other Than Airport Purposes.

No release of airport property for sale or lease should be granted except on condition that the airport owner agrees that the net proceeds derived from such sale or lease shall be used for the operation, maintenance or improvement of a public airport.  In those cases where the circumstances justify, the granting of the release may be conditioned on the airport owner agreeing to use the proceeds on a particular airport, for capital improvements generally on a particular airport, or for some specific capital improvement or improvements on a particular airport.

The requirement that the proceeds be used for airport purposes should not be incorporated in the deed of release for the reason that such a provision in the deed of release would create an encumbrance on the title which, in all probability, would be objectionable to a purchaser of the property.  Further, it is not considered essential for the protection of the interests of the United States.  The agreement on the part of the airport owner to use the proceeds for airport purposes should, therefore, be embodied in a separate instrument which may be in the form of a resolution in which the airport owner covenants and agrees with the United States that, in the event the release is granted, the proceeds will be used for the required airport purposes.

USCA4 Appeal: 25-1910      Doc: 34      Filed: 01/28/2026      Pg: 82 of 100

## 6.140110  Public Advertisement of Sale, Real and Personal Property.

The granting of consent to the sale by a grantee of real or personal
property shall be made subject to the condition that the property will
be publicly advertised and sold to the highest bidder unless it is
determined by the Regional Office that:

    (1)   the value of such property is less than $1000, or

    (2)   the property is a utility system to be sold to a
           utility company for continued use and operation, or

    (3)   the negotiated sale price of the property approximates
           fair market value (based on appraisal or other appropriate
           means) and public advertisement of sale would serve no
           useful purpose.

All sales of property for nominal or no consideration, whether or not to
another non-Federal public agency, must be approved by the Washington
Office.

## 6.140111  Revenue-Producing Property.

Land together with improvements
thereon conveyed for revenue-producing purposes may be released from
the terms, conditions, reservations and restrictions of the applicable
surplus airport property instruments of disposal, including the national
emergency use provision and the reversionary provision, to permit sale
or other permanent disposal only if it can be determined, on the basis of
all pertinent facts and circumstances, that a release of such land and
improvements will not prevent accomplishment of the purpose for which such
property was conveyed and is necessary to protect or advance the interests
of the United States in civil aviation, and that its sale or other disposal
will not materially and adversely affect the use, operation, or maintenance
of the airport at which the property is located. We seriously doubt that
there will ever be circumstances that would justify or support a determi-
nation that any land conveyed for revenue-producing purposes is no longer
needed to serve the purpose for which it was conveyed. In order to make
the required determination, the facts should disclose that (1) the owning
agency has been unable to obtain a reasonable amount of revenue from the
property by renting, leasing, etc., despite efforts of the owning agency
to exploit the property, and (2) at least fair value will be derived from
outright sale of the property and the amount thereof will exceed in amount
the revenue which could be expected to be derived from rentals, leases
or other use over a 15-to 20-year period of time. It should be borne
in mind that property conveyed for revenue-producing purposes at a
public airport should be continuously utilized for such purposes, if
possible. No releases of such property to permit sale thereof should be
granted under any circumstances other than (1) and (2) mentioned above.

## 6.140111   Revenue-Producing Property(Continued)

P. L. 80-289, which is the Act authorizing the disposal of property
needed to develop sources of revenue from nonaviation businesses at a
public airport, was approved July 30, 1947.  Therefore, no surplus air-
port property deeds issued prior to that date included revenue-producing
property in the conveyance.  The deeds issued subsequent to that date
may or may not have included such property in the conveyance.  However,
the deed itself does not differentiate between revenue-producing property
and strictly airport property.  Therefore, in considering requests for
releases of land, structures, or other improvements to permit sale thereof,
recourse should be had to the pertinent disposal reports and correspondence
to ascertain whether any of the property for which the release is requested
was recommended for conveyance as revenue-producing property.

Consent need not be obtained by the owning agency, and it is unnecessary
to grant a release to permit the owning agency to lease or rent revenue-
producing property for nonaviation purposes, since use of the property for
nonaviation purposes to obtain revenue was contemplated by the conveyance.
However, the leasing of revenue-producing property for nominal considera-
tion is violative of the obligations of the airport owner regarding such
property.  Furthermore, no release of obligation to use the property for
revenue-producing purposes to permit a lease for nominal consideration
should be granted.  The property should always be either producing
revenue or available for that purpose unless released for sale as
outlined hereinabove.

## 6.1402   Releases of Grant Agreement Obligations.  As a general rule,
requests for releases from Grant Agreement obligations involve a part
of the airport land in order that it may be used or disposed of by sale
or otherwise for other than airport purposes.  In some circumstances,
requests are received for consent to use buildings for nonairport
purposes for limited periods of time.  However, in most cases, the
period of time is of such length or duration that it will not expire
within what may be considered the "foreseeable future", insofar as
concerns the question as to whether the property will be needed for an
airport purpose within the foreseeable future.

In all cases where request is made for consent to sell or otherwise
dispose of land comprising a part of the airport or to lease land or
a structure on land for a period of time that extends beyond the
foreseeable future, such request should not be granted unless it can
be and is determined, on the basis of all pertinent facts and circum-
stances, that such land or building is not now and will not in the
foreseeable future be needed for any airport purpose.  In addition,
as is the case with the release of surplus airport land, the request

7/6/76                                                                    5190.6 CHG 1

## SECTION 3.  SURPLUS PROPERTY AGREEMENTS

### 121.  GENERAL.

a. Basic and General Policies and Procedures. Part 155 of the FAR's
sets forth the basic and general policies and procedures applicable
to all such agreements.  A copy of Part 155 should be available
for review by all owners of surplus airport property, particularly
upon a change in local administration or political office which
could affect the airport and its place in the community.  Changes
in surplus property agreements consistent with the purpose of the
FAA to foster the development, improvement, operation or maintenance
of a system of public airports or to foster a source of revenue
for such purposes from nonaviation business at public airports,
should be encouraged when it is in the public interest.

b. Authorized Uses of Surplus Property. Surplus airport property
agreements obligate the grantee owner to obtain the written
consent of the Administrator, FAA, to use, lease, sell, salvage,
or dispose of transferred airport property for other than airport
purposes.  Section 13(g) of the Surplus Property Act of 1944
(as amended by P.L. 80-289), in authorizing the conveyance of
surplus Federal property for airport purposes, includes--as within
such "airport purposes"-- the conveyance of property "needed to
develop sources of revenue from nonaviation businesses at a
public airport."  In administering the Act the FAA recognizes
a distinction between aeronautical property (aviation use) and
nonaviation-use property, both of which may be, and have been,
conveyed as serving an airport purpose (See definition in
paragraph 112.)  It is the position of the FAA that surplus
Federal property conveyed under the Act for airport purposes
may be used to support a nonaviation activity only if, among
other requirements, such use produces a reasonable income
available for the development, improvement, or operation of
public airport facilities.  No other use of such property, or
the income it produces was contemplated by the Act.

c. Property Identification. Very few older deeds of conveyance
separately identify revenue or nonaviation use property from
aviation use property.  The original application of the grantee and
the FAA (CAA) disposal report initially established which areas
of an airport were being recommended for transfer as revenue-
producing property and which for aviation use.  The current scaled
drawing referred to in paragraph 115b(3) reflects subsequent
FAA actions pursuant to the authority of P.L. 81-311.  Such
actions (e.g., approving a land-use plan for compliance purposes)
may confirm and/or modify the land usage authorized by initial
disposal and recommendations for specific areas of a surplus
airport.

Add. 25

5190.6   CHG 1                                                    7/6/76

    d.  Land Transferred Under Regulation 16, War Assets Administration.
        Prior to the amendment of the Surplus Property Act in 1947 by
        P.L. 80-289, surplus Federal properties were conveyed for airport
        purposes under the procedures of WAA Regulation 16.  This
        Regulation did not specifically identify those land uses coming
        within an airport purpose.  It did require that the building
        areas and nonaviation facilities shall be used only in a manner
        not to interfere with the efficient operation of the landing
        area.  The actual conveyances under this regulation vary in
        format but many of them stipulate that existing facilities
        may be used for compatible nonaviation purposes until such time
        as the FAA (CAA) decides they are needed for an aviation
        purpose.  The regulation and the conveyance documents are
        silent as to the income from such nonaviation use.  It is the
        position of the FAA that the usage contemplated by WAA
        Regulation 16 is no more extensive than that by P.L. 80-289.
        Consequently, a nonaviation use of property may be authorized only
        when it serves an airport purpose.  This purpose is served
        when the income from such property, including the net proceeds
        of a sale following release, is applied to the development,
        improvement, maintenance, or operation of a public airport.

122.  RELEASE FROM SPECIFIC CONDITIONS.

    a.  Industrial Use Restrictions.  Certain surplus property conveyances
        prohibit the use of the property as an industrial plant, factory
        or similar facility.  P.L. 81-311 repeals this prohibition.
        The FAA will issue needed releases or corrections to effect
        the elimination of such restrictions for record.  This does
        not authorize industrial use of land otherwise obligated
        and needed for airport aeronautical use purposes.

    b.  Reservation of Fissionable Material.  Many surplus property
        agreements reserve to the U.S. the right to explore for, mine,
        and extract fissionable material.  Section 68 of the Atomic
        Energy Act of 1954, as amended, released and quitclaimed to
        the grantees under such agreements all such rights.  The
        FAA will issue needed releases or corrections to effect the
        elimination of such reservations for the record.

    c.  Other Reserved Subsurface Interests.

        (1)  Minerals and Petroleum.  Some surplus property agreements
            reserve to the U.S. all subsurface minerals and petroleum
            other than fissionable materials.  It has been determined
            that the reservation of subsurface minerals and petroleum
            is not a covenant or restriction that may be released, conveyed
            or quitclaimed by the FAA under P.L. 81-311.  Disposition
            of this reservation is the responsibility of the Federal

Chap 6
                                                                 Par 121

Add. 26

agency controlling or having jurisdiction over reserved sub-
surface interests. Requests concerning such interests should
be referred to the controlling agency.

(2) Residual Interest. Routinely, in disposing of these reserved
mineral rights to an approved applicant, the GSA imposes a
prohibition against exploring for or extracting such minerals
or petroleum in any way that would interfere with the operation
and maintenance of the airport involved. Other Federal agen-
cies normally would do the same. Such an imposed prohibition
constitutes a residual interest in the subsurface minerals
retained by the Government which theoretically could be con-
veyed to the airport owner under P.L. 80-289. As a matter of
policy, the FAA will not recommend to GSA or another Federal
agency a conveyance to a grantee of the mineral rights reserved
to the U.S. (in a surplus airport property deed). In those
cases where GSA or another Federal agency has already conveyed
to other parties the mineral rights so conditioned, the FAA
will not recommend conveyance of the Government's residual
interest to the airport owner.

d. National Emergency Use Provision.

(1) The FAA may grant a release of this provision which is often
referred to as the recapture clause. However, concurrence
of the Department of Defense (DOD) must be specifically
requested and obtained by the FAA when the airport subject to
recapture is either listed in the current "Airports Required By
Department of Defense for National Emergency Use," list or has
a based Federal military aviation activity.

(2) If the only reason for requesting release of the National
Emergency Use Plan (NEUP) is an alleged difficulty in selling
bonds or attracting private capital, this should be clearly
established and documented. A mere statement is not enough.
There should be copies of letters from lending institutions or
bond brokers to support the allegation.

(3) For a release of the recapture clause, the airport owner must
provide two scaled drawings (see paragraph 115b(3) and (4)) and
two copies of other exhibits, as appropriate, for each DOD
Federal military activity (Army, USAF, Navy (including MCAS))
and USCG, listed in the currently applicable list or currently
based at the airport. The National Guard and the Air Guard
are not Federal military activities until mobilized by the
United States.

11/25/77

*     (4) When requested, the Office of Airports Programs will obtain the
required concurrence of the DOD upon submission of the summary
memorandum (see paragraph 115a) together with required copies
of scaled drawings and other exhibits specified above. The
region's request must indicate its determination to grant the
release if DOD concurs. Additionally, the Office of Airports
Programs, AAP-1, Attention: AAP-600, shall be provided one
complete set of scaled drawings and exhibits for headquarters
internal coordination and record purposes.         *

e. Reduction or Change in Aviation Use Property. Economic growth or
changes in aviation needs may make it desirable to convert dedi-
cated aviation use property to the status of revenue-production
property. The conversion may receive FAA approval provided the
present/future civil aviation needs are met or assured and the
public benefit in civil aviation is enhanced. Further, in all
such conversions, FAA shall require assurance that all such
converted property will be utilized to produce a fair return
for civil airport purposes consistent with its original con-
veyance and in support of the owner's endeavor to make the air-
port as self-sustaining as possible.

* f. Lease, Sale or Disposal Considering Intangible Benefits.

(1) Surplus Federal property conveyed to local public agencies
under the Surplus Property Act must be used for airport
purposes. As amended by P.L. 80-289 this statute recognizes
that the use of surplus property to generate revenues for
the airport from nonaviation business activity at the
airport is an authorized airport purpose. A use or lease
of such property with less than its fair rental value
accruing to the airport (or a sale and disposal of such
property for less than its appraised fair market value)
is inconsistent with the intent of the statute and shall
not be authorized. P.L. 81-311 empowers the FAA to
extend this concept on request to surplus airport property
conveyances antedating P.L. 80-289.

(2) In determining whether fair market value is to be received
from a proposed nonaviation use of surplus airport property,
the consideration need not be monetary. Thus, for example,
conveyance of a property interest in a right of way over
surplus airport land to a railroad or highway may be con-
sistent with the intent of the law if the resulting
trackage or roadway will directly benefit the airport or
enhance its efficiency or utility to a degree commensurate
with the value of the property involved. Therefore, the

value of these intangible benefits may be used as an offset against fair market value in determining the monetary consideration to be received for the property.

(3) Also, in the interests of equity, an exemption may be made in the case of property that was originally owned or acquired in fee simple title by the present airport owner then leased to the Government and subsequently reacquired for public airport purposes under the Surplus Property Act. In such instances property not otherwise needed to meet any present or foreseeable airport purpose may be leased or conveyed at less than fair market value for use that is completely compatible with the operation, maintenance, development and improvement of the airport.

g. Consent to Divert Excess Revenue from Surplus Property. The requirement to use surplus property assets for airport purposes also applies to the revenues derived therefrom. The approval of a lease for nonaviation purposes does not release the grantee from its obligation to apply the resulting income to the maintenance, operation and development of the airport. However, under P.L. 81-311, the FAA may, under certain circumstances, release a grantee from its obligation to devote such revenues exclusively to airport purposes. Approval may be given to divert to other public purposes excess revenues derived from surplus airport property when the following conditions have been met:

(1) The level of maintenance and quality of operating supervision provided to the airport is and has consistently been acceptable to the FAA as meeting the obligations of the grantee.

(2) There are no violations or defaults of the transfer deed or of subsequent agreements with the Government applicable to the airport.

(3) The FAA has determined (by appropriate review, especially of the NASP, airport layout plan, land-use plan, airport property map) that there are no foreseeable improvements, extensions, rehabilitations or additions to the capital plan that could result in improved aeronautical services to the public. Any release or approval to divert excess revenues under these conditions shall be specifically limited to past accumulations of income in excess of operating costs and shall not authorize further diversions of revenues subsequently received.

7/6/76

h. Release of Reverter Clause. Frequently, in order to promote
   private investment in airport facilities, the owners of surplus
   airports seek the removal of the provision giving the United States
   the option to revert title in the event of default. This is an
   important remedy intended to be reserved to the Government. In
   unusual circumstances such a proposal with full justification may
   be referred for individual consideration by FAA headquarters.

i. Release of Obligations for Property Not Received. The FAA may
   release an airport owner of all inventory accountability obliga-
   tions for specific items of property when it is determined that
   the items were not, in fact, received by the owner even though
   specified in the instrument of disposal.

123. TOTAL RELEASES FOR SALE, SALVAGE, RELOCATION, REMOVAL OR OTHER DISPOSAL.

a. Personal Property, Equipment, Structures or Facilities. Surplus
   airport property in these categories may be released from all
   inventory accountability (whether or not the airport at which
   it is located is included in the MRNAP or has a based Federal
   military aviation activity) whenever it has been determined that
   such property:

   (1) has outlived its useful life, has deteriorated beyond
       economical repair or rehabilitation, is no longer needed,
       has been replaced, is to be traded to obtain similar or
       other property needed for the airport; or

   (2) has been destroyed or lost by fire or other uncontrol-
       lable cause and the insured value, if any, has been
       credited to the airport fund; or

   (3) has been, or should be, removed or relocated to permit
       needed airport improvement or expansion including salvage
       or other use elsewhere on an airport.

b. Utility Systems (Includes Railroad Utilities).

   (1) Utility distribution systems may be released to permit
       demolition or other disposal when they have deteriorated
       beyond economical repair or are no longer needed for the
       airport. Also, where an airport owner is unable to
       maintain a utility system because of lack of adequately
       skilled personnel, financial ability, etc., it may be
       released from the terms, conditions, reservations and
       restrictions of any applicable surplus property instrument
       of disposal to permit conveyance of the system to a utility
       company for continued operation, provided the bill of sale
       includes the following provisions:

Chap 6
                                                            Par 122

Add. 30

7/6/76

5190.6 CHG 1

    (a) Utility services will be supplied to all present and
      future occupants of the airport; and

    (b) The Government shall have the option to lease or purchase
      the system under mutually acceptable terms upon military
      reactivation of the airport, and shall be granted right
      of entry and use of such system pending its acquisition
      from the utility company.

   (2) In the event the airport or the utility system is subject to
     the National Emergency Use Provision and the airport is either
     listed in the current MRNAP or has a based Federal military
     aviation activity, no release of a utility system, whether to
     permit demolition or a sale to a utility company, shall be
     granted until the DOD has advised FAA in writing that it has
     no objection to such release. If the airport is not listed in
     the MRNAP or does not have any based military activity,
     paragraph b(1)(b) above need not apply.

124. TOTAL RELEASE OF AIRPORT LAND.

  a. General Policy. Airport land is a valuable asset. A total release,
    permitting the sale and disposal of real property acquired for
    airport purposes under the Surplus Property Act, shall not be
    granted unless and until all other avenues and uses of such
    property to benefit civil aviation have been fully explored.

    (1) If any such property is no longer needed to directly support an
     airport purpose or activity (including the generation of revenues
     for the airport), it may be released for sale and disposal
     only upon a demonstration that such disposal will produce an
     equal or greater benefit (to the airport which it is a part or
     another public airport) than would the continued retention of
     the land. Such a release constitutes in effect an authoriza-
     tion to convert a real property asset into another form of
     asset (cash or physical improvements) which better serves
     the purpose for which the real property was initially conveyed
     This objective is not met unless an amount equal to the net
     proceeds of a sale of the property at its current fair market
     value is realized as a consequence of the release and such
     amount is firmly committed to be applied to airport purposes
     as outlined in this paragraph.

    (2) This policy does not apply when the release involves the land
     owned in fee by the sponsor and leased to the Federal Government
     for a term of years and then included with other properties as
     part of a surplus property agreement. In this case, there is
     no requirement for the disposition of the net proceeds from the

Add. 31

sale or disposal. However, the airport owner should be
encouraged to use the money for airport development.

b. Purpose of Release.

   (1) As indicated in paragraph 115b(2), the airport owner
requesting a release of surplus airport land must identify
and justify the reason for which the release is requested.
One such justification could be a showing that the expected
net proceeds of a sale of the property at its current
market value will be required to finance items of airport
development and improvement; the need for which is concurred
in by the responsible FAA official. In approving a release
on this basis, consideration will be given to the amount
of funds already accumulated from prior airport revenues
and the amount of land needed to be disposed of to adequately
finance the development or improvement items proposed.
Land will not be released merely to make it available for
private or public development regardless of its collateral
benefits to the community.

   (2) However, in some instances, the conversion of unneeded
airport land into a more productive asset may be justified
even though no specific items of airport development or
improvement are immediately required. At some airports,
for instance, land in excess of present and future aero-
nautical requirements does not and cannot generate adequate
revenues for the airport from rentals and leases in its
existing state. Frequently such land has a potential
market value if developed for specific nonaviation uses
far exceeding that indicated by its present rental value.
As an example, a tract of undeveloped land at an airport
may be capable of yielding only $1,000 a year as income
to the airport from agricultural or grazing leases.
Because of its location, it might have a current market
value of $50,000 for compatible industrial development.
The $50,000, if invested at 4 percent interest would
yield $2,000 or twice the present annual rental income.
Under these circumstances, a release and sale may be
justified as consistent with the terms of the original
conveyance if the proceeds are adequately protected
and accounted for.

c. Determining Land Values. The value to be placed on land for
which a release has been requested shall be based on the
present appraised value (for its highest and best use) of the
land itself and any Federal improvements initially conveyed
with the property. In many cases, the original buildings

and improvements may have been outlived their useful life and a
determination may have been made (by FAA) that no further obliga-
tion to preserve or maintain them exists. If they have been
replaced under such circumstances or if additional improvements
have been added without Federal financing, the value of such
improvements need not be included for purposes of determining
the financial commitment of a release granted under the guidance
in this paragraph. Also, intangible benefits, if any, must be
considered in determining this financial commitment.

d. Appraisals. With the exceptions noted in this subparagraph, a
release authorizing the sale and disposal of airport land shall
not be granted unless the fair market value has been supported
by at least one independent appraisal report. (See Uniform
Appraisal Standards for Federal Land Acquisition booklet for
guidance.) Additional appraisals by more than one appraisal
organization may be required by the FAA when it is deemed
appropriate. Appraisals shall be made by noninterested appraisers
qualified by experience and who have professional status as
appraisers of real property. If any appraiser is involved in
negotiations for the purchase or sale of the property or if
there is evidence of collaboration between appraisers, such
appraisal reports are invalid and shall not be considered by
FAA in determining the fair market value of the land involved.
The costs of obtaining the appraisals shall be borne by the
airport owner but may be considered as an offset to the proceeds
realized from a sale in determining net proceeds. (See paragraph
112d.) The requirement for an appraisal may be waived if the
responsible FAA official acting on the request for release
determines that:

   (1) The approximate fair market or salvage value of the property
       released is less than $1,000, or

   (2) The property released is a utility system to be sold to a
       utility company and will accommodate the continued airport
       use and operational requirements, or

   (3) It would be in the public interest to require public
       advertising and sale to the highest responsible bidder in
       lieu of appraisals.

e. Long-term Leases. Where it is determined necessary to establish
fair market value of land in connection with long-term leases of
the airport property, similar requirements for appraisal shall
prevail.

Add. 33

5190.6   CHG 1                                              7/6/76

f.  Application of Proceeds.

   (1)  Any release of airport land shall be subject to a firm
        commitment obligating the airport owner with respect to an
        amount equal to the net proceeds of a sale of the property
        at its current fair market value. Note that the actual
        proceeds realized are not controlling. Following a valid
        release the airport owner may discount the selling price
        or give the land away as a subsidy or inducement to
        attract industrial development or he may use the land
        for another local public purpose (city or county maintenance
        buildings, parks, etc.), provided it is compatible with the
        airport operations.                                      *

   (2)  An FAA release must, however, insure that the current value
        of the land asset previously dedicated to airport purposes is
        replaced by its equivalent value in new development or improve-
        ment at the airport or retained for such purposes while generat-
        ing interest or dividend income to operate the airport. This
        implies a contractual commitment, as consideration for the
        release, to apply an amount equal to the net proceeds of a
        fair market value sale to specified items of airport develop-
        ment and improvement.

   (3)  While the income from such an amount, where no immediate
        improvements are contemplated, may be used for current
        operation and maintenance of aviation-use airport property
        (see paragraph 112a) the obligated amount itself must be
        used for the following purposes in the order of priority
        indicated:

*      (a)  Eligible items of airport development set forth in       *
            FAR Part 152 (and as appropriate, in the NASP by
            priority of need) to be accomplished in accordance
            with currently applicable FAA design criteria.

       (b)  Any aeronautical items of airport development
            ineligible under the ADAP.

*      (c)  Deposit at interest in an identifiable account for
            deferred use within a reasonable time for items
            in priority (a) and (b) above. The interest or
            dividends from these deposits can be used for the
            current operation and maintenance of the aviation-
            use airport property.                                 *

       (d)  Retirement of airport bonds which are secured by pledges
            of airport revenue, including repayment of loans from
            other Federal agencies for such development.

Add. 34

        (e) Development of common use facilities and utilities of
            dedicated revenue production property of the airport.
            (See paragraph 124a(2) for exception.)

g. Issuance of Release. A release of land acquired as surplus Federal
property may be granted by a responsible FAA official under currently
delegated authority in accordance with the above guidance in this
paragraph. The record must show that:

    (1) The FAA has determined that such land and improvements are no
        longer needed for public airport purposes and that such release
        will not adversely affect the use, operation or maintenance of
        the airport.

    (2) A current scaled drawing or ALP, conforming to applicable design
        and safety criteria and reflecting the deletion of such land
        and improvements, has been approved by FAA.

    (3) DOD has consented to the release from the NEUP where the
        airport is included in the MRNAP or a Federal military
        aviation activity is currently based on the airport.

    (4) The release will encumber the property by reserving the
        rights and restrictions of paragraph 116c(3)(a) and (b).

    (5) The fair market value of the released property has been
        established.

    (6) The FAA has determined that sale of the property is more
        advantageous to civil aviation than its lease or rental.

    (7) There is a firm agreement binding the owner to expend within
        five years from the date of the release an amount equal to
        the current fair market value of the property reduced by the
        intangible benefit, if any, for specific improvements at the
        airport or another specified public airport. If the agreement*
        does not identify specific items of development within
        the priority categories listed in subparagraph f(3) above,
        the obligated amount must be deposited or invested in an
        income-producing account, the interest or dividends from
        which will be committed to airport use. In such cases,
        the principal amount may not be withdrawn without a further
        release by the FAA.

125.-134. RESERVED.

### SECTION 4.  GRANT AGREEMENTS

135. GENERAL. This Section covers the requirements and procedures to
release, cancel or modify any of the sponsor's assurances as contained
in a FAAP or ADAP grant agreement.

Add. 35

USCA4 Appeal: 25-1910     Doc: 34     Filed: 01/28/2026     Pg: 96 of 100

# CHAPTER 7.   RELEASE, MODIFICATION, REFORMATION OR AMENDMENT OF AIRPORT AGREEMENTS

## SECTION 1.   GENERAL GUIDANCE

**7–1. AUTHORITY TO RELEASE, MODIFY, REFORM, OR AMEND.**

   **a.** The authority of the Administrator to release, modify, reform or amend all or part of any airport agreement and the legislative basis for such authority are discussed in Chapter 1, paragraph 5 of this Order.

   **b.** The Administrator has delegated to regional Airports Division Managers full authority to take any action with respect to their functions and assigned responsibilities, subject only to the limitations set forth in Order 1100.5, FAA Organization–Regions and Centers, Chapter 2, Section 3.

**7–2.   GENERAL PRINCIPLES.**

   **a.** Within the specific authority conferred upon the Administrator by law, the FAA will, when requested, act to release, modify, reform or amend any airport agreement to the extent that such action will protect, advance, or benefit the public interest in civil aviation. Such action may involve only relief from specific limitations or covenants of an agreement or a complete and total release which authorizes a subsequent disposal of obligated airport property.

   **b.** Any property, when described as part of an airport in an agreement with the United States or defined by an ALP, is considered to be "dedicated" or obligated for airport purposes by the terms of the agreement. If any of the property so dedicated is not needed for present or future airport purposes, an amendment to or release from the agreement may be granted in accordance with the guidance contained in this Chapter. The omission of an airport from the NPIAS is not to be construed as a determination by the FAA that such airport has ceased to be needed for present or future airport purposes.

   **c.** A decision to release, modify, reform, or amend an airport agreement will be based on the guidelines outlined in paragraphs 7–37a and b below and on the specific factors pertinent to the type of agreement as detailed in the following sections of this Chapter. However, any release which has the effect of permitting the abandonment, sale, or disposal of a complete airport (whether or not such action contemplates the development of a replacement airport facility) must be referred to AAS–1 for ARP–1 approval (see Order 1100.5, Chapter 2, Section 3, paragraph 222h(15)).

**7–3.–7–5.   RESERVED.**

## SECTION 2.   SURPLUS PROPERTY AGREEMENTS

**7–6.   GENERAL.**

   **a. Basic and General Policies and Procedures.** FAR Part 155 contains procedures which must be followed to release airport property from surplus property disposal restrictions contained in the conveyance instrument. Owners of surplus airport property should be advised to consult this regulation whenever changes in property use are being contemplated. Changes to surplus property instruments, consistent with the purpose of fostering and promoting the development, improvement, operation or maintenance of the airport are encouraged by the FAA.

   **b. Authorized Uses of Surplus Property.** Section 13(g) of the Surplus Property Act of 1944 (as amended by P.L. 80–289) authorizes conveyance of surplus federal property for "airport purposes." Refer to paragraph 4–18 and Appendix 5 for a discussion of both aeronautical property (aviation use) and nonaviation property use for revenue production.

   **c. Property Identification.** Very few older deeds of conveyance separately identify nonaviation revenue use property from that transferred for aviation use. The original application for the property and the FAA's (CAA) disposal report initially established these areas. They may now differ however, as the result of changed land use plans approved by the FAA pursuant to the authority of P.L. 81–311 (see paragraph 4–18e). For compliance purposes, it is important to verify changes subsequent to the initial conveyance that has been approved by the FAA.

   **d. Land Transferred Under Regulation 16, War Assets Administration.** Prior to the amendment of the Surplus Property Act in 1947 by P.L. 80–289,

surplus Federal properties were conveyed for airport purposes under the procedures of WAA Regulation 16. The conveyance documents under this regulation vary in format but many of them stipulate that existing facilities may be used for compatible nonaviation purposes until such time as the FAA decides they are needed for an aviation purpose. The regulation and the conveyance documents are silent as to the income from such nonaviation use. Income from such property, including the net proceeds of a sale following release, must be applied to the development, improvement, maintenance, or operation of a public airport.

**7–7.  RELEASE FROM SPECIFIC CONDITIONS.** The FAA will issue needed releases or corrections to effect the elimination of the restrictions which may have been repealed or modified by laws enacted subsequent to the Act, such as:

**a.  Industrial Use Restrictions.**  This restriction is contained in certain surplus property conveyances which prohibit the use of the property as an industrial plant, factory or similar facility. P.L. 81–311 repealed this prohibition.

**b.  Reservation of Fissionable Material.**  This reservation is contained in many surplus property agreements which reserve to the U.S. the right to explore for, mine, and extract fissionable material. Section 68 of the Atomic Energy Act of 1954, as amended, released and quitclaimed to the owner all such rights.

**c.  Other Reserved Subsurface Interests.**

(1)  **Minerals and Petroleum.**  Some surplus property agreements reserve to the U.S. all subsurface minerals and petroleum other than fissionable materials. It has been determined that these reservations may not be released, conveyed or quitclaimed by the FAA under P.L. 81–311. Requests concerning these interests will be referred to the Federal agency controlling or having jurisdiction over them.

(2)  **Residual Interest.**  Routinely, in disposing of these reserved mineral rights to an approved applicant, the GSA imposes a prohibition against exploring for or extracting such minerals or petroleum in any way that would interfere with the operation and maintenance of the airport. Other Federal agencies would normally do the same. This has the effect of retaining for the Government a residual interest in the subsurface minerals which theoretically could be conveyed to the airport owner under P.L. 80–289. As a matter of policy, the FAA will not recommend to GSA or another Federal agency that the mineral rights reserved to the U.S. (in a surplus airport property deed) be transferred. In those cases where GSA or another Federal agency has already conveyed to other parties the min-

eral rights so conditioned, the FAA will not recommend conveyance of the Government's residual interest to the airport owner.

**d.  National Emergency Use Provision (NEUP).**

(1)  The FAA may grant a release of this provision which is often referred to as the recapture clause. However, concurrence of the DOD must be specifically requested and obtained by the FAA when the airport is listed in the current "Airports Required By Department of Defense for National Emergency Use," (see Chapter 13 of current edition of Order 5190.2, List of Public Airports Affected by Agreements with the Federal Government (RIS: AS 5190–1)).

(2)  When requesting a release of the recapture clause, the airport listed in Chapter 13 of Order 5190.2 must provide FAA with five scaled drawings and two copies of other exhibits. The regional Airports office will forward the documentation required in paragraph 7–6a to AAS–300 along with four scaled drawings and one copy of the exhibits for processing to DOD.

(3)  Upon receipt of the DOD concurrence, AAS–300 will forward the determination to the regional Airports office for release of the NEUP.

**e.  Release of Reverter Clause.**  Frequently, in order to promote private investment in airport facilities, the owners of surplus airports seek the removal of the provision giving the United States the option to revert title in the event of default. This is an important remedy intended to be reserved to the Government and will normally be released. Any such proposal shall be referred to AAS–300 for consideration.

**f.  Release of Obligations for Property Not Received.**  The FAA may release an airport owner of all inventory accountability obligations for specific items of property when it is determined that the items were not, in fact, received by the owner even though specified in the instrument of disposal.

**7–8.  RELEASE FOR SALE OR DISPOSAL.**

**a.  General Policy.**  A total release, permitting the sale and disposal of real property acquired for airport purposes under the Surplus Property Act, shall not be granted unless it can clearly be shown that the sale of such property will benefit civil aviation.

(1)  If any such property is no longer needed to directly support an airport purpose or activity (including the generation of revenue for the airport), it may be released for sale or disposal upon a demonstration that such disposal will produce an equal or greater benefit (to the airport or another public airport) than

the continued retention of the land. Such a release has the effect of authorizing the conversion of a real property asset into another form of asset (cash or physical improvements) which better serves the purpose for which the real property was initially conveyed. This objective is not met unless an amount equal to the net sale proceeds based on the current FMV of the property is realized as a consequence of the release and such amount is committed to airport purposes.

(2)  In cases where an airport has a large amount of revenue production property that has remained undeveloped due to the lack of demand for this kind of property and where there appears to be no prospect for future development, FAA should fully evaluate the merits of either reversion or complete release for sale. This must be coordinated with AAS–300.

**b. Sponsor Owned Land, Leased to Federal Government During WW II, and Deeded Back Via P.L. 80–289.** The FMV requirement discussed in paragraph 7–8a(1) above does not apply when the release involves land owned in fee, leased to the Federal Government for a term of years and then included with other properties and improvements conveyed back to the owner in a surplus property deed. In this case, there is no requirement that the owner account for the net proceeds from the sale or disposal of this particular property. However, FAA should encourage the use of the money for airport development.

**c. Purpose of Release.**

(1)  As indicated in paragraph 7–3b(2), the airport owner requesting a release of surplus airport land must identify and justify the reason for which the release is requested. One such justification could be a showing that the expected net proceeds from the sale of the property at its current market value will be required to finance items of airport development and improvement; the need for which is concurred in by FAA. In approving a release on this basis, consideration will be given to the amount of funds already accumulated from prior airport revenues and the amount of land needed to be disposed of to adequately finance the development or improvement items proposed.

(2)  FAA recognizes that in some instances, the conversion of unneeded airport land into a more productive asset may be justified even though no specific items of airport development or improvement are immediately required. This occurs at some airports, for instance, where land in excess of present and future aeronautical requirements does not and cannot generate adequate revenues for the airport from rentals and leases in its existing state. Frequently such land has a potential market value (if developed for specific nona-

viation uses) far exceeding that indicated by its present rental value. As an example, a tract of undeveloped land at an airport may be capable of yielding only nominal income to the airport from agricultural or grazing leases. Because of its location, it might have a much greater value for compatible industrial development. The proceeds from the sale, if invested at current interest could yield considerably more than its annual rental income. Under these circumstances, a release and sale may be justified.

**d. Monetary Consideration.** A sale and disposal of airport property for less than its FMV is inconsistent with the intent of the statute and shall not be authorized except as discussed in paragraph b. above. See paragraph 7–9 for information on application of sale proceeds.

(1)  In determining FMV for a proposed nonaviation use of surplus airport property, the consideration need not be monetary. The value of intangible benefits may be used as an offset against FMV in determining the monetary consideration to be received for the property. For example, conveyance of a property interest in a right–of–way over surplus airport land to a railroad or highway may be consistent with the intent of the law if the resulting track or roadway will directly benefit the airport or enhance its efficiency or utility to a degree commensurate with the value of the property involved. Where intangible benefits are included in the FMV determination, the airport owner must submit:

(a)  a plan identifying the intangible benefits to be derived by the airport,

(b)  the amount attributed to the intangible benefits, and

(c)  the merit of its application as an offset against the FMV in arriving at the monetary consideration.

(d)  A plan reflecting the current and future needs for AIP funding of projects. FAA will review the information and make a determination as to the reasonableness of the proposal.

(2)  **Determining Land Values.** Subject to the conditions in (1) above, the value to be placed on land for which a release has been requested shall be based on the present appraised value (for its highest and best use) of the land itself and any Federal improvements initially conveyed with the property. In many cases, the original buildings and improvements may have outlived their useful life and a determination may have been made by FAA that no further obligation to preserve or maintain them exists. If they have been replaced under such circumstances, or if addition-

al improvements have been added without Federal financing, the value of such improvements need not be included for purposes of determining the financial commitment of a release granted under the guidance in this paragraph.

(3) **Appraisals.** With the exceptions noted in this subparagraph, a release authorizing the sale and disposal of airport land shall not be granted unless the FMV has been supported by at least one independent appraisal report determined to be acceptable by the FAA. Appraisals shall be made by noninterested and qualified real estate appraiser. If any appraiser is involved in negotiations for the purchase or sale of the property or if there is evidence of collaboration between appraisers, such appraisal reports are invalid and shall not be considered by FAA in determining the FMV of the land. The cost of obtaining appraisals shall be borne by the airport owner but may be considered as an offset in determining net proceeds (Appendix 5) realized from the sale. The requirement for an appraisal may be waived if the FAA determines that:

(a) The approximate fair market or salvage value of the property released is less than $25,000, or

(b) The property released is a utility system to be sold to a utility company and will accommodate the continued airport use and operational requirements, or

(c) It would be in the public interest to require public advertising and sale to the highest responsible bidder in lieu of appraisals.

(4) FAA employees must be sensitive to local economic conditions in the airport's geographical area when they are reviewing FMV issues. The fluctuation in economic conditions can cause considerable variation in FMV at a given time and in a given location.

e. **Consent to Divert Excess Revenue from Surplus Property.** See discussion of Income Accountability under paragraph 4–20c and d.

**7–9. APPLICATION OF PROCEEDS.**

a. FAR Part 155.7(d) requires that any release of airport land to permit its sale or disposal shall be subject to a written commitment obligating the airport owner with respect to an amount equal to the net proceeds of a sale of the property at its current FMV. FAA shall not issue a release without this commitment.

Following a release by FAA based on such a commitment, the airport owner may discount the selling price or give the land away as a subsidy or inducement to attract industrial development or other purposes, provided they are compatible with the airport operations.

b. The net proceeds realized for the sale of surplus property, or the equivalent amount, must be placed in an identifiable interest bearing account to be used for the purposes listed in c. below. The interest and dividends can be used for the operation and maintenance of the aeronautical portion of the airport or, with the concurrence of FAA, the revenue producing property, if it can be clearly shown to enhance the revenue production capability of that property.

c. The obligated amount itself must be used for one or more of the following purposes as agreed to by FAA and reflected in the supporting documentation for the deed of release:

(1) Eligible items of airport development set forth in the current Airport Grant Program and reflected in the airport's Capital Improvement Program (CIP).

(2) Any aeronautical items of airport development ineligible under the grant program.

(3) Retirement of airport bonds which are secured by pledges of airport revenue, including repayment of loans from other Federal agencies for such development

(4) Development of common use facilities, utilities, and other improvements on dedicated revenue production property that clearly enhance the revenue production capabilities of the property.

d. All aeronautical improvements funded by proceeds from such sale will be accomplished in accordance with current applicable FAA design criteria or such State standards that have been approved by the FAA.

**7–10. RELEASES INVOLVING PERSONAL PROPERTY, STRUCTURES OR FACILITIES.**

a. **General Requirements.** Surplus airport property in these categories may be released from all inventory accountability (whether or not the airport at which it is located is included in Chapter 13 of the current edition of Order 5190.2) when it has been determined that such property:

(1) has outlived its useful life.

(2) has deteriorated beyond economical repair or rehabilitation.

(3) is no longer needed.

(4) has been replaced.

(5) is to be traded to obtain similar or other property needed for the airport; or

(6) has been destroyed or lost by fire or other uncontrollable cause and the ensured value, if any, has been credited to the airport fund; or

(7) has been, or should be, removed or relocated to permit needed airport improvement or expansion including salvage or other use elsewhere on an airport.

**b. Utility Systems (Includes Railroad Utilities).**

(1) Utility distribution systems may be released to permit demolition or other disposal when they have deteriorated beyond economical repair or are no longer needed for the airport. Also, where an airport owner is unable to maintain a utility system because of lack of adequately skilled personnel, financial ability, etc., it may be released from restrictions of any applicable surplus property instrument of disposal to permit conveyance of the system to a utility company

for continued operation, provided the bill of sale includes the following provisions:

(a) Utility services will be supplied to all present and future occupants of the airport; and

(b) The Government shall have the option to lease or purchase the system under mutually acceptable terms upon military reactivation of the airport, and shall be granted right of entry and use of such system pending its acquisition from the utility company.

(2) In the event the airport or the utility system is subject to the NEUP and the airport is listed in Chapter 13 of the current Order 5190.2, no release of a utility system, whether to permit demolition or a sale to a utility company, shall be granted until the DOD has advised FAA in writing that it has no objection to such release.

**7-11.-7-15.  RESERVED.**

## SECTION 3.  GRANT AGREEMENTS

**7-16.  GENERAL.**  This section covers the requirements and procedures to release, cancel or modify any of the sponsor's conditions or assurances as contained in a FAAP/ADAP/AIP grant agreement.

**7-17.  RELEASE FROM SPECIFIC CONDITIONS OR ASSURANCES.**

**a. Maintenance Obligation Release.**  A release may be granted to an airport owner to remove the obligation to maintain specific areas of an airport. (See paragraph 7-37c(5).)

**b. Consent to Permit Interim Use.**  The FAA may consent to the interim use for nonaviation purposes of dedicated aeronautical property whether or not acquired with grant funds. Such consent or approval must be based upon a determination that the property as a whole has not ceased to be used or needed for airport purposes within the meaning of the applicable statute. Consent to such use may be granted under the guidelines outlined in paragraph 7-37a.

**c. Abandonment, Demolition or Conversion of Grant Funded Improvements, Other Than Land.**

(1) Paragraph 2-3 of this Order points out that the sponsor/owner obligation under a FAAP/ADAP/AIP grant agreement remains in full force and effect throughout the useful life of the facilities improved under such FAAP/ADAP/AIP project, but in any event not to exceed the 20-year life of the grant agreement except for the privately-owned airport

which requires that the useful life of the improvements will be at least 10 years. This does not apply to land purchased or reimbursed under the grant programs, which has no such 20-year limitation. The FAA has legally determined that the useful life of an airport or airport facility may be determined to have expired when it is no longer used or needed for the purpose for which it was developed, or if the physical useful life of the facility has expired.

(2) The physical useful life of such a facility extends only during the time it is serviceable and useable with ordinary day-to-day maintenance, and is not extended by reconstruction, rehabilitation or major repair of that facility. Under the foregoing guidelines, the determinations as to the expiration of the useful life and physical useful life of such facilities (see paragraph 2-3) is a responsibility of the regional Airports offices.

(3) Releases to permit abandonment, demolition or conversion to another compatible use of FAAP/ADAP/AIP developed or improved facilities shall be approved or granted provided the appropriate regional Airports office determines that:

(a) The grant agreement involved has expired, or

(b) the facility in question is no longer needed for the purpose for which it was developed under FAAP/ADAP/AIP, or

Add. 40